UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RASHAD AHMAD REFAAT EL BADRAWI | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| | : | **3:07-CV-01074-JCH** |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DEPT. OF HOMELAND SECURITY, ET AL. | : | |
| *Defendants* | : | **September 10, 2010** |

## DEFENDANTS' RULE 56(a)1 STATEMENT

The defendants, Dept. of Homeland Security, Charles Lee, Albert Pitts and Thomas McGrail hereby submit their Local Rule 56(a)1 Statement in Support of their Motion for Summary Judgment.

1. The plaintiff, Rashad El Badrawi, is a citizen of Lebanon and Egypt and a practicing Muslim who attended school and worked in the United States from approximately 1995 to 2004. (Pl. depo. 22).

2. Plaintiff is a highly educated professional; he has an undergraduate degree from the American University in Beirut, Lebanon, a master's degree in Pharmaceutical Sciences from Northeastern University, and a master's degree in Information systems from Northeastern University. (Pl. depo. 22).

3. Plaintiff was also admitted to two separate Ph.D. programs at Northeastern University in Pharmacology and a Ph.D. program in Computer System Engineering. (Pl. depo. 40-41).

4. Plaintiff is "highly educated," fluent in English, and "somewhat social" (Pl. depo. 11, 38, 42).

5. Before beginning his employment at UConn Health Center ("UConn"), plaintiff worked at two other companies in the United States: Proteome in the Boston area and Curagen in New Haven, Connecticut. (Pl. depo. 26).

6. In June 2003, plaintiff was hired at UConn where he continued to work as a researcher until approximately 2004 and plaintiff was close with some of his co-workers there.  (Pl. depo. 28, 30, 108).

7. Plaintiff suffers from Crohn's disease, a disease that is an inflammation of the gastrointestinal tract. (Pl. depo. 47; Exhibit 24, p.2).

8. Plaintiff was first diagnosed with Crohn's disease in 1996 at age 27 by Dr. Gail Kaufman, a physician in Boston, Massachusetts and his Crohn's has been stable since 1996. (Pl. depo. 48-49, 53-54, 59).

9. Dr. Kaufman diagnosed plaintiff's Crohn's disease as a "mild" case and prescribed 400 milligrams of Asacol taken as six tablets as day. (Pl. depo. 55-56).  Dr. Kaufman also advised plaintiff to avoid stress. (Pl. depo. 57, 65).

10. Later treating physicians concurred with Dr. Kaufman's diagnosis of a mild case of Crohn's disease. (Exhibit 26).

11. Since the onset of Crohn's disease, plaintiff has experienced infrequent "flare up" episodes of his Crohn's disease. (Pl. depo. 58).

12. From 1996-2000, plaintiff experienced fewer than ten minor episodes of Crohn's disease, a minor episode being one that involves moderate pain and lasting less an hour or less, (Pl. depo. 58, 60).

13. From 1996-2000, plaintiff experienced no major episodes of Crohn's disease, a major episode being one that involved abdominal pain for more than hour, some bleeding and difficulty digesting. (Pl. depo. 58, 61).

14. From 2000-2003, plaintiff experienced a "handful", approximately five, minor flare up episodes. (Pl. depo. 62).

15. From 2005-2007, plaintiff experienced five minor flare up episodes and no major episodes. (Pl. depo. 62).

16. Plaintiff believes emotional stress and stress at work triggered, or contributed to, his flare up episodes. (Pl. depo. 63).

17. Plaintiff does not obtain his prescribed medication, Asacol, through a drug store near his home or work or through mail order - but instead gets his medication in Lebanon while he is there on a visit. (Pl. depo. 65).

18. Plaintiff pays for his prescription medication in cash. (Pl. depo. 69).

19. Plaintiff did not produce records of his prescription medication in this litigation.

20. Plaintiff does not know where he obtained his Asacol from when he resided in Hartford, Connecticut. (Pl. depo. at 76).

21. Plaintiff was born in a Sunni Muslim family and continues to practice that faith. (Pl. depo. 80).

22. Plaintiff abstains from drugs, alcohol and pork products and prays five times a day and occasionally attends a mosque (Pl. depo. 81, 83- 84).

23. Plaintiff usually goes to Friday services every week and only misses Friday prayer services if he is ill or far from a location where a prayer service is offered. (Pl. depo. 84-85).

