UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RASHAD AHMAD REFAAT EL BADRAWI | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | 3:07-CV-01074 (JCH) |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DEPT. OF HOMELAND SECURITY, ET AL. | : | |
| *Defendants* | : | DECEMBER 6, 2010 |

### STATE DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

The defendants, Charles Lee, Albert Pitts and Thomas McGrail, ("State Defendants") hereby file their reply brief in further support of their motion for summary judgment.

Plaintiff arrived at Hartford Correctional Center (HCC) in the evening on Friday, October 29, 2010 and underwent an intake process that involved multiple interactions and screenings by HCC security personnel, Correctional Managed Health Care (CMHC) medical personnel and CMHC mental health personnel. Plaintiff did not ask for a Ramadan meal accommodation upon entering HCC, although he purportedly had not eaten since the early morning hours of that day. Plaintiff states in his declaration that he made his requests for a Ramadan meal accommodation within the first two days of entering HCC. Accepting that testimony as true, as the Court must at this juncture,

plaintiff requested and was refused a Ramadan meal accommodation on Saturday October 30th and possibly also on Sunday October 31st. Plaintiff declares that one or possibly three different unnamed HCC personnel told him that he could not join the Ramadan List for fasting Muslim inmates because he had arrived at HCC midway through Ramadan. Plaintiff also avers that, as a result of these denials of his meal accommodation request, he suffered "severe distress" due to these HCC personnel "prevent[ing] from" observing Ramadan. (Pl. Decl. Docket 383-1, ¶ 25).

While plaintiff's distress and outrage about these alleged three denials of his right to the free exercise of his religious observation was undoubtedly the impetus behind his commencement of this federal lawsuit nearly three years later, they were not sufficiently strong in November 2004 to cause him to speak up at an orientation meeting specifically targeted to answering inmate's questions about HCC and informing new inmates about services and programs available to them. Nor did plaintiff seek out a supervisory HCC personnel or religious personnel while Ramadan was being observed at HCC. On Monday, November 1, 2010, plaintiff received his orientation to HCC during which the topic of religious observance at HCC was specifically addressed. He signed a form acknowledging receipt of the HCC handbook which also covers the topic of religion and instructs inmates that there are religious staff at HCC, (although plaintiff now claims that, despite his frequent memory gaps on other topics, that he knows for sure he did not receive an HCC handbook at orientation). Plaintiff even completed an inmate request form on a topic unrelated to Ramadan – his request for Asacol - on November 1, 2004.

At orientation, plaintiff completed a religious designation form designating his religion as Islam. He did not note on the form that in addition to being Muslim he also wished to fast for Ramadan. According to plaintiff's affidavit, at the time plaintiff attended this orientation, he had received at least one of his "denial" responses from one of the unnamed HCC correction officers and perhaps all three "denials" – plaintiff does not clarify precisely when the other two denials occurred. Orientation was an ideal opportunity for plaintiff to raise this question of observing Ramadan, but for some inexplicable reason he neglected to do so. If plaintiff had received only one denial by an unnamed HCC staff member prior to orientation, then it would seem peculiar to simply accept that as the HCC policy and remain silent at a orientation when religion was being specifically discussed and forms related to religion are being distributed and completed and then <u>later</u> seek out other seemingly less well informed unnamed HCC personnel and ask the question of them a second or third time <u>after</u> specifically failing to do so at orientation. If plaintiff had already received all three "denials" by unnamed HCC personnel at the time he had his orientation on Monday, then his constitutional harm now alleged was complete. Therefore, it would seem strange for plaintiff to remain completely silent when faced with deprivation of his rights of such a magnitude that three years later he concluded was sufficiently serious that litigation was warranted. At a minimum, a reasonable person in plaintiff's situation would have noted his request for a Ramadan meal accommodation on his religious designation form at that time or complete an inmate request form regarding Ramadan similar to the inmate request form that plaintiff

completed requesting his medication on that very same day, Monday, November 1, 2004. Unfortunately, plaintiff did not do so.