24. When Plaintiff resided in Connecticut, he did not attend a mosque in Connecticut but would go to Friday prayer services at chapel at UConn.  An Imam would not preside at the UConn Friday prayer service, which lasted only ten minutes. (Pl. depo. 86-87).

25. Plaintiff has observed the Muslim Holy Month of Ramadan since the age of 10. (Pl. depo. 93).  Ramadan is the Muslim Holy Month during which Muslims are required to fast during daylight hours, and abstain from material pleasures, among other practices-fasting is the main requirement of observing Ramadan. (Pl. depo. 88-89).

26. A Muslim is suffering from a medical condition, he or she is excused from fasting. (Pl. depo. 92).

27. During the Ramadan fast, a Muslim is required to eat and drink only before dawnand after sunset. (Pl. depo. 94, 113).

28. In 2004, Ramadan occurred from October 14, 2004 to November 13, 2004. (Exhibit 15).

29. On October 29, 2004, at approximately 8:00 a.m., federal Immigration and Customs Enforcement (ICE) officials arrested plaintiff outside his apartment in Hartford, Connecticut in his parking garage as he prepared to leave for work.  (Docket # 83, ¶ 2, Pl. depo. 100-101).

30. Federal officials arrested plaintiff on charges that he violated federal immigration laws. (Docket # 83, ¶ 51).

31. The State of Connecticut and the individual state defendants were not involved in the decision to arrest or detain plaintiff or the actual arrest.

32. Plaintiff was initially detained at a federal building in Hartford and remained there until the evening of October 29, 2004.

33. Throughout the day of the 29th, plaintiff believed he was going to be released by federal official on bail because a federal official had told him several times that day that he would be released, and had advised him to contact a bail bondsman. (Pl. depo. 107).

34. While at the federal building in Hartford, plaintiff contacted his supervisors at UConn and apprised them of his arrest by the federal officials. (Pl. depo. 105).

35. In the afternoon or evening of October 29, 2004, plaintiff was told by a federal official that he would not be released that day but would instead be transferred to Hartford Correctional Center (HCC) that evening. (Pl. depo. 107).

36. Plaintiff was transported alone in a van to Hartford Correctional Center between 5-6 p.m. on October 29, 2004. (Pl. depo. 110-111).

37. Plaintiff was initially put in room with forty other prisoners and/or pretrial detainees at HCC. (Pl. depo. at 114).

38. Plaintiff had his picture taken and was asked some questions, but he does not remember what those questions were. (Pl. depo. 114).

39. Plaintiff was searched, he showered and was issued some HCC property, such as inmate clothing, a mattress and personal hygiene products. (Pl. depo. 118).

40. Plaintiff was very confused throughout the HCC admission process. (Pl. depo. 114).

41. Plaintiff does not recall who he spoke with at HCC during the admission process. (Pl. depo. 115).

42. Plaintiff did not ask for a meal and does not recall telling any HCC personnel or federal official that he was observing Ramadan or that he had not eaten that day.  (Pl. depo. 115).

43. Plaintiff was shocked, depressed and confused at this time and his mind was not clear and this may have contributed to his failure to inform any official that he was fasting for Ramadan. (Pl. depo. 110, 115-116).

44. Plaintiff underwent the medical intake process at HCC, which included a mental health and physical health screening and evaluation. (Pl. depo. 120, 125; Lee Decl. ¶ 12; Exhibits 1-4).

45. During his mental health screening, plaintiff told the mental health nurse that he had a history of depression. (Exhibit 2).

46. Plaintiff told the medical nurse that the suffered from Crohn's disease and took the medication Asacol. (Pl. depo. 126; Exhibits 1-3).

47. The nurse noted on plaintiff's medical record that plaintiff had not taken his Asacol since October 2, 2004, twenty-seven (27) days before his admission to HCC. (Exhibit 1).

48. CMHC did not stock Asacol onsite in the HCC medical unit and the nurse faxed the request for Asacol to the pharmacy at UConn that night.

49. Plaintiff felt stressed during his intake, and he does not recall if he said anything about Ramadan to the medical or mental health intake nurses. (Pl. depo. 125, 128).

50. Plaintiff was not mistreated by any of the HCC intake or admission personnel during his intake. (Pl. depo. 128).

51. Plaintiff found the entire experience of being arrested, detained by the federal officials and then transported to HCC "too shocking, too intimidating" and was overwhelmed by this situation. (Pl. depo. 116).