At a minimum, plaintiff's failure to properly avail himself the appropriate avenues for making his Ramadan request, deprives this Court of any basis to conclude what HCC personnel would have done if plaintiff had properly raised the issue to HCC personnel through completion of a Ramadan sign-up form, an inmate request form, or an even an inmate grievance. Plaintiff's sparse testimony regarding the alleged denials also deprives this Court with an adequate record upon which to reach any conclusion about the nature of the alleged "denials." What plaintiff asked from these unnamed HCC personnel and what they said in response is simply unknowable since plaintiff cannot recall with any degree of detail or clarity and he cannot identify the HCC personnel. Plaintiff's affidavit, like his deposition testimony, is devoid of any detail about what he said and what words were said to him by the three unnamed HCC personnel. Since plaintiff has not adduced sufficient facts to demonstrate what precisely he said to these unnamed HCC personnel; what they understood his request to be; what they understood his status to be; whether the HCC personnel properly understood that he was a new inmate; or whether the HCC personnel were aware of his religious designation there is no basis for a finder of fact to conclude with any degree of certainty whether these HCC personnel actually understood what plaintiff was asking for or what they were intending to convey to plaintiff. All of these unknowns preclude plaintiff from meeting his burden of proof, preclude this Court

from finding any of the defendants' personally liable both on the merits and on the grounds of qualified immunity.

The situation plaintiff alleges to have experienced at HCC is precisely the type of situation that calls out for some administrative process prior to the filing a federal lawsuit. Deterring unnecessary federal litigation, and providing prison officials with an opportunity to remedy errors by correction officers, are two of the reasons why Congress enacted the Prisoner Litigation Reform Act (PLRA) to require inmates to exhaust administrative remedies prior to bringing an action under Section 1983 or any other federal statute. 42 U.S.C. § 1997e. The Second Circuit has interpreted the PLRA's exhaustion requirement to apply to only those lawsuits commenced by inmates while "confined in" a prison. *Greig v. Goord*, 169 F.3d 165 (2d Cir. 1999).

> [T]he language of § 1997e(a)--as well as that of § 1997e(h)--does not literally apply to [plaintiff]. Section 1997e(a) purports to limit actions brought by "a prisoner confined" in specified correctional facilities, and § 1997e(h) further defines the word "prisoner" to mean a person "incarcerated or detained" in a facility. Appellees do not contend that Greig was "confined," "incarcerated," or "detained" at the time he filed this action.

*Id.* at 167.

While the Second Circuit's decision in *Greig*, appears to indicate that the plaintiff's failure to take advantage of the administrative remedies available to him at HCC is not necessarily fatal to his Section 1983 claim, his neglect to do so is still material to his claims. Plaintiff's failure to take reasonable steps to determine what the

actual policy was at HCC regarding newly admitted inmates ability to join the Ramadan List is relevant to the ultimate issue of whether he can establish the liability of the individual defendants on this Section 1983 claim.

Moreover, the *Greig* decision supports defendants' claim that plaintiff cannot commence a RLUIPA action against the individual defendants after he ceased to be "confined" in HCC. RLUIPA provides that, "[n]o government shall impose a substantial burden on the religious exercise of a person <u>residing in</u> or <u>confined to</u> an institution, as defined in section 2 of the Civil Rights of Institutionalized Persons Act (42 U.S.C. 1997)…" 42 U.S.C. § 2000cc-1 (underscore added). RLUIPA directly incorporates the definition of "person" at issue in the *Greig* case.

Reading RLUIPA in the present tense, to require the plaintiff to be "residing in or confined to" a prison or institution at the time he commences his action, is the interpretation most faithful to the text of the statute; most consistent with Congress' overall policy goals in enacting RLUIPA and the PLRA; and, when applied to the facts of cases such as this one, which at its core is a negligence claim, is the only logical way a "government" could reasonably be permitted an opportunity to defend itself regarding whether it: 1) intended to impose a burden through a law or policy, 2) had a compelling governmental interest in imposing the alleged burden, and 3) imposed the burden in the most narrowly tailored manner possible to advance its compelling interest.

Interpreting RLUIPA in the present tense is the best interpretation because that is how Congress wrote the statute. The language "confined to" is nearly identical to the language the Second Circuit interpreted in *Greig*. Moreover, plaintiff himself successfully argued in this litigation for a narrowed "present tense" reading of another statute:

> The use of the present tense is significant. The U.S. Supreme Court has explained that the legislature's "use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992); *see also Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002) (rejecting an interpretation of a statute that runs counter to basic rules of grammar). The Supreme Court has also construed the present tense of a statute to require that the conditions described in a statute existed at the time the suit was filed. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003); *Gwaltney v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57-59 (1987). Thus, the use of the present tense is significant and, courts have held, does limit the meaning of laws to the present.