52. The HCC admission process lasted 3-4 hours, and plaintiff was brought to his housing unit, Dorm 3, between 9-9:30 p.m. (Pl depo. 118-119, Exhibit 22).

53. The HCC personnel on the housing unit did not mistreat plaintiff upon his arrival to the housing unit. (Pl. depo. 120).

54. After plaintiff arrived at Dorm 3, he told another inmate that he was in pain and the inmate alerted a Dorm 3 correction officer.

55. The correction officer responded to the complaint and brought plaintiff to the HCC medical unit. (Pl. depo. 131; Exhibit 22).

56. At the medical unit, plaintiff spoke with an African-American female nurse and told her he was "beginning to have serious pain" and that he had brought medication for his Crohn's disease to HCC. (Pl. depo. p. 132).

57. Plaintiff understood from federal officials that his medication was going to be brought to HCC. (Id. at 109).

58. The nurse informed plaintiff that she did not have documentation that indicated he should be taking medication and said he should see doctor. (Pl. depo. 132).

59. Plaintiff was returned to his cell. (Pl. depo. p. 133).

60. Plaintiff does not recall what steps he took on his first full day in HCC, Saturday, October 30, 2004, to obtain a Ramadan meal accommodation or prescription medication.

61. Plaintiff believes he had a meal on Saturday and went to the HCC dining hall that day. (Pl. depo. 134).

62. Plaintiff does not recall if spoke with any correction officer in dining hall on Saturday morning during breakfast about obtaining a Ramadan meal accommodation but he thinks he "probably… started talking about it on that day." (Pl. depo. p. 135).

63. During the plaintiff's incarceration at HCC the regularly scheduled evening meal for his dorm occurred after sunset so plaintiff did not require a schedule accommodation for the evening meal in order to observe Ramadan. (Pl. depo. 136).

64. On Sunday, October 31, 2004, plaintiff experienced abdominal pain after he awoke. (Pl. depo. 137).

65. Plaintiff was unable to eat due to pain and he does not recall eating any meals on Sunday. (Pl. depo. 137).

66. Plaintiff does not recall if he spoke to any HCC personnel about fasting for Ramadan on that Sunday. (Pl. depo. 137).

67. Plaintiff does not recall hearing of any religious services announcements at HCC on that Sunday. (Pl. depo. 138).

68. Plaintiff does recall hearing announcements meals and in the morning.  (Pl. depo. 134, 138).

69. Plaintiff thinks that at one time he may have mentioned fasting or "something like that" to a correction officer. (Pl. depo. 139).

70. Plaintiff received orientation to HCC on Monday November 1, 2004.

71. Orientation is a scheduled a presentation provided to all new inmates at HCC by several HCC personnel on a variety of subjects, including but not limited to, medical care programs available at HCC, religious programs, how to make an inmate request using an inmate request form, and how to file an inmate grievance. (Lee Decl. ¶ 44; Exhibit 11).

72. The HCC "orientation counselor" covers the topic addressed in the HCC handbook. (Pitts Decl. ¶ 14).

73. Plaintiff recalls that orientation was held in the HCC dining hall and that multiple HCC personnel made presentations during orientation but he does not recall the day orientation was held.  (Pl. depo. 139, 141-142).

74. Plaintiff also does not recall the name of any HCC staff who conducted orientation or how many inmates were in the room during orientation or how long it lasted. (Id. 143).

75. Plaintiff thinks he completed forms at orientation but does not remember what forms he completed.  (Pl. depo. 141; Exhibits 8-9).

76. Plaintiff signed a document stating that he had received the HCC handbook. (Pl. depo. 141-142; Exhibit 8).

77. Plaintiff testified at his deposition that he was not provided a handbook at orientation and does not remember whether he ever received a HCC handbook. (Pl. depo. 141, 144).

78. Plaintiff learned about the grievance process during orientation. (Pl. depo. 147).

79. The topic of religion was discussed at orientation. (Pl. depo. 145).

80. The HCC handbook makes clear that there are religious personnel at HCC and that those personnel oversee religious programs. (Exhibit 11).

81. Plaintiff completed a form at orientation identifying his religion as Islam. (Pl. depo. 145; Exhibit 9).

82. Plaintiff did not saying anything to the HCC staff person to whom he submitted his religious designation form at orientation, or informing the HCC staff person that he was fasting for Ramadan. (Pl. depo. 148).

83. HCC Chaplains usually attend orientation and make a short 5-8 minute presentation about religious programs during orientation. (Pitts Decl. ¶ 14).