(Pl. Reply Br. In Supp. Mot. To Compel Production from State Defendants, Docket #125, p. 11).

A present tense interpretation of RLUIPA is also consistent with Congress' twin policy goals of seeking to ameliorate substantial burdens on religious practices in institutions through the availability of injunctive and declaratory relief against institutions that receive federal funds. The burden shifting provisions of RLUIPA make it more likely that plaintiffs will be able to obtain swift injunctive and declaratory relief upon a showing of "substantial burden." The burden shifting provision of RLUIPA also makes it more likely that Congress intended a prisoner seeking to bring a claim under RLUIPA first seek to address the alleged "substantial burden" on his religious practices within the

institution. Requiring a prisoner seeking to bring a RLUIPA claim to utilize available administrative remedies properly weeds out those claims of burden arising out of oversights or negligence, where there is no intent, policy or law that seeks to impose a burden on any religious practice and no real governmental policy or practice at issue. *See e.g. Lovelace v. Lee*, 472 F.3d 174, 195 (4th Cir. 2006) ("Allowing negligence suits to proceed under RLUIPA would undermine this deference by exposing prison officials to an unduly high level of judicial scrutiny.")

The facts of the instant case demonstrate why RLUIPA claims should <u>not</u> be commenced years after a prisoner's confinement has ceased. Plaintiff could not identify any of the personnel he alleges denied his request for a meal accommodation; he could provide no meaningful context for what he said to these HCC personnel when he made his request; what exactly they said in response to him; with whom he spoke to at his orientation, and no DOC official had any recollection of plaintiff being at HCC. In short, DOC, the named defendants and this Court have no basis upon which to determine whether any HCC personnel intentionally or negligently provided him with misinformation about his ability to join the Ramadan List. The prison grievance process and inmate request form procedures are adapted to address and get to the source of problems such as the ones alleged by plaintiff and quickly remedy them. As defendants explained at length in their opening brief and in their multiple declarations, there is no real dispute that had plaintiff properly made a request to an HCC chaplain for a Ramadan

meal accommodation by speaking with the chaplain, completing a Ramadan sign-up form, or even raised the issue at orientation where chaplains routinely participate, his request would have likely been granted almost immediately.

Plaintiff attempts to create disputes of material fact by asserting without support that the 2004 Ramadan statistics which indicate two inmates were added to the Ramadan List in 2004 does not in fact support such a conclusion.  As defendants note in their opening brief, Imam Durmas Avci, the person who created that document, specifically recalled adding new people to the Ramadan List in 2004, his first year at HCC.  Plaintiff asserts that Imam Avci must be mistaken in his recollection about 2004 because Father Bruno and Reverend Pitts interpret the term "transfer" to not include inmates new to the DOC.  Plaintiff's characterization of Father Bruno's testimony and Reverend Pitt's is both not accurate and irrelevant.  Imam Avci created the 2004 Ramadan statistics document that plaintiff relies upon and he specifically recalled adding new inmates to the Ramadan List in 2004 and other years. Moreover, plaintiff's half-hearted statistical comparison of the difference between Ramadan statistics in the years 2004-2006 is so lacking in proper scientific support, and expert testimony, and also ignores the fact that the 2007 Ramadan statistics indicate that there were no added inmates during that year. (See Exhibit A).  Plaintiff's dubious inference from a comparison of three years' statistics is unsupported and should be discredited by this Court.

Plaintiff's theory of liability under both Section 1983 and RLUIPA is one of "gross negligence" and not an intentional policy or practice. While plaintiff objects to the standard used by defendants in their analysis of his "failure to train claim," (Pl. Opp. 32), plaintiff does not advocate for a materially different standard other than to prefer the terminology "gross negligence." Plaintiff fails to elaborate on why the standard in *Walker v. City of New York* and *Green v. City of New York* is inapt in this case other than to discredit it because it is derived from the *Monell* line of municipal liability cases. Many courts in this district and this Circuit, including this one, have applied the standards from municipal liability *Monell* cases to claims involving state actors and vice versa.