84. Religious programs are always discussed at orientation even if a Chaplain is not present. (Avci depo. 78-79; Pitts Decl. ¶ 14; Bruno Decl. ¶ 19).

85. Sister Loretta Sullivan, an HCC chaplain, was on duty at HCC that day and toured plaintiff's housing unit, Dorm 3, that day. (Exhibit 23, p.2).

86. Plaintiff did speak to anyone about Ramadan at orientation. (Pl. depo. 148).

87. Plaintiff did not ask a Chaplain or orientation counselor at orientation for a Ramadan meal accommodation.

88. Plaintiff could have completed a Ramadan sign-up form at his orientation or requested one. (Avci depo. 84).

89. Plaintiff learned about the inmate request form process from inmates and correction officers during the first few days at HCC.  (Pl. depo. 146-147).

90. Plaintiff completed an inmate request form on November 1, 2004 requesting the prescription medication Asacol. (Exhibit 5).

91. When plaintiff first arrived at HCC, he did not understand the prison environment and did not understand what the term "orientation" meant. (Pl. depo. 139).

92. Plaintiff purposely avoided contact with other people while at HCC including other inmates and correction officers. (Pl. depo. 156).

93. Plaintiff had no visitors and made no phone calls and did not seek out inmates with questions while he was at HCC. (Pl. depo. 133-134, 156).

94. Plaintiff spent most of his time sitting in his cell. (Pl. depo. 155-156).

95. Plaintiff did not purchase food or other items at the HCC commissary, did not open an inmate trust account, and did not use the HCC library. (Pl. depo. 155).

96. Plaintiff could have purchased food in the HCC commissary.

97. On October 29, 2004, the CMHC intake nurse faxed a request for Asacol for plaintiff to UConn. (Exhibit 4).

98. A CMHC nurse noted in the medical notes that plaintiff had not taken Asacol since October 2, 2004. (Exhibit 1).

99. Plaintiff started to experience pain on October 29, 2004 after he entered his Dorm. (Pl. depo. p. 179).  Plaintiff believes the pain was caused, at least in part, by the stress he was experiencing from being arrested. (Pl. depo. p. 179).

100. That night, plaintiff was seen by a CMHC nurse in the medical unit and later returned to his cell.

101. Plaintiff did not request that his name be added to the "sick call" list at HCC.

102. Plaintiff filled out an inmate request form requesting Asacol for his Crohn's disease on November 1, 2004. (Pl. depo. 170; Exhibit 5).

103. On Wednesday, November 3, 2004, a CMHC nurse delivered a thirty day supply of Asacol to plaintiff's housing unit and plaintiff was permitted to keep the Asacol "on his person" (Exhibit 6, p.1).

104. On November 12, 2004, plaintiff was seen by Dr. James McKenna, a CMHC physician, at HCC. (Pl. depo. p. 180; Exhibit 7).

105. Plaintiff cannot recall if he was already receiving Asacol when he met Dr. McKenna on November 12, 2004. (Pl. depo. 180).

106. Dr. McKenna did not note a report of severe pain by plaintiff. (Exhibit 7).

107. A report of severe pain would be relevant to Dr. McKenna's course of treatment of plaintiff's Crohn's disease because severe abdominal pain could indicate a serious medical problem and could require further tests to rule out a more serious condition. (Exhibit 24, p.6).

108. Plaintiff was unable to fast for Ramadan because of the "flare up" of his Crohn's disease. (Pl. depo. 176-177).

109. Even if he had been added to the Ramadan List upon entering HCC, plaintiff made not have fasted due to his Crohn's disease. (Pl. depo. 176-178).

110. Plaintiff never filed a medical grievance or an emergency medical grievance while he was at HCC. (Pl. depo. 179).

111. Warden Lee did not supervise medical personnel at HCC.  (Lee Decl. ¶ 13, Exhibit 14).

112. Warden Lee referred all medical issues to the CMHC Health Services Administrator (HSA) for HCC, Sharon Brown. (Lee Decl. ¶¶ 6, 15).

113. Warden Lee was not aware of how long CMHC took to provide medication to individual inmates but understood CMHC's practice to be as soon as possible and always within medically acceptable timeframes.  (Lee Decl. ¶ 28).