> It appears to the court that the standard for "deliberate indifference" as an element of a claim for municipal liability is the same as the standard for "deliberate indifference or gross negligence" as an element of a claim of personal liability.

*Shirback v. Lantz*, 2008 U.S. Dist. LEXIS 25840 (D. Conn. 2008) (Hall, D.J.)(citing *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

While plaintiff may discount defendants' reliance on *Green* and *Walker*, he offers no assistance to the Court for why supervisory liability of a municipality or municipal official should be analyzed differently than supervisory liability for an individual supervisor employed by the state. Defendants do not see support for a distinction in either logic or the application of the standards in cases in this District and Circuit. First, there is no obvious basis in logic for utilizing different standards or factors in analyzing "supervisory liability" based upon whether the supervisor works for a municipality, or is

a municipality or is employed by the state and plaintiff provides none. Many cases in this district use the terms "gross negligence" and "deliberate indifference" interchangeably. *Atwood v. Town of Ellington*, 468 F. Supp.2d 340, 353 n. 6 (D. Conn. 2007). ("While "gross negligence" and "deliberate indifference" have been used interchangeably in the supervisory liability context…). Even *Beatty v. Davidson*, 713 F. Supp. 2d 167 (W.D.N.Y. 2010), the recent district court decision cited by plaintiff in his opposition brief, (Pl. Opp. Br. p. 32), the district court employs language in defining "gross negligence" that is practically the same as the Section 1983 "deliberate indifference" standard:

> The Second Circuit equates gross negligence with recklessness, defining it as "the 'kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" *Poe*, 282 F.3d at 140 n. 14 (quoting *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991)). Simple negligence is not enough to establish personal involvement for the purposes of supervisory liability. *Davidson v. Cannon*, 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

*Beatty*, 713 F. Supp. 2d at 177.

The facts of this case are fall so far short of either the "gross negligence" or "deliberate indifference" standard that this Court need not take great pains to consider whether applying one standard versus the other would affect the outcome of this case. The test for "deliberate indifference" set forth in *Green* and *Walker* provides more

meaningful guidance to this Court in determining whether additional training was constitutionally mandated than the general standard of "gross negligence;" any theoretical distinction between "gross negligence" and "deliberate indifference" that may exist is of no moment in this case.

Warden Lee was not "grossly negligent" or "deliberately indifferent" in failing to provide training to correction officers regarding Ramadan, beyond the training that they already received which is detailed in defendants' opening papers, because he was not aware of any issues relating to difficulties encountered by new inmates joining the Ramadan List. He reasonably deferred to the DOC's Director of Religious Services, Father Bruno, and the Institutional Religious Facilitator at HCC, Reverend Pitts, in establishing and implementing all religious programs. Not surprisingly, Warden Lee only became involved in religious issues if a program or policy impacted safety and security at HCC or if a specific issue was brought to his attention by an inmate or staff. Plaintiff seriously mischaracterizes the import of Warden Lee's deposition testimony in which he testified that correction officers did respond to questions regarding religious programs. Warden Lee did not testify that he authorized or encouraged correction officers to respond to policy questions, but instead that a correction officer need not refuse to answer a question about a religious program if he can address it. In any event, Warden Lee clearly never authorized or encouraged correction officers to provide information about which a correction officer was unsure or unknowledgeable and he never received notice that correction officers were providing incorrect information about

12

religious programs related to Ramadan or any religion. Plaintiff's assertion, (Pl. Br. pp. 22-23, n. 10), that the lack of a record of grievances at HCC regarding Ramadan is attributable to the fact that HCC grievances were "thrown away" is a patent falsehood. Plaintiff's counsel well knows, or at least should at this point in the litigation, "grievance" is a term of art in the prison context; all grievances at HCC were and are carefully catalogued and retained at HCC, that plaintiff's counsel was provided with grievance logs dating back years before and also after 2004, and that a grievance counselor searched boxes of grievances at HCC for any that pertained to Ramadan and none did.