114. Through a Memorandum of Understanding between the Department of Correction and the University of Connecticut, healthcare for all inmates is provided by the University of Connecticut Correctional Managed Healthcare ("CMHC"), a subdivision of the University of Connecticut Health Center.  (Lee Decl. ¶ 13, Exhibit 14).

115. CMHC provides medical, dental and mental health services to all inmates as well as ancillary services including radiology, laboratory, pharmaceutical, hospitalization/inpatient care, outpatient/medical clinic care, and physician specialty care and Warden Lee does not supervise medical care. (Exhibit 14, Exhibit 24, p. 5).

116. CMHC personnel provided all medical care to plaintiff at HCC, including the mental health and medical screening of plaintiff at the time of his admission to HCC and that CMHC personnel are not employees of the DOC. (Exhibits 14).

117. Warden Lee had no direct knowledge of any of plaintiff's requests for medical care.

118. There is no evidence that Warden Lee had actual knowledge of a problem at HCC regarding undue delay in inmate's receipt of prescription medication for chronic or acute medical problems.

119. There is no evidence that Warden Lee had any knowledge of plaintiff being at HCC, until this lawsuit, or that he had any knowledge of his medical needs. (Lee Decl. ¶ 29).

120. Plaintiff never directly brought his problem to the attention of Warden Lee.  He never wrote to him, filed a grievance, spoke with Warden Lee when he toured Dorm 3. (Lee Decl. ¶¶ 28, 29).

121. HCC custody personnel responded appropriately to plaintiff's request for medical treatment when they escorted him to the medical unit when he complained of pain on October 29, 2004 and by instructing him on how to complete an inmate request form regarding his Asacol request on or near November 1, 2004.  (Exhibit 5, Pl. depo. 176).

122. Plaintiff's only requests for medical care to HCC custody staff or to CMHC staff were:
1) his statement to CMHC intake staff that he took Asacol; 2) his visit to the medical unit
on October 29, 2004; 3) and submission of an inmate request form on November 1, 2004.

123. Correction officers did not ignore a request by plaintiff for medical care.

124. Correction officers did not ignore a request by plaintiff to be placed on the HCC daily
"sick call" list.

125. Plaintiff did not inform any of the HCC Captains, Majors or Lieutenants, who toured
Dorm 3 that he was in severe or excessive pain and needed to see a physician.

126. Plaintiff purposely avoided contact with other inmates and staff at HCC.

127. Plaintiff had difficulty understanding prison protocol and procedure.

128. The unrebutted expert testimony, which is based upon plaintiff's own medical records
and testimony, is that the abdominal pain he alleges would not have been caused by four
days of missed dosages of Asacol. (Exhibit 24, p. 5 ¶ 2).

129. Plaintiff has adduced no expert medical testimony that would establish that the four day
delay in receiving Asacol caused the flare-up of his Crohn's disease or that plaintiff
would not have experienced the flare-up anyway because of the external stress and
anxiety of being suddenly and indefinitely incarcerated.

130. Plaintiff does not know whether CMHC personnel failed to deliver his Asacol before
November 3, 2004 due to negligence, oversight or because of the notation in plaintiff's
records that he had not taken Asacol for 27 days before arriving at HCC.

131. October 29, 2004, the date of plaintiff's admission to HCC, was the approximate half-
way point of the Muslim holy month of Ramadan.

132. Plaintiff did not request a Ramadan meal accommodation during the HCC intake process
or otherwise apprise the medical staff or HCC intake staff that he was fasting or had not
eaten all day.

133. The formal policy within the DOC, and within HCC, in 2004 permitted newly admitted
and transferred inmates to join the Ramadan List even if Ramadan had already begun.
(Bruno Decl. ¶ 26).

134. There was no sign up deadline in the Ramadan Guidelines issued by the Director of Religious Services, Father Bruno, in 2004 because there was no sign up deadline at all.

135. In order to participate in Ramadan in 2004 and present, an inmate must have: 1) previously designated his religion as Islamic, and 2) sign the Ramadan sign-up form in the presence of a Chaplain. (Bruno Decl. ¶¶ 26, 32;  Pitts Decl. 19-21).

136. The year following plaintiff's incarceration at HCC, in 2005, the DOC instituted a sign-up deadline for Ramadan for reasons of administrative ease.  (Bruno Decl. ¶ 33; Pitts Decl. ¶ 3).

137. At some point, plaintiff learned that there was a Ramadan List for inmates who were fasting for Ramadan. (Pl. depo. 165).