  Plaintiff makes a series of allegations that Thomas McGrail refused to "temporarily" remove an inmate from the Ramadan List. (Pl. Opp. Br. pp. 41-42). Even if McGrail did refuse to "temporarily" remove an inmate who had been determined to have broken the fast, this case has absolutely nothing to do with inmates who sought to be reinstated to the Ramadan List after been found to have violated the Ramadan guidelines. There is also no evidence to support a claim that McGrail was personally involved in any act related to plaintiff. Plaintiff also insinuates some discriminatory bias on the part of McGrail because McGrail would purportedly complain about having to add and remove names from the Ramadan list. Noticeably lacking from plaintiff's arguments about McGrail is that McGrail <u>ever actually prevented anyone</u> from being added to the Ramadan List. Even if McGrail resented the additional work required of him as a result of the addition and removal of names from the Ramadan List, the evidence is undisputed

that he had no authority to bar anyone from the Ramadan List and never actually did so. McGrail testified in his declaration that he added people to the Ramadan list routinely, so whether he did it with a cheerful demeanor or not is not material fact in this case. In fact, if HCC had a policy of not allowing new individuals onto the Ramadan List, why would any Imam be required to interact with him at all once the initial list was sent to the kitchen from Reverend Pitts prior to the start of Ramadan.

Plaintiff claim that the decision in *Iqbal v. Ashcroft,* 129 S. Ct. 1937 (2009), is not relevant here because he makes no claim of intentional discrimination. (Pl Opp. at 28-29). Yet his brief is replete with unsubstantiated accusations of rampant intentional discriminatory conduct and bias against Muslims at HCC by Mr. McGrail, and many, again unnamed, HCC personnel. (See e.g. Pl. Opp. Br. p. 34). Indeed, plaintiff seems to argue that correction officers intentionally provided him with misinformation so as to impede his ability to observe Ramadan because these three unnamed HCC personnel <u>may have</u> harbored animus against Muslims. There is simply no support in the record for such a conclusion and *Iqbal* rightly holds that a supervisor cannot be held personally liable for misconduct of his subordinates when he has no knowledge of their allegedly tortuous conduct. We do not know what was said to plaintiff by the correction officers and whether any inaccurate information, assuming it was in fact given, was a result of a misunderstanding or discriminatory bias. For example, there is evidence in the record to support a conclusion that plaintiff may have conveyed to the correction officers that he wished to "make up" days for Ramadan but was told that he could not do that. A

14

reasonable finder of fact, could not reasonably conclude on the evidence proffered by plaintiff in his surprising sparse affidavit that he properly made a request for a Ramadan meal accommodation, that the HCC personnel to whom he made the request understood his request and his status as a new inmate and that they conclusively denied his request without also referring him to religious personnel.  As defendants point out in their opening brief, in plaintiff's interrogatory responses, he acknowledged that at least one of the three HCC personnel who denied his request told him he had to "start at the top." Regrettably, plaintiff did not follow up on this alleged instruction.

Plaintiff's medical claim against Warden Lee should be dismissed because the only evidence of personal involvement of Warden Lee in issues related to prescription medication for chronic conditions is Warden Lee's surmising at his deposition that in all his years at HCC and in all the conversations he has had about inmates and with inmates relating to medical issues someone at sometime probably said something about a delay in receiving prescription medication. (Pl. Opp. Br. pp. 48).  That plaintiff persisted in this patently frivolous claim against Warden Lee, while at the same time eschewing meaningful discovery on the topic of delay in procuring prescription medication for inmates with University of Connecticut Health Center Correctional Managed Health Care, the proper defendant in any such action, is deeply troubling.

Plaintiff also fails to address the undisputed fact that he has not taken meaningful steps to seek to attend his trial in this matter and may in fact decline to do so even if issued a visa by the United States. His affidavit is on this point is tellingly silent.

For the foregoing reasons, state defendants respectfully submit that their motion for summary judgment should be granted as to all state defendants on all counts in plaintiff's complaint.

        Respectfully submitted,

        DEFENDANTS
        CHARLES LEE,
        ALBERT PITTS AND THOMAS MCGRAIL

        RICHARD BLUMENTHAL
        ATTORNEY GENERAL

BY:   */S/ Maura Murphy Osborne*
      Maura Murphy Osborne
      Assistant Attorney General
      Federal Bar No. ct19987
      55 Elm Street
      P.O. Box 120
      Hartford, CT 06141-0120
      Tel: (860) 808-5020
      Fax: (860) 808-5347
      Maura.MurphyOsborne@ct.gov

## CERTIFICATION

I hereby certify that on December 6, 2010, a copy of the foregoing Reply Brief was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Maura Murphy Osborne*
Maura Murphy Osborne