138. Plaintiff did not see any other inmates in Dorm 3 receive a bag breakfast delivered to their cell before dawn. (Pl. depo. 166).

139. Plaintiff did not require a meal schedule accommodation for the evening meal because his dorm went to the dining hall after sunset. (Exhibit 15).

140. Plaintiff did not learn of the existence of a Ramadan sign-up form at HCC and he did not ask anyone if there was such a form. (Pl. depo. 167).

141. DOC policy in 2004 required inmates who wanted to fast for Ramadan complete a Ramadan sign-up form. (Bruno Decl. ¶¶ 26-27, 32; McGrail Decl. ¶ 6).

142. Only inmates who complete the form and sign it in the presence of a Chaplain are permitted to join the Ramadan List. (Bruno Decl. ¶¶ 26-27, 32; McGrail Decl. ¶ 6).

143. Warden Lee had no direct involvement in running religious programs at HCC and he had no direct involvement in establishing religious policy.  (Pitts Decl. ¶ 7, Lee Decl. ¶ 32)

144. Religious policy at HCC was established by the Director of Religious Services in the DOC headquarters through the DOC Commissioner.  (Bruno Decl. ¶ 7).

145. Warden Lee's involvement in religious issues was relegated to religious issues that intersected with facility safety and security concerns, such as religious garments, articles and the scheduling of inmate collective religious activities throughout the facility.  (Lee Decl. ¶ 32).

146. At some point, plaintiff spoke with HCC personnel about joining the Ramadan List. (Exhibit 25, p.3).

147. Plaintiff believes he "probably" made three requests to join the Ramadan List. (Pl. depo. 167).

148. Plaintiff recalls asking a blond correction officer about fasting for Ramadan because he had been told by another inmate that this blond correction officer had a reputation for being helpful.  (Pl. depo. 167).

149. The blond correction officer directed plaintiff to speak with someone of higher authority than him and told plaintiff that he would have to "start at the top" with his request for a meal accommodation. (Exhibit 25, p.5).

150. Plaintiff did not take any further steps to "start at the top" with his request for a Ramadan meal accommodation.

151. Plaintiff does not know whether he ever put a Ramadan meal schedule accommodation request in writing. (Pl. depo. 170).

152. In his responses to interrogatories, plaintiff indicated that all his requests were verbal. (Exhibit 25, p.5).

153. Plaintiff did make a written request for a "common fare" diet but is uncertain about when he made the request. (Pl. depo. 157).

154. That request was "probably" made after Ramadan ended on November 13, 2004.  (Pl. depo. 157).

155. Plaintiff does not recall how much time elapsed between his submitting the inmate request form for the common fare diet, and when he began receiving a common fare diet. (Pl. depo. 158).

156. When plaintiff was in the HCC dining hall, he did not speak to inmates who are employed on the kitchen staff in the dining hall about a desire to get on the Ramadan List. (Pl. depo. 153).

157. Plaintiff never filed a grievance relating to Ramadan. (Pl. depo. 171).

158. Plaintiff contends he was not aware of grievance process at HCC. (Pl. depo. 171).

159. Plaintiff did not observe any mailboxes in the housing units for different subject areas, such as grievances or religion, but he might have seen a box in his housing unit. (Pl. depo. 171-172).

160. Plaintiff's housing unit has a series of mailboxes for inmates to send correspondence on topics such as: medical, food services, religion, physical education, library, grievances, warden. (Lee Decl. ¶ 20).

161. Plaintiff did not place written correspondence in the "religious" mailbox located in his housing unit regarding his Ramadan request.

162. Plaintiff also did not observe the postings in his housing unit regarding religious programming.

163. Religious programming information, including Ramadan sign-up information and the listing of religious staff and medical staff were posted in Dorm 3. (Lee Decl. ¶ 49; Pitts Decl. ¶ 15; Bruno Decl. ¶ 20).

164. Plaintiff was unaware that HCC had religious personnel on staff. (Pl. depo. 169).

165. The fact that religious personnel were on staff at HCC was discussed at orientation, noted in posting in the HCC housing units and covered in the HCC handbook. (Lee Decl. ¶¶ 44, 53, 54; Pitts Decl. ¶¶ 14-15; Bruno Decl. ¶ 20; Exhibit 11).

166. Plaintiff never spoke with Warden Lee when the Warden toured his housing unit, Dorm 3, never wrote a letter or inmate request to Warden Lee.

167. Plaintiff did not speak with any HCC supervisory custody staff – captains, lieutenants, or majors – about his request when they toured his unit.

168. HCC held religious programs for Muslim inmates during those first three weeks of plaintiff's detention there, such as Taleem and Jumah, and that those programs were announced on his unit either through a loud voice or over an intercom.

169. If plaintiff had spoken with any religious personnel at HCC during Ramadan, he would have likely been placed on the Ramadan List almost immediately and no later than the length of time it took the chaplain to verify his religious designation as Muslim; consult with the IRF; and travel to the kitchen to add plaintiff's name to the kitchen's Ramadan List.

170. Plaintiff was extremely shocked and anxious about being suddenly arrested, uprooted from his life and employment in Connecticut, and detained by federal officials for what could have been an indeterminate period of time.

171. Plaintiff experienced some abdominal pain due to extreme anxiety and stress and an alleged flare -up of his Crohn's disease when he first entered HCC.

172. Plaintiff's pain and other symptoms prevented him from fasting during Ramadan after he entered HCC.

173. Plaintiff does not recall ever seeing any religious personnel on tours in Dorm 3 during this time there. (Pl. depo. 165, Exhibit 23).

174. HCC religious personnel routinely toured HCC housing units. (Lee Decl. ¶ 56; Pitts Decl. ¶17; Exhibit 23).

175. Chaplains were announced when they arrived at his unit by custody staff and wore clothing and items that clearly identified them as clergy; that information regarding religious programs at HCC was posted in Dorm 3.

176. During his first weeks at HCC, plaintiff did not request a Quran or a prayer rug. (Pl. depo. 157). Plaintiff later received a Quran from the Muslim Chaplain at a November meeting in the Chaplain's office. (Pl. depo. 156-157).

177. Plaintiff first saw HCC religious personnel approximately three weeks after his arrest, and about a month before his December 22, 2004 release from HCC.

178. On or about November 22, 2004, plaintiff met with the Islamic Chaplain, Imam Avci[1], in the Chaplain's office. (Pl. depo. 159).

179. Plaintiff did not know that there was a part-time Imam or Muslim Chaplain at HCC until this meeting. (Pl. depo. p. 160).

180. Before he learned there was an Imam on staff at HCC, plaintiff did not request meeting with any Chaplain. (Pl. depo. p. 165).

---

[1] Although plaintiff could not recall the name of the Imam with whom he spoke in November 2004, Durmas Avci, was the only Islamic Chaplain assigned to HCC in 2004 and has worked as an Islamic chaplain in the DOC since 2003. Plaintiff did remember that the Imam had a Turkish accent and Imam Avci is a native of Turkey. (Exhibit 25, p.5; Avci depo. 10).

181. Plaintiff was also not aware that Imam Avci, or another DOC Imam, conducted weekly Friday Jumah services at HCC until after he met with Imam Avci and Imam Avci told plaintiff about the Jumah services. (Pl. depo. p. 160-161).

182. Plaintiff also doesn't recall learning about or attending Taleem, or Islamic religious studies, those first three weeks and he never attended Taleem at HCC.

183. Plaintiff attended Jumah only two or three times during the entire time he was at HCC, which was October 29, 2004 to December 22, 2004. (Pl. depo. 161).

184. Instead of attending Jumah, plaintiff would pray inside cell. (Pl. depo. p. 162).

185. On one occasion, when he requested to go to a Friday Jumah service, a correction officer declined to release him go to Jumah initially because he did not know Jumah was scheduled, but after plaintiff "insisted" he be permitted to go he was released to attend Jumah. (Pl. depo. 163).

186. Plaintiff does not know how the one meeting with Imam Avci was scheduled, but he recalls the meeting lasted approximately one half-hour. (Pl. depo. p. 172).

187. During the meeting, plaintiff complained to Imam Avci that he had not been able to fast for Ramadan. (Pl. depo. p. 173).

188. Plaintiff may have complained to Imam Avci about the delay in receiving his medication. (Pl. depo. 173).

189. Plaintiff believes he "might" have told Imam Avci that his Crohn's disease hindered his ability to fast during Ramadan. (Pl. depo. 174).

190. Plaintiff was not put on the Ramadan List because he did not speak with a Chaplain during Ramadan. (Avci depo. 71, line 16 – 72, line 13).

191. Imam Avci would have put plaintiff on the Ramadan list if plaintiff attended Jumah services on November 5, 2004 and spoken to Imam Avci. (Avci depo. 81, line 1 – 10).

192. Plaintiff testified at his deposition that Imam Avci confirmed what he had heard from the unnamed correction officer: that he was required to be at HCC from beginning of Ramadan in order to be allowed to join the Ramadan List. (Pl. depo. 173).

193. Imam Avci would have put plaintiff on the Ramadan List in November 2004 if he had come to him during Ramadan. (Avci depo 72, line 8).

194. Imam Avci and others put newly admitted inmates on the Ramadan List after the start of Ramadan in 2004.  (Avci depo. 97, lines 10-21, p 112; Pitts Decl. ¶ 9; McGrail Decl. ¶ 8; Exhibit 17)

195. Other Chaplains could have put plaintiff on the Ramadan List in 2004.

196. Chaplains of other religious denominations carried Ramadan sign-up sheets with them during Ramadan and assisted Muslim inmates with signing up for Ramadan. (Avci depo. 113-114).

197. Plaintiff never met Warden Lee, Reverend Pitts, or Thomas McGrail while he was incarcerated at HCC and does not know if he ever saw them there. (Pl. depo. 187-188).

198. Thomas McGrail had no role in determining who was put on the Ramadan List, was not aware of plaintiff at HCC, did not supervise any correction officer and simply worked in the HCC kitchen preparing the food served to inmates. (McGrail Decl. ¶¶ 6, 10 ).

199. Each defendant toured HCC housing units. (Pitts Decl. ¶ 17; McGrail Decl. ¶ 10).

200. Plaintiff never complained to Warden Lee about either a medical issue or religious issue.

201. Plaintiff does not know if anyone informed Warden Lee, Reverend Pitts or Thomas McGrail about his desire for a Ramadan meal accommodation. (Pl. depo. 188).

202. Plaintiff found it too difficult to learn about the complaint process or Ramadan sign-up processes on his own. (Pl. depo. 188).

203. Plaintiff did not inquire further about his Ramadan request or in writing with the individuals who oversaw that program because he believed he was "going through what that system tells me." (Pl. depo. 169).

204. There is no record of grievances from inmates at HCC who were denied access to the Ramadan List because they entered HCC during Ramadan. (Avci depo. 104, line 11).

205. The Director of Religious Services and the Islamic consultant retained by the DOC had never heard of a complaint involving a new inmate was kept off the Ramadan List because he entered a facility after the start of Ramadan before this complaint. (Bruno Decl. ¶¶ 39, 41-42).

206. DOC Imams review the Ramadan Guidelines and suggest changes to address problems of concerns they may have. (Exhibit 29).

207. Imams reviewed the Guidelines in 2003 and did not request language regarding imposition of a deadline or a need for clarification that new inmates could join the Ramadan List. (Exhibit 29).

208. Imams employed by the DOC meet and confer frequently to discuss the religious practices of Muslims in the DOC and have no reservations about voicing any concerns they may have or problems they learn about. (Exhibits 28-29).

209. DOC Imams have never reported to Father Bruno that there was a problem at HCC with new inmates receiving a Ramadan meal accommodation. (Bruno Decl. ¶ 39).

210. There is no evidence of a widespread practice of new inmates being denied access to the Ramadan List.

211. Plaintiff was removed from HCC by federal officials on December 22, 2004.  On the day of his release, CMHC personnel noted that they provided plaintiff with a supply of Asacol, (Exhibit 6).

212. Plaintiff never filed an inmate grievance regarding either his medical care or religious practices.

213. Plaintiff has not attempted to obtain a visa to enter the United States for at least three years. (Pl. depo. 192).

214. Even if plaintiff was provided a visa to come to the United States, he may choose to decline to enter the District of Connecticut. (Pl. depo. 192).

Respectfully Submitted,

DEFENDANTS
CHARLES LEE, ALBERT PITTS and
THOMAS MCGRAIL

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:/s/*Maura Murphy Osborne*

Maura Murphy Osborne
Assistant Attorney General
Federal Bar No. ct19987
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5020
Fax: (860) 808-5347
Maura.MurphyOsborne@ct.gov


## CERTIFICATION


I hereby certify that on September 10, 2010, a copy of the foregoing Motion For Summary Judgment Rule 56(a)1 Statement was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/*Maura Murphy Osborne*
Federal Bar No. ct19987
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5020
Fax: (860) 808-5347
Maura.MurphyOsborne@ct.gov