UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RASHAD AHMAD REFAAT EL BADRAWI,        :
    Plaintiff,        :
            :        CIVIL ACTION NO.
v.        :        07-cv-1074 (JCH)
            :
UNITED STATES OF AMERICA,        :
  ET AL.,        :        APRIL 11, 2011
    Defendants.[1]        :

### PUBLIC VERSION OF RULING ON MOTIONS FOR SUMMARY JUDGMENT ON CLAIMS AGAINST THE UNITED STATES

## I.    INTRODUCTION

On the morning of October 29, 2004, Plaintiff Rashad Ahmad Refaat El Badrawi left for work only to be met outside his apartment building by federal agents. The agents placed him in handcuffs and arrested him on the charge that he had overstayed his period of authorized stay as a nonimmigrant visa holder. El Badrawi was brought to a government facility where he was questioned about alleged ties to jihadist and extremist groups. El Badrawi was then held without bail at the Hartford Correctional Center (HCC), a state run prison facility, for nearly two months. El Badrawi claims that, while he was incarcerated at HCC, he was not permitted to join the "Ramadan list" and therefore was not able to observe the Muslim Holy Month of Ramadan by fasting during daylight hours. El Badrawi also claims that prison staff refused to provide medication, which had been prescribed to him and which he had at the time of his arrest.

On November 10, 2004, El Badrawi appeared before an Immigration Judge for a hearing on the charge that he was subject to removal for overstaying his visa.

---

[1] This case was formerly captioned as <u>El Badrawi v. Dep't of Homeland Security, et al.</u> Plaintiff's claims against the Department of Homeland Security have been dismissed.

However, rather than adjudicating that issue, the parties informed the Immigration Judge that they had agreed that El Badrawi would voluntarily depart the country, under government safeguards, "as soon as possible."  The government then kept El Badrawi detained at HCC for an additional 42 days and continued to investigate him.  The government finally escorted El Badrawi out of the country on December 22, 2004.

El Badrawi brought this action against various departments and officials of the federal and state governments, challenging the legality of his arrest, his detention, and the conditions under which he was detained.  In a prior decision, El Badrawi v. Dep't of Homeland Security ("El Badrawi I"), 579 F. Supp. 2d 249 (D. Conn. 2008), this court dismissed a number of those claims.  However, the court held that El Badrawi had stated claims against the United States under the Federal Tort Claims Act ("FTCA") for false arrest and for abuse of process with respect to his detention following the agreement to voluntarily departure.[2]  The court also held that El Badrawi had stated claims, pursuant to 42 U.S.C. section 1983, against HCC's Warden, Charles Lee, for violations of the Free Exercise Clause and the Eighth Amendment.  The court also granted El Badrawi permission to amend the Complaint in order to plead claims against Warden Lee; James Pitts, a Chaplain at HCC; and Thomas McGrail, HCC's Director of Food Services, pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq.

This Ruling addresses the parties' Motions for Summary Judgment on El Badrawi's two claims against the United States.  The United States and El Badrawi

---

[2] In El Badrawi I, the court held that a third FTCA claim, for intentional infliction of emotional distress, survived the federal government's Motion to Dismiss.  However, El Badrawi subsequently agreed to dismiss that claim with prejudice.  See Order (Doc. No. 225).

have each moved for summary judgment on both of these claims.  After the Motions were briefed, the court heard oral argument.  For the reasons that follow, the United States' Motion for Summary Judgment is denied.  El Badrawi's Motion for Summary Judgment against the United States is granted with respect to the claim for false arrest and denied with respect to the claim for abuse of process.

## II.   BACKGROUND

El Badrawi, a citizen of Lebanon and Egypt, lived in the United States in compliance with immigration law for over ten years.  El Badrawi was admitted to the United States in 1993 on a nonimmigrant student visa.  El Badrawi pursued and obtained a master's degree in pharmaceutical sciences and a master's degree in information systems engineering at Northeastern University.  In 1999, El Badrawi was granted an H-1B visa that would permit him to live in the United States while working in the biotechnology industry.  El Badrawi and his employers periodically renewed his H-1B visa as necessary, and he occasionally departed and reentered the country as necessary to maintain his immigration status.  On April 4, 2003, El Badrawi received an H-1B visa to perform research work at the University of Connecticut Health Center (the "University").  Under that visa, he was authorized to live and work in the country until May 1, 2004.

In October 2003, the Department of State ("DOS") executed a Certificate of Revocation with respect to El Badrawi's visa.  Pl. Ex. 18.  By the terms of this Certificate, the revocation of El Badrawi's visa would become effective only upon El Badrawi's departure from the United States.  From October 2003 until December 22, 2004, El Badrawi never left the United States, and therefore the DOS revocation never

3

became effective.  DOS did not provide any notice of the Certificate of Revocation to El Badrawi or to the University.

On March 31, 2004, the University and El Badrawi filed a timely application for an extension of El Badrawi's stay under the H-1B visa program.  The University requested and paid an additional $1000 fee for premium processing of the application.  This meant that the United States Customs and Immigration Service ("USCIS") was required to act on that application within 15 days or refund the additional fee.  Despite contacting USCIS multiple times, neither El Badrawi nor the University was ever notified whether his extension of stay had been approved or denied.

Federal regulations provide an automatic extension upon a timely application for an extension of an H-1B visa:  "A nonimmigrant alien [with an H-1B visa] whose status has expired but who has filed a timely application for extension of such stay . . . [is] authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay."  8 C.F.R. § 274a.12(b)(20).  This extension terminates prior to the 240-day limit if USCIS denies the application before that period ends.  Id.  With respect to El Badrawi, this period of extension began upon the expiration of the period of stay authorized under El Badrawi's visa—May 1, 2004—and barring early termination, would continue until late December 2004.  At no time did USCIS deny El Badrawi's application for extension.

In the Spring of 2004, following the Madrid train bombings, the federal government became concerned that al-Qaida might plan a similar attack timed to occur around or just before the 2004 United States presidential election.  See USA Ex. 16.  The administration formulated and began to implement a plan for heightened

enforcement of immigration laws in order to help prevent or disrupt terrorist attacks in the period leading up to the presidential election.  See USA Ex. 21.

In October 2004, Immigration and Customs Enforcement ("ICE") Agent Gregory Manack, the Resident Agent in Charge of ICE's Hartford office, assigned Senior Special Agent Michael Loser to investigate El Badrawi.  During his investigation, Loser confirmed that El Badrawi's visa had expired and that El Badrawi had a pending application for extension which had not been adjudicated by USCIS.  Nonetheless, Loser concluded that El Badrawi "appears to be in violation of his immigration status at this time."  USA Ex. 29.  On October 28, 2004, Manack issued a warrant for El Badrawi's arrest—which alleged that El Badrawi was in the country in violation of United States immigration laws, USA Ex. 30—and a Notice to Appear—which directed El Badrawi to appear for removal proceedings based on the charge that he had overstayed his period of admission, USA Ex. 31.

On the morning of October 29, 2004, El Badrawi left home to commute to his job at the University.  Outside his apartment building, however, he was met by Agent Loser and one or more other officers.  The officers arrested El Badrawi and placed him in handcuffs.  After searching his apartment, the officers transported El Badrawi to an ICE facility, where he was detained and interviewed to determine whether he had any knowledge of or involvement in extremist, jihadist, or terrorist groups.  El Badrawi denied any such knowledge or involvement.  Later that day, El Badrawi was transported to HCC, where he remained incarcerated until December 22, 2004.

El Badrawi was brought before an Immigration Judge ("IJ") on November 3, 2004.  At that initial hearing, the IJ was informed that El Badrawi had a pending

application for extension of his H-1B visa and that DOS had previously issued a Certificate of Revocation based on national security grounds. The IJ informed the parties that he was uncertain of how these facts affected El Badrawi's immigration status, but the government's attorney indicated that she was not prepared to address the merits of the case. USA Ex. 40, at 10-11. The IJ continued the hearing until November 10, 2004; instructed the parties to address the merits at that hearing; and ordered that El Badrawi remain in confinement until that time. Id.

At the November 10, 2004 hearing, the parties did not address the issue of whether El Badrawi was removable. Instead, at the start of the hearing, the government's attorney immediately informed the IJ that the parties had agreed to "voluntary departure under safe[guards] . . . as soon as possible." USA Ex. 41 at 1. The IJ asked whether 30 days would provide enough time, and the parties each agreed. Id. The parties further agreed that the first choice of destination would be Lebanon, with Egypt as a second choice if Lebanon would not accept El Badrawi. Id. The IJ accepted the agreement and informed El Badrawi that he would be "escorted to JFK, but this is not a deportation order, which makes it easier for you in the future to get another visa." Id. at 2. El Badrawi claims that the government's attorney, John Marley, told him that he would be able to leave the United States within six days. Pl. Ex. 1 ¶ 34.

Although the hearing ended without any discussion of whether El Badrawi was in fact removable—and certainly without an admission of such by El Badrawi—the IJ issued a form order that begins: "Upon the basis of respondent's admissions, I have determined that the respondent is subject to removal on the charge(s) in the Notice to Appear." USA Ex. 42. The Order indicated that El Badrawi had been granted voluntary

departure under safeguards in lieu of removal.  Id.  The Order also included an alternate order requiring El Badrawi's removal, but this alternate order was to become effective only if El Badrawi failed to depart voluntarily.  Id.

The government kept El Badrawi detained for an additional 42 days.  Throughout his detention, El Badrawi possessed a valid Lebanese passport, as well as the means and intent to purchase an airplane ticket to leave the country.  Through his attorney, El Badrawi made several inquiries to ICE officials about expediting his departure.  El Badrawi offered to arrange and pay for his own airfare.  However, according to El Badrawi's testimony, he was told that he was being detained so that the government could conduct additional investigations or background checks.  USA Ex. 2 at 358, 360-61.  Government officials ultimately scheduled El Badrawi's departure for December 22, 2004, and he was escorted out of the country on that day.

The United States admits that it is unable to locate and produce evidence documenting the measures it took with respect to El Badrawi during the 42-day detention period.  The United States contends that its standard removal procedure would have involved, among other things, a background check referred to as a Third Agency Check ("TAC") and a process of notifying and obtaining approval from Lebanon.  The United States contends that there is no reason to believe that these measures were not taken during El Badrawi's detention.  However, the United States admits that a TAC generally produces numerous paper and electronic records, but it has not been able to produce any records confirming that a TAC was done in El Badrawi's case.  Nor has the United States produced any records confirming when and if ICE began the process of notifying the Lebanese government regarding El Badrawi's departure.  However, the

parties agree that the ICE Cyber Crime Center investigated El Badrawi during a portion of this period of detention.  The investigation had been initiated on November 2, 2004, and the final report of that investigation was prepared on November 29, 2004, and published on December 3, 2004.  USA Exs. 37, 38.  The government does not contend that this investigation produced any indication that El Badrawi presented a national security risk.

A federal government cable issued on December 6, 2004, shows that El Badrawi was initially scheduled to depart for Lebanon on December 13, 2004.  However, a second cable issued the next day indicates that that itinerary was cancelled.  Ultimately, the government rescheduled El Badrawi's departure for December 22, 2004, and permitted him to leave the country on that date.

## III.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to determine whether there are issues of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at

38.   "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  <u>Carlton v. Mystic Transportation, Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.   DISCUSSION

### A.   False Arrest Claim

In <u>El Badrawi I</u>, 579 F. Supp. 2d at 275-77, the court held that El Badrawi had alleged a claim for false arrest under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2674.  As the court explained there:

> El Badrawi's false arrest claim will stand or fall depending on whether or not the ICE officials had probable cause to believe that El Badrawi was in the country illegally.  Under Connecticut law (and federal constitutional law), probable cause exists when an officer has knowledge of sufficient facts and circumstances to warrant a reasonable officer in believing that the arrestee has committed or is committing an arrestable offense.

<u>Id.</u> at 276 (citing <u>Walczyk v. Rio</u>, 496 F.3d 139, 156 (2d Cir. 2007)).  In this case, an "arrestable offense" includes a violation of immigration law, because federal immigration officers have authority to arrest where they have probable cause to believe "that the alien so arrested is in the United States in violation of any [law or regulation regarding the admission, exclusion, expulsion, or removal of aliens]."  8 U.S.C. § 1357(a)(2); <u>see United States v. Sanchez</u>, 635 F.2d 47, 63 n.13 (2d Cir. 1980).

Resolution of El Badrawi's claim for false arrest depends on two issues.  First, the court must determine whether, as the government contends, the doctrine of

9

collateral estoppel bars litigation of the issue of whether El Badrawi was subject to arrest for overstaying his visa.  The court holds that collateral estoppel does not apply in this case.  Second, the court must interpret and apply 8 C.F.R. § 274a.12(b)(20), the regulation providing that El Badrawi was "authorized to continue employment with the same employer for a period not to exceed 240 days" while his application for an extension of stay was pending.  The parties agree that the merits of the false arrest claim turn entirely on this regulation.  If the regulation permitted El Badrawi to remain in the country and protected him from removal during the extension period, then the ICE officers did not have probable cause to arrest him.  If it did not provide such protection, then the ICE officers did have probable cause.  After examination of the record and the parties' arguments, the court finds that there is no genuine issue of material fact and that the claim is resolved, as a matter of law, in favor of El Badrawi.

### 1.    Collateral Estoppel Does Not Bar El Badrawi's Claim

Collateral estoppel forecloses relitigation of an issue that was "actually litigated and decided by a court of competent jurisdiction in a prior action . . . between the same parties or their privies."  Ali v. Mukasey, 529 F.3d 478, 489 (2d Cir. 2008) (quotation omitted).  "Accordingly, collateral estoppel applies when:  (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was a full and fair opportunity for litigation in the prior proceeding, and (4) the issues previously litigated were necessary to support a valid and final judgment on the merits."  Id. (quotation omitted).  The government contends that the issue of whether El Badrawi was subject to removal based on overstay of his visa was actually litigated and decided in El Badrawi's immigration court proceedings.

10

The government claims that El Badrawi was required to concede that he was removable in order to obtain a grant of voluntary departure and that this concession was binding.

The record of the immigration proceedings does not support the claim that El Badrawi conceded removability.  At the first hearing, on November 3, 2004, El Badrawi contested the charge that he was removable for overstaying his period of admission.  USA Ex. 40 at 5, 11.  His attorney informed the IJ of the pending application for extension of his H-1B visa, and the government informed the IJ of the administrative Certificate of Revocation that had been issued prior to the expiration of El Badrawi's visa.  However, when the IJ asked how these facts affected El Badrawi's immigration status, the government's attorney responded, "I'm not prepared to address all these particular issues. . . . I do not want to get into the merits of the case."  Id. at 10-11.  The IJ concluded that he could not resolve the issue then.  Id. at 11 ("I don't know whether he's in status or not, and I don't know what the effect of the revocation is").

At that next hearing, on November 10, 2004, no one ever mentioned the issue of El Badrawi's immigration status or whether he was actually subject to removal.  Instead, at the start of the hearing, the government's attorney immediately informed the IJ that the parties had agreed to voluntary departure under safeguards "as soon as possible."  USA Ex. 41 at 1.  The IJ accepted that agreement and informed El Badrawi that he would be "escorted to JFK, but this is not a deportation order, which makes it easier for you in the future to get another visa."  Id. at 2.  At no point in the two-page transcript of this proceeding does El Badrawi concede that he was removable.  Id. at 1-2.

The government contends that an agreement to voluntary departure is, in effect, a concession of removability, because 8 C.F.R. § 1240.26(b) requires the alien to

concede removability before an IJ may grant voluntary departure.  The government asserts that El Badrawi's agreement to voluntary departure, with this supposed implicit concession of removability, is binding because it is "akin to a plea bargain."

The government's reading of 8 C.F.R. § 1240.26(b) is contested.  El Badrawi contends that this regulation provides two different procedures for obtaining voluntary departure:  by grant of an IJ, as described in subsection (b)(1), and by stipulation of the parties as described in subsection (b)(2).  The requirement that the alien concede removability appears only in subsection (b)(1).  El Badrawi argues that such a concession is not required where the parties stipulate pursuant to subsection (b)(2).  The government, on the other hand, argues that a stipulation under subsection (b)(2) is not an entirely separate procedure and that, even with a stipulation, the IJ must still grant voluntary departure under subsection (b)(1) and must still require a concession of removability.  The court need not resolve this dispute, because the government's reading only supports the conclusion that the IJ ought to have required El Badrawi to concede removability, whereas the transcripts show that the IJ did not so require, and El Badrawi did not so concede.

Assuming for the sake of argument that the IJ should have required a concession of removability, and granting the fact that an agreement to voluntary departure can be binding, the court finds that the agreement at issue here did not constitute a binding concession of removability by El Badrawi.  As a general rule, where an issue in litigation is resolved by stipulation, its binding effect in future litigation depends upon the parties' intent:  "Most courts have held that a fact established in prior litigation by stipulation, rather than by judicial resolution, has not been 'actually litigated.'  However, we have

specified that <u>where parties intend a stipulation to be binding in future litigation</u>, issues

to which the parties have stipulated will be considered 'actually litigated' for collateral

estoppel purposes."  <u>Uzdavines v. Weeks Marine, Inc.</u>, 418 F.3d 138, 146-47 (2d Cir.

2005) (citations omitted) (emphasis added); <u>accord</u> <u>United States v. Real Property</u>

<u>Located at 22 Santa Barbara Dr.</u>, 264 F.3d 860, 873 (9th Cir. 2001) ("A stipulation may

meet the 'fully litigated' requirement where it is clear that the parties intended the

stipulation of settlement and judgment entered thereon to adjudicate once and for all the

issues raised in that action") (quotation omitted); <u>Red Lake Band v. United States</u>, 607

F.2d 930, 934 (Ct. Cl. 1979) ("'[A]n issue is not 'actually litigated' for purposes of

collateral estoppel unless the parties to the stipulation manifest an intent to be bound in

a subsequent action").

      There are no material issues of fact with respect to the Immigration Court

proceedings.  The record before the court establishes, as a matter of law, that the

parties did not intend a binding resolution of the issue of El Badrawi's removability.

Nothing in the record suggests that El Badrawi intended for that issue to be resolved.

Moreover, if the government had intended for the agreement to include a binding

concession of removability, the government was in a position to insist on such a

concession under any reading of the relevant regulation.  <u>See</u> 8 C.F.R. § 1240.26(b)(1)

(requiring, <u>inter alia</u>, a concession of removability for an IJ's grant of voluntary

departure) & (b)(2) (permitting the Attorney General to stipulate to voluntary departure).

Instead, the record shows that the parties cut off litigation of the issue of removability

and that El Badrawi never made any concession on this point.  Therefore, the parties'

agreement to voluntary departure does not constitute a binding concession that El

Badrawi was removable based on the charge in the Notice to Appear and does not preclude litigation of the related issue of whether or not the government had probable cause to arrest him.

Finally, the government also notes that, although the hearing ended without any concession and without any discussion of whether El Badrawi was removable, the IJ issued a form order that begins: "Upon the basis of respondent's admissions, I have determined that the respondent is subject to removal on the charge(s) in the Notice to Appear." USA Ex. 42. There is no explanation of the "admissions" to which the Order refers. It is clear, however, that "admissions" does not refer to any express admission of removability, as the record shows that there was not one.

The IJ's unsupported finding of removability also does not support collateral estoppel. As already explained, the record shows that the parties did not actually litigate the issue, and there is no evidence that they intended for the IJ to resolve this issue. In addition, the government has not shown that it was necessary for the IJ to make this determination. Even assuming the government's reading of 8 C.F.R. § 1240.26(b) is correct, it would have been El Badrawi's concession of removability that was required, not the IJ's independent determination of removability. Therefore, the IJ's finding of removability appears to be gratuitous, not the resolution of an issue that was actually and necessarily litigated.

In sum, the record shows that the parties did not actually and necessarily litigate the issue of whether El Badrawi was removable for overstaying his visa in the immigration proceedings. Therefore, the immigration proceedings do not preclude El Badrawi from litigating that issue here.

2.    **Law of the Case Does Not Bar Reconsideration**

Turning to the merits of El Badrawi's claim, the parties agree that the issue depends entirely on the interpretation of 8 C.F.R. § 274a.12(b)(20).  See, e.g., USA Reply at 3; Pl. Mem. at 24.  That regulation provides, in part:

> A nonimmigrant alien [who was admitted under one of various forms of work-based visas, including an H-1B visa] whose status has expired but who has filed a timely application for an extension of such stay . . . [is] authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay.

8 C.F.R. § 274a.12(b)(20).  The government contends that this extension applies only to an alien's authorization to work in the United States and that it does not extend an alien's authorization to be in the United States.  The government argues that an alien may remain in the country during this period, but he does so subject to the government's discretion to arrest, detain, and remove him.

El Badrawi notes that the court has already rejected that interpretation and argues that the claim for false arrest can be resolved simply by application of the law of the case doctrine.  In El Badrawi I, the court rejected the government's proposed reading:

> Ultimately, the government's interpretation of 8 C.F.R. § 274a.12(b)(20) makes little sense.  El Badrawi's reading, in which employment authorization necessarily includes the right to physically remain in the country, is a much more reasonable one.  And with this interpretation clarified, it becomes clear that Manack and Loser lacked probable cause to arrest El Badrawi.  El Badrawi's FTCA claim for false arrest/false imprisonment survives the government's Motion to Dismiss.

El Badrawi I, 579 F. Supp. 2d at 278.

"As most commonly defined, the [law of the case] doctrine posits that when a

15

court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983).  Strict application of this doctrine would appear to resolve the merits of this claim.  However, the court is mindful that the "doctrine of law of the case is not an inviolate rule, and the decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling should not be allowed to prejudice the party seeking the benefit of the doctrine." United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991) (internal quotation and citations omitted).  "In this context 'prejudice' . . . refers to a lack of sufficiency of notice' or a lack of sufficient 'opportunity to prepare armed with the knowledge [the prior ruling is not deemed controlling].'" Id. (quoting United States v. Birney, 686 F.2d 102, 107 (2d Cir. 1982)). Furthermore, law of the case should not be followed if there are "cogent and compelling reasons to deviate, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear or prevent manifest injustice." Uccio, 940 F.2d at 758 (quotations omitted).

In light of these standards, the court does not rely on the law of the case doctrine.  El Badrawi is not prejudiced, in the requisite sense, by the court's reconsideration of this issue.  El Badrawi has not been unfairly surprised by the government's reassertion of its position, and his counsel have briefed the issue extensively in connection with the pending motions.  Furthermore, interpretation of the regulation requires consideration of whether deference is due to an agency interpretation of this regulation, and the parties have now had a more adequate opportunity to develop the record on that issue.  See Davidson v. Bartholome, 460 F.

Supp. 2d 436, 443 (S.D.N.Y. 2006) ("it is well settled that the law of the case doctrine does not preclude a court from entertaining a subsequent summary judgment motion on the basis of an amplified record").  Therefore, the court considers each of the government's arguments below.  However, after such consideration, the court remains persuaded that its prior holding is correct.

### 3.    Government Counsel's Reading Is Not Entitled to Deference

The government contends that its reading is owed deference as an agency's interpretation of its own regulation.  Generally, an agency's interpretation of its regulations deserves deference "unless plainly erroneous or inconsistent with the regulation."  Auer v. Robbins, 519 U.S. 452, 461 (1997).  "We give 'substantial deference' to an agency's interpretation of its own regulations, 'only setting it aside if the plain language of the regulation or 'other indications of the [agency's] intent' require another interpretation."  Fabi Constr. Co. v. Secretary of Labor, 508 F.3d 1077, 1080-81 (D.C. Cir. 2007) (quoting Thomas Jefferson Univesity v. Shalala, 512 U.S. 504, 512 (1994)); accord Rock of Ages Corp. v. Secretary of Labor, 170 F.3d 148, 154 (2d Cir. 1999).

In order to qualify for deference, the proposed interpretation must, in fact, be the agency's official and settled interpretation:  "We have never applied [deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.  To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question . . . . Deference to what appears to be nothing more than an agency's convenient litigation position would be entirely inappropriate."  Bowen v.

Georgetown Univ. Hospital, 488 U.S. 204, 212-13 (1988); see also Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 171 (2007) (granting deference because the "agency's course of action indicates that the interpretation reflects its considered views"); Auer, 519 U.S. at 462 (granting deference because "the Secretary's position is in no sense a 'post hoc rationalization'" but instead "reflect[s] the agency's fair and settled judgment").

The court's analysis begins with the text of the regulation. The provision at issue states:

> (b) Aliens authorized for employment with a specific employer incident to status. The following classes of nonimmigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. An alien in one of these classes is not issued an employment authorization document by the Service:
>
> *       *       *
>
> (20) A nonimmigrant alien within the class of aliens described in [certain specified subsections of this section (b)] whose status has expired but who has filed a timely application for an extension of such stay. These aliens are authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of authorized stay. Such authorization shall be subject to any conditions and limitations noted on the initial authorization. However, if the district director or service center director . . . denies the application for extension of stay, the employment authorization under this paragraph shall be automatically terminated upon notification of the denial decision[.]

8 C.F.R. § 274a.12(b)(20) (emphasis added).

Focusing first on the text of subsection (20) itself, the authorization to "continue employment with the same employer" is stated in nearly unconditional terms. The only

two conditions are with regard to time and with regard to any conditions of the initial authorization.  With regard to time, the regulation states that the extension begins immediately, on the date that the period of previously authorized stay expires.  With regard to the conditions of the initial authorization, the regulation continues all "conditions and limitations noted on the initial authorization."  This appears to indicate that the temporary authorization carries forward the same terms that applied prior to the expiration.  The government's position—that, in order to avoid arrest and deportation, the alien must obtain separate authorization to stay in the country or must leave the country until she does—is difficult to square with language stating an unconditional authorization to continue employment under the same terms from the day that the visa expires.  At the very least, it is fair to say that the government's reading imposes extremely significant additional conditions upon the authorization stated in the regulation; those conditions are entirely unsupported by the text of the regulation; and those conditions significantly alter the meaning of the plain text.  Thus, even limiting the focus to the text of subsection (20) itself, the agency's interpretation is difficult to reconcile with the text of the regulation.

Reading subsection (20) in the context of 8 C.F.R. § 274a.12(b) as a whole, the problems with the government's interpretation increase.  The right to work provided by this regulation is expressly described as a right "incident to status."  8 C.F.R. § 274a.12(b).  It is described this way because employment in the country is the very reason that aliens affected by this regulation are permitted to be in the country.  See, e.g., 8 U.S.C. § 1101(a)(15)(H) (giving authority for the H-1B visa program by identifying classes of aliens permitted to "com[e] temporarily to the United States to perform

services"); 8 C.F.R. § 214.2(h)(1)(i) (providing that, under the H-1B visa program, "an alien may be authorized to come to the United States temporarily to perform services or labor for, or to receive training from, an employer, if petitioned for by that employer"). Thus, for the classes of aliens affected by subsection (b), work authorization is part and parcel of their authorization to be in the country, not a separate matter. The direct connection between these two rights is further highlighted by the fact that such aliens are "not issued a separate employment authorization document by the Service." 8 C.F.R. § 274a.12(b).

Despite this direct connection between work authorization and immigration status, the government contends that its reading is permissible because, as a general matter in immigration law, the right to be in the country and the right to work in the country do not always go together. It is undisputed that the right to be in the country does not generally imply the right to work in the country. The court need not determine whether the right to work in the country always implies the right to be in the country.[3] The question here is whether this particular regulation's grant of authority to continue employment includes a right to be in the country. The fact that section 274a.12(b) pertains solely to aliens whose immigration status is based and conditioned upon their need to work in the country strongly indicates that the two rights go together here. An

_____

[3] The government did not identify any law or regulation—other than the regulation at issue here—that provides work authorization to an alien who is not protected against arrest and removal. The government did call attention to one part of the immigration code, in which Congress expressly provided protection against removal in addition to work authorization. Congress provided that when the Attorney General grants temporary protective status, he "shall not remove the alien from the United States," 8 U.S.C. § 1254a(a)(1)(A), and "shall authorize the alien to engage in employment in the United States," 8 U.S.C. § 1254a(a)(1)(B). This statute's clarity in this regard is commendable, and it serves to highlight the agency's unfortunate decision not to speak as clearly in the regulation at issue here. However, this does not show that the express authorization to "continue employment" in the country in the regulation at issue here can or should be read to exclude the right to be in the country. Indeed, what authorization is it to "continue employment" in the United States, but be required to be outside the United States?

extension of only the right to work, without the right to remain in the country, is at odds with the nature and purpose of the affected work-based visa programs.

In sum, the government's reading conflicts with the text of the regulation.  The government's interpretation would render the authorization to "continue employment with the same employer" meaningless.  An alien may not "continue employment with the same employer" in the United States if that alien may not remain in the United States.  Although, in some instances, work authorization may be a separate matter from immigration status, this does not show that the regulation at issue here can be read to extend only work authorization.  For H-1B visa holders, and for all other aliens affected by this regulatory provision at issue, work authorization and immigration status go hand-in-hand.  By its terms, the regulatory provision at issue addresses work authorization that is granted "incident to status."  8 C.F.R. § 274a.12(b).  On the government's reading, however, subsection (b)(20) of that provision grants a form of work authorization that is entirely separate from, not incident to, status.  Because the government's reading cannot be reconciled with the text of the regulation, it is not entitled to deference.

In addition, the government has failed to show that its proposed reading is the agency's settled interpretation, rather than an expedient litigation position.  First, the government fails to identify a single agency publication or internal memorandum showing that the Department of Homeland Security ("DHS"), its subsidiary agencies, or their predecessors, ever took the view that the government now asserts with respect to

the regulation at issue.[4]  The government argues instead that its position is supported

by agency practice.  However, despite being pressed to do so repeatedly in this

litigation, the government has failed to make a record of any other case in which it has

sought to remove an alien based on this interpretation of the regulation.[5]

Indeed, the only pieces of record evidence suggesting that anyone in DHS has

ever taken the position that the government asserts here are the IJ's Order with respect

to El Badrawi, USA Ex. 42, and the testimony of Agent Manack, the ICE agent who

---

[4] The parties both cite various internal agency memoranda, but as the parties both concede, none of them purport to interpret the regulation at issue or consider how it affects removability. El Badrawi relies on INS Memoranda from 2000, 2002, and 2003.  These memoranda indicate that, as a general matter, the agency viewed timely-filed applications for extension of stay or change of status as giving rise to a period of "authorized stay" which is distinct from "authorized status."  See Pl. Exs. 43, 44, 45. However, these memoranda are focused on how such applications may bear on subsequent admission into the country, and they do not consider the impact of 8 C.F.R. § 274a.12(b)(20).  Therefore, although these memoranda provide some support for El Badrawi's position, they do not explain whether, as a general matter, aliens might be removable despite being in a period of "authorized stay," nor whether 8 C.F.R. § 274a.12(b)(20) would alter any such general rule.

The government responds with internal USCIS Memoranda from 2008 and 2009, after this litigation began.  Neither of these Memoranda address the question of whether an alien is removable as an overstay during the extension period provided by 8 C.F.R. § 274a.12(b)(20).  The 2008 Memo is cited for the uncontroversial "general" rule that, "[e]xpiration . . . of status puts a nonimmigrant out of status, and the alien remains out of status until some adjudication restores status or the alien departs."  USA Ex. 58, at 5.  The 2008 Memo does not address whether 8 C.F.R. § 274a.12(b)(20) modifies this general rule.

In a passage selectively quoted by the government, the 2009 Memo provides:  "As a matter of prosecutorial discretion, DHS may permit an alien who is present in the United States unlawfully, but who has pending an application that stops the accrual of unlawful presence, to remain in the United States while that application is pending.  In this sense the alien's remaining can be said to be 'authorized.' However, the fact that the alien does not accrue unlawful presence does not mean that the alien's presence in the United States is actually lawful."  USA Ex. 57 at 9.  By its own terms, this passage applies to aliens who are present unlawfully and have been permitted to remain only as a matter of prosecutorial discretion.  Therefore, this passage is relevant only if one assumes that El Badrawi was present unlawfully.  The passage's reference to a pending application does not support such an assumption.  The explanatory examples that follow this passage involve aliens who have filed an application for adjustment of status, but have allowed their visa to expire without filing any application for extension of stay.  USA Ex. 57 at 9-10.  These examples indicate that this passage concerns aliens who are unlike El Badrawi in so far as they (1) have not filed a timely application for extension of stay and (2) are not entitled to the benefit of 8 C.F.R. § 274a.12(b)(20).

[5] Although the government may credibly claim that agency record keeping does not permit it to identify all of the times in which it has done so, Gov't Reply at 5 n.3, that does not explain why it could not identify one such instance, if there were one.

issued the order to arrest El Badrawi, USA Ex. 9 at 181-92.[6]  The government does not

contend that either the IJ or Agent Manack has been delegated authority to establish

official DHS policy.  The IJ's Order states no reasoning and shows no consideration of

the regulatory provision at issue.  See USA Ex. 42.  Nor does Agent Manack's

testimony indicate what DHS's policy is.  Agent Manack stated that he arrived at his

reading of the regulation based on his training and experience, but he admitted that he

could not recall being provided with any agency guidance on the meaning of the specific

regulation at issue.  Id. at 183.  Agent Manack also admitted that he could not recall any

case in which he or anyone else at ICE had ever arrested or initiated removal

proceedings against an alien covered by the provision at issue here.  Id. at 190-91.

This testimony provides no indication that Agent Manack's reading of the regulation

reflects the settled view of DHS, rather than a mistaken view of the law held by an ICE

agent.[7]

It would be generous to say that there is a lack of evidence supporting DHS's

position on this regulation.  In fact, there is evidence that the government's proposal

here is not DHS's view.  Perhaps the most significant piece of evidence on this issue is

_____

[6] At oral argument, the government claimed that the decision to arrest El Badrawi had been considered and approved by the ICE Office in Boston, as well as the ICE office in Hartford, indicating a consensus view across multiple ICE offices that El Badrawi was subject to removal despite the extension provided by section 274a.12(b)(20).  The record conflicts with that assertion.  Matthew Etre, the government's 30(b)(6) witness on the Boston office's involvement in the investigation of El Badrawi, testified that no one in the Boston ICE office made any determination as to whether El Badrawi was in a valid immigration status.  USA Ex. 4 at 100-01.  Etre testified that the determination that El Badrawi was out of status was made by the Hartford ICE office after El Badrawi's case had been transferred from Boston to Hartford, id., and that the Boston office was not involved in El Badrawi's case after the investigation was transferred to the Hartford office, id. at 20.

[7] The government also cites a BIA opinion, In re Rotimi, 24 I. & N. Dec. 567 (BIA 2008), in support of its reading.  Because, as explained in the following section, that opinion does not concern the regulation at issue here and is expressly limited to the facts and legal issues in that case, the court finds that that opinion does not provide evidence of a settled agency interpretation of the regulation at issue in this case.  That opinion is considered below for its ability to persuade.  See, infra, at 35-38.

provided by a DHS publication intended to assist aliens in understanding the law.  In an August 2008 "Customer Guide" pamphlet entitled, "I Am a Nonimmigrant. How Do I . . . Extend My Nonimmigrant Stay in the United States?," Pl. Ex. 39, USCIS, an agency within DHS, explains the criteria for and the process of applying for an extension of, inter alia, an H-1B visa, and then provides guidance in a series of questions and answers.[8]  In response to the question, "What if I file [for an extension of stay] on time but USCIS doesn't make a decision before my I-94 expires?," the USCIS Guide provides the following answer:

> If we receive your application before your status expires, and if you have not violated the terms of your status and meet the basic eligibility requirements, you may continue your previously approved activities in the United States (including previously authorized work) for a maximum period of 240 days, or until the first of the following occurs:
>
> - We make a decision on your application; or
>
> - The reason for your requested extension has been accomplished.
>
> If your application is denied after your previously approved stay has expired and you are still in the United States, you will be considered 'out of status' as of the date of your original period of stay expired.  You must cease employment (if such employment was authorized) and depart the United States immediately.

Pl. Ex. 39 at 2 (emphasis added).

The USCIS Customer Guide provides quite different guidance with respect to aliens who file an untimely application for extension of stay.  In response to the

---

[8] This USCIS Customer Guide remains available on the USCIS website.  A nonimmigrant alien or an employer seeking guidance on the agency's view of the law need only go to www.uscis.gov, and click on "Resources," then "How Do I Customer Guides," then "Nonimmigrant," and then "How Do I Extend My Nonimmigrant Stay in the U.S.?"  As of the date of this Ruling, those steps would bring one to a pdf version of the Guide, located at http://www.uscis.gov/USCIS/Resources/C1en.pdf.

question, "Can I get an extension of stay if my status already expired?," the Guide provides:

> If your status expired <u>before</u> you filed an application with USCIS to extend your stay in the United States, or if you have otherwise violated the terms of your status (such as by working without authorization), <u>then you are "out of status."</u> . . . . If you fall out of status, we recommend that you leave the United States as soon as possible to limit the possible impact on your ability to the United States in the future.

Pl. Ex. 39 at 2 (emphasis added).

These answers cannot be squared with the position that the government advances here. They indicate that the alien will be considered "out of status" only <u>if</u> the application is not timely filed, <u>if</u> the alien has violated the terms of his status, or <u>if</u> the timely-filed application is denied. In contrast, where an application is timely filed, the Guide states, "you may continue your previously approved activities in the United States (including previously authorized work)." Pl. Ex. 39 at 2. This permission can only be read to include permission to be present in the United States. It is plainly not limited to work, as work is listed as just one example of "previously approved activities," and being present in and temporarily residing in the United States are certainly among the "previously approved activities" of an alien admitted on a nonimmigrant visa. Furthermore, where the extension application is timely-filed, the Guide indicates that the alien will be considered "out of status" only if the application is denied, and that, upon such denial, the alien <u>then</u> "must cease employment (if such employment was authorized) and depart the United States immediately." <u>Id.</u> This plainly indicates that DHS's position is that the alien may remain in the United States until the application is denied and need only leave once it is denied. Finally, the Guide contemplates that the alien might "accomplish" the reason for the requested extension (<u>e.g.</u>, complete the

work project that forms the basis for a work-based visa) during the time that the extension application is pending.  Id.  This further indicates that DHS intended that the alien may remain in the United States and continue to work while the application is pending.  Thus, the USCIS Customer Guide shows that the interpretation advanced here is not DHS's official or settled position.[9]

Given the lack of support for the government's proposed reading, the government argues that an agency interpretation may be entitled to deference even though it is first stated in the course of litigation.  See Long Island Home Care, 551 U.S. at 171; Auer, 519 U.S. at 462; Rock of Ages, 170 F.3d at 156.  But those cases do not support deference here.  In Auer, the agency interpretation was set forth in the Secretary of Labor's amicus brief, provided at the request of the Supreme Court.  519 U.S. at 461.  Because the Secretary was not a party to the case and because the amicus brief clearly required the Secretary to consider and state the Department's official position, the Court concluded that the interpretation could not be gainsaid as a "post hoc rationalization advanced by an agency seeking to defend past agency action against attach" and that there was "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question."  Id. at 462.  Furthermore, the Court found that the regulation "comfortably bears" the Secretary's interpretation.  Id.

---

[9] The government fails to address the significance of the USCIS Customer Guide and offers no explanation of how DHS could consistently provide this information to aliens and yet take the position that they remain subject to arrest and deportation at any time while the application is pending. In a footnote, the government dismissively assets, "[T]hat pamphlet does not in any way limit ICE's authority to arrest aliens who overstay their authorized period of admission.  Although plaintiff may feel the pamphlet 'assumes' that aliens cannot be removed, that assumption cannot trump the agency's interpretation of the regulation."  Gov't Reply at 8 n.5 (citation to Plaintiff's Memo omitted).  This response ignores the fact that the USCIS Guide is the strongest piece of record evidence of the agency's interpretation.

Similarly, in Long Island Home Care, the Department of Labor was not a party to the litigation. Instead, the litigation between private parties, see 551 U.S. at 164, turned on a controversial Department interpretation that had first been set forth in an internal memorandum after the litigation began, 551 U.S. at 171. In addition to the internal memorandum, however, the Department initiated the notice-and-comment rulemaking process in order to codify the new interpretation. 551 U.S. at 170-171. Thus, there could be no doubt that the interpretation was the Department's official position. Furthermore, the Court found it likely that the interpretation "create[d] no unfair surprise." Id.

In Rock of Ages, the interpretation was advanced by the Mine Safety and Health Review Commission, acting in its statutorily-assigned capacity as an appellate review board for agency adjudications. 170 F.3d at 154. Congress has expressly delegated to the Commission the authority to issue rules and precedential decisions and to address "questions of law, policy or discretion" raised in agency adjudications. 30 U.S.C. § 823(d)(2)(A)(ii). The Second Circuit, considering an as-applied due process challenge, noted that the "an agency's interpretation of a regulation is not undeserving of deference merely because it is advanced by the agency for the first time." Rock of Ages, 170 F.3d at 156. However, before deciding that the Commission's interpretation was, in fact, deserving of deference, the Second Circuit determined that the Commission's interpretation was "consistent with the language, history and purpose" of the regulation and that the "plain language [of the regulation] gives fair notice of what it requires." Id.

Any analogy to these three cases begins and ends with the fact that, in this case,

the government's proposed interpretation was previously unannounced.  Here, there is no record showing that anyone at a policy-making level in DHS has ever taken the position advanced by government here.  To the contrary, the only directly pertinent agency publication is directly contrary to the government's proposed interpretation. See, supra, at 21-26.  Moreover, DHS was named as a defendant in this highly controversial litigation, and its agents' interpretation and application of the regulation forms the basis for plaintiff's claim.  Thus, the circumstances of this case provide no reassurance that the government's position is not simply a "post hoc rationalization." See Bowen, 488 U.S. at 212-213 ("Deference to what appears to be nothing more than an agency's convenient litigation position would be entirely inappropriate").  Finally, it cannot be said that the regulation "comfortably bears" the reading proposed by the government, Auer, 519 U.S. at 462, or that the proposed reading is "consistent with the language, history and purpose" of the regulation, Rock of Ages, 170 F.3d at 156.  See, supra, at 18-21.  In sum, the record indicates that the reading proposed by government counsel is not, in fact, the "fair and considered judgment" of DHS.  Therefore, the court concludes that the reading proposed by government counsel is not entitled to deference.

The court's conclusion is buttressed by the fact that the government's proposed interpretation presents grave due process concerns.  The government has argued that, on its reading of 8 C.F.R. § 274a.12(b)(20), an alien who has filed a timely application for extension may remain in the country, but if he does, the government has discretion to arrest, detain, and remove him.  There is a serious question as to whether this interpretation is consistent with the Fifth Amendment's Due Process Clause.  Therefore,

it would not be entitled to deference, even if it were the agency's interpretation.

Courts must avoid an interpretation of a statute or a regulation that would raise "a serious doubt" as to its constitutionality. Zadvydas v. Davis, 533 U.S. 678, 689 (2001) (reading an implicit limitation into an immigration statute authorizing indefinite detention in order to avoid unconstitutionality under the Due Process Clause); see also Dent v. Holder, 627 F.3d 365, 374 (9th Cir. 2010) ("doctrine of constitutional avoidance requires us to construe the statute and the regulation, if possible, to avoid a serious constitutional question").  This principle of constitutional avoidance trumps deference to an agency's interpretation. Solid Waste Agency of N. Cook County v. Army Corps of Engineers, 531 U.S. 159, 174 (2001) (refusing to defer to an agency's interpretation where "significant constitutional questions [are] raised by respondents' application of their regulations"); DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 574-75 (1988) (an "interpretation by the Board would normally be entitled to deference" but the doctrine of avoiding constitutional problems required a different result); Blake v. Carbone, 489 F.3d 88, 100 (2d Cir. 2007) (by deferring in the face of constitutional problems, "we would abdicate our dual responsibilities to uphold the Constitution and to ensure the executive and legislative branches' compliance therewith").

Authority relied upon by the government holds that "[d]ue process requires that regulations be sufficiently specific to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." Rock of Ages, 170 F.3d at 156 (quotation omitted); cf. Long Island Care, 551 U.S at 170-71 (changes in interpretation are not a basis to disregard an agency interpretation "as long as interpretive changes

create no unfair surprise").  This principle of fair notice is well established in administrative law.  See, e.g., County of Suffolk v. First American Real Estate, 261 F.3d 179, 195 (2d Cir. 2001) ("Due process requires that before a . . . significant civil or administrative penalty attaches, an individual must have fair warning of the conduct prohibited by the statute or regulation that makes such sanction possible"); United States v. Approximately 64,695 Pounds of Shark Fins, 520 F.3d 976, 980 (9th Cir. 2008) ("Due process requires that an agency provide fair notice of what conduct is prohibited before a sanction can be imposed") (quotation omitted); Trinity Broadcasting of Florida, Inc. v. FCC, 211 F.3d 618, 628 (D.C. Cir. 2002) ("we have repeatedly held that in the absence of notice—for example where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability") (quotation omitted); General Elec. Co. v. E.P.A., 53 F.3d 1324, 1328 (D.C. Cir. 1995)  ("The due process clause thus prevents . . . deference from validating the application of a regulation that fails to give fair warning of the conduct it prohibits or requires") (quotation omitted).

The government's interpretation of section 274a.12(b)(20) implicates liberty interests that are protected by the Due Process Clause.  First, on the government's interpretation, aliens who do continue their employment may be arrested and detained.  "The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.'  Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects."  Zadvydas, 533 U.S. at 690.  Second, on the government's interpretation, these aliens are subject to removal

from the country, which also gives rise to serious due process concerns.  See Jordan v. De George, 341 U.S. 223, 231 (1951) ("Despite the fact that [the Immigration Act of 1917] is not a criminal statute, we shall nevertheless examine the application of the vagueness doctrine to this case.  We do this in view of the grave nature of deportation"); Fong Haw Tan v. Phelan, 333 U.S. 6, 10 (1948) ("We resolve doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile"); Duarte-Ceri v. Holder, 630 F.3d 83, 89 (2d Cir. 2010) ("deportation is a drastic measure" (quoting Fong Haw Tan, 333 U.S. at 6)); Restepo v. McElroy, 369 F.3d 627, 635-36 n.16 (2d Cir. 2004) ("[D]eportation, like some other kinds of civil sanctions, combines an unmistakable punitive aspect with non-punitive aspects. . . . As such, procedures and limits more akin to those of criminal law may be appropriate").  The record in the present case illustrates that an arrest for an alleged immigration violation can lead to lengthy incarceration, under conditions that are unpleasant, if not violative of other basic Constitutional rights, and can bring an abrupt and unexpected termination to an established and productive career.  Therefore, due process requires notice that such consequences may follow from remaining in the country during the period of extension provided by section 274a.12(b)(20).[10]

---

[10] The due process concerns here are exacerbated by the fact that immigration laws provide limited post-arrest review of an ICE agent's decision to arrest and detain an immigrant.  An alien's opportunity to be heard on the charge of overstaying his period of admission consists solely of an administrative hearing, in which he bears the burden of proving that he had been lawfully admitted by clear and convincing evidence.  See 8 U.S.C. § 1229a(c)(2)(B).  In El Badrawi's case, the first such opportunity came five days after his arrest and detention.  Moreover, because the government was not prepared to address the merits at that time, a hearing to address whether El Badrawi was removable was delayed an additional week, during which time El Badrawi remained in custody.  No immigration procedure provided El Badrawi with a right to obtain his release while awaiting a hearing and decision on the charge in the Notice to Appear.  See 8 U.S.C. § 1226(a) (providing the arresting officials with apparently unlimited discretion to detain the alien pending a decision on whether the alien is to be removed); 8 C.F.R. § 236.1(c)(8) (permitting the arresting officials with discretion to release the alien prior to the removal hearing only if the alien "demonstrate[s] to the satisfaction of the officer that such release

Based on the text of the regulation, aliens making a good faith effort to comply with immigration law could not reasonably be expected to anticipate the position advanced by the government, i.e., that despite being admitted under a work-based visa, and despite an express government authorization to continue that work while a timely-filed extension application is pending, they remain subject to arrest, detention, and removal at any time.[11]  Given its plain meaning, the regulation gives rise to a reasonable expectation that affected aliens "are authorized to continue employment with the same employer" subject to the same conditions and limitations that applied during their previously authorized period of stay.

Where a complicated or unclear regulation raises concerns about pre-enforcement notice, these concerns can sometimes be addressed through the agency's enforcement process (e.g., through a non-punitive warning issued prior to the attachment of sanctions) or through guidance in agency publications.  See General Elec., 53 F.3d at 1329 (notice may be provided by "the agency's pre-violation contact with the regulated party" or by "the regulations and other public statements issued by the agency").  Such is not the case here.  There was no direct, pre-enforcement warning to El Badrawi.  There is not even any indication that an affected alien might have

---

would not pose a danger or property to persons, and the alien is likely to appear for any future proceedings"); 8 C.F.R. § 236.1(d)(1) (permitting an immigration judge to exercise apparently unlimited discretion in determining whether to detain the alien prior to a decision on the removal charges).  Where post-arrest, pre-hearing remedies are so limited, clear notice is surely required.

[11] The regulation also fails to provide adequate notice to employer-sponsors of H-1B visas. These employers expend considerable resources to comply with the law and obtain H-1B visas for employees, with the expectation of addressing their special labor needs.  Accordingly, they have a significant interest in having those alien employees be available to work without risk of sudden, unexpected arrest and deportation.  The brief of amici curiae American Immigration Council and American Immigration Lawyers Association, with supporting declarations from employers who rely on the H-1B visa program, highlights the substantial interest that employers have in the administration of the H-1B visa program, the lack of notice provided by the regulation at issue, and the hardship that the government's proposed interpretation would impose upon them.  See Brief Amici Curiae (Doc. No. 385).

indirect notice through a pattern of enforcement actions against other similarly situated aliens.  The only relevant agency guidance is the USCIS Customer Guide.  That Guide is entitled to significant weight in this analysis, because it is published for the purpose of explaining the relevant regulation to the very people who are put at risk by the government's proposed interpretation.  That Guide plainly supports and fosters the expectation that aliens in El Badrawi's position may remain in the country while awaiting a determination on their timely filed extension applications.

Most significantly, the government does not concede that any additional notice is needed.  The government has argued that any alien who overstays his initial period of authorization should be aware that he is subject to removal, and that section 274a.12(b)(20) and the USCIS Guide do nothing to change this.  The government maintains that the regulation leaves the government with unbridled discretion to arrest and detain aliens who remain in the country during the 240-day extension period.  In other words, the government maintains that the authorization to continue employment in 8 C.F.R. § 274a.12(b)(20) should be interpreted as an authorization to continue employment, subject to the risk of arrest, detention, and removal, regardless of whether or not the government provides any advance notice of that risk.[12]

Construing section 274a.12(b)(20) in this manner would raise a serious doubt as to its constitutionality.  It is highly doubtful that the Due Process Clause permits a law that expressly authorizes an alien to continue his employment in the country, subject,

---

[12] This case would be dramatically different if DHS had provided guidance to affected aliens that section 274a.12(b)(20) does not protect them from arrest and removal.  In that case, aliens in El Badrawi's position could be deemed to have notice of the risks of remaining in the country while their application is pending and to have assumed that risk.  The government would only need to argue section 274a.12(b)(20) leaves in tact its discretion to arrest, detain, and remove aliens, where advance notice has been given.

implicitly, to the risk of arrest, detention, and removal, regardless of whether the government provides any notice of that risk.  Even if the regulation were read to apply solely to work authorization, and not to provide protection against removal, due process would require, at least, that the government provide clear, advance notice of this reading to the aliens who are put at risk of arrest, detention, and removal.  In the absence of such notice, the regulation may not be read to leave the government's discretion to arrest, detain, and remove untouched.  Because the regulation can easily be read to avoid the problems raised by the government's interpretation, the court does not defer to and does not adopt the reading proposed by the government.  Therefore, even if the government's proposed reading were the settled view of DHS, that reading would not  be entitled to deference.

In sum, the government's proposed reading is inconsistent with the text of the regulation.  There is no basis upon which to conclude that the government's proposal reflects the considered view of the agency.  No agency official with authority to set DHS policy has ever advanced the interpretation advanced by the government here, and there is no evidence, outside of the present case, that the government's reading reflects DHS practice.  Instead, the only official DHS publication that addresses this regulation directly contradicts the government's proposed reading.  Therefore, the government's reading is not entitled to deference as an agency interpretation.  Moreover, even if the government's reading were official DHS policy, that reading would not be entitled to deference because there is a serious doubt that it can be reconciled with the Due Process Clause of the Fifth Amendment.  On the government's reading, the work authorization provided to an alien by section 274a.12(b)(20) is subject, implicitly, to the

government's unbridled discretion to arrest, detain, and remove the alien without notice. It is highly doubtful that a law with such significant, hidden consequences comports with due process. Therefore, the court would not defer to the government's reading even if it had been shown to be DHS policy.

### 3.     Case Law Does Not Support the Government's Reading

The government also relies on two recent, non-binding rulings that were not considered in El Badrawi I. Neither of these opinions directly addresses the issue before the court, and neither is controlling or persuasive.

First, the government relies on a 2008 Board of Immigration Appeals opinion because it contains the statement, "work authorization is not equivalent to lawful status; nor is it necessarily reflective of a right to lawfully be or remain in this country." In re Rotimi, 24 I. & N. Dec. 567, 578 (B.I.A. 2008). Rotimi did not involve a removal proceeding; it did not involve an H-1B visa holder; and, it did not involve the regulation at issue here. Instead, the issue before the Board was whether, in Rotimi's admissibility proceeding, he was eligible for a waiver of the bar against his admission based on his prior conviction. This bar may be waived only if the alien had "lawfully resided continuously in this country for 7 years immediately proceeding the institution of proceedings." 8 U.S.C. § 1182(h). The Board had to decide whether Rotimi had "lawfully resided" in the country during an earlier period in which his visa had expired but he had a pending asylum application and visa petition.

The numerous limitations that the Board placed on its own holding show that this case has no direct application here. First, the Board explained that the phrase "lawfully resided" is unique to that admissibility provision (section 212(h)) of the Immigration and

Naturalization Act.  Rotimi, 24 I. & N. Dec. at 571 ("Significantly, the precise phrase 'lawfully resided' has not been employed elsewhere in the Act, and we are unaware of its use in a comparable context").  Second, the Board emphasized that its decision was limited to the interpretation of that phrase as applied to the facts of the case, and in doing so, it made clear that its decision had no bearing on the case before us:

> [W]e reject respondent's reliance on [a Ninth Circuit case], at least to the extent it finds that 'lawful' residence arises simply from the inability to deport an alien coupled with the alien's eligibility for work authorization.
>
> Importantly, we need now only resolve whether an applicant for privileges or benefits is deemed to have "lawfully resided" here for purposes of section 212(h) prior to a favorable action on the application, when the applicant enjoys no other status or privilege that prevents the initiation and completion of removal proceedings.

Id. at 577 (footnote omitted).[13]  This passage is important in two respects.  In the first part of the passage, the Board specifically rejects the view that a bar against removal entails "lawful residence."  This makes clear that an alien may lack "lawful residence," in the sense that the Board was concerned with, and yet not be subject to removal.  Therefore, the Board's holding—that work authorization does not entail "lawful residence," id. at 578—is irrelevant here because whether or not one "lawfully resides" is an entirely different question than whether or not one is removable.  Even if "lawful residence" were of any relevance to the present case, in the second portion of the passage, the Board makes clear that its holding is also limited to the application of that

---

[13] See also Rotimi, 24 I. & N. Dec. at 568 ("Further, we find it unnecessary to adopt a comprehensive definition of this statutory language in the context of this case") and 571 ("Given the breadth of the possible issues that might arise in any particular alien's situation, we find that it would be imprudent for us to attempt a comprehensive ruling that would address and resolve the many cases that are not before us").

phrase to an alien who cannot claim any specific legal protection against removal.

Because El Badrawi reasonably contends that 8 C.F.R. § 274a.12(b)(20) does provide

him with such protection, it cannot be assumed that the Board would have seen Rotimi

and El Badrawi as similarly situated.  Therefore, the Board's holding in Rotimi has no

direct bearing on the issue before this court.

To the extent that the government seeks some support in the Board's reasoning,

the Second Circuit's opinion affirming the result in Rotimi forecloses application of that

reasoning here.  The Second Circuit opinion indicates that it affirmed the Board's

holding because it felt constrained to do so under the Chevron deference standard and

because the Board's repeated limitations of its holding foreclosed consideration of the

consequences of the Board's reasoning as applied to other cases.  Rotimi v. Holder,

577 F.3d 133, 139 & n.5 (2d Cir. 2009) (noting that the court did not take account of the

consequences for other cases because "the BIA did not attempt to craft an

interpretation . . . that would apply to all cases").  However, two members of the panel

signed a concurring opinion that roundly criticized the Board's reasoning.  E.g., id. at

141 ("Furthermore, I do not believe that any of the other sources relied upon by the BIA

adequately explain why . . . lawful residence follows only from the grant of a specific

privilege to remain in the country").  The concurrence explained that the Board's

interpretation would lead to "absurd and unjust consequences" if applied in cases

where, like El Badrawi, the alien applied for the extension adequately before the

expiration of his visa but the government inexcusably delayed in acting on that

application.  Id. at 142.  The concurring judges refrained from reversing the Board

because "Rotimi does not quite present such circumstances."  Id.  In light of this

criticism, the Board's reasoning carries little, if any, weight.

Second, the government relies on Bokhari v. Holder, 622 F.3d 357 (5th Cir. 2010), a recent Fifth Circuit decision that declined to follow this court's holding in El Badrawi I.  The Fifth Circuit did consider the regulation at issue here.  However, it did not address whether an alien covered by the regulation was removable.  Instead, the issue there was whether the alien was entitled to adjustment of status under 8 U.S.C. § 1255, a question which depended on whether he had "for an aggregate period exceeding 180 days failed to maintain, continuously, a lawful status."  See Bokhari, 622 F.3d at 360 (quoting 8 U.S.C. § 1255(k)(2)(a)).  Bokhari's employer had timely filed for an extension of his work-based visa, triggering application of 8 C.F.R. § 274a.12(b)(20). The Fifth Circuit explained, "The sole focus of our review, however, is whether Bokhari's employment authorization, which he received automatically . . . gave him legal immigration status, as defined in 8 C.F.R. § 1245.1(d)(1)(ii)."[14] Id. at 360.  The Fifth Circuit declined to follow this court's prior holding, stating instead that it found its own prior holding in United States v. Flores, 404 F.3d 320 (5th Cir. 2005), to be persuasive.[15] Bokhari, 622 F.3d at 360-61.  Without further discussion of the regulation, the Fifth Circuit asserted that, "Section 274a.12(b)(20), by its plain language addresses employment authorization only, and thus does not address an employee's immigration status."  Id. at 361.

---

[14] 8 C.F.R. § 1245.1 is a regulation pertaining to section 245 of the Immigration and Naturalization Act, which is codified at 8 U.S.C. § 1255.  8 C.F.R. § 1245.1(d)(1) defines "lawful immigration status," "for purposes of section 245(c)(2) of the Act," to include, inter alia, an alien "whose initial period of admission has not expired or whose nonimmigrant status has been extended in accordance with part 214 of 8 CFR chapter I."  8 C.F.R. § 214.1 addresses the process of applying for an extension of stay.

[15] The Fifth Circuit also cited In re Teberen, 15 I. & N. Dec. 689, 690 (B.I.A. 1976).  As this court noted in El Badrawi I, 579 F. Supp. 2d at 276-77, Teberen was decided 15 years before the adoption of the regulation at issue, and thus could not address that regulation.

To the extent that the <u>Bokhari</u> court rested its interpretation on a general

reference to the text of section 274a.12(b)(20), it is not persuasive to this court.  The

court has discussed the regulation in detail above.  The citation to the <u>Flores</u> case is not

persuasive either.  In that case, the Fifth Circuit did not consider the regulation at issue

here and did not consider whether an alien who is entitled to an automatic extension

under that regulation is subject to removal.  Instead, <u>Flores</u> holds that "an alien may be

temporarily granted a stay of removal and be permitted to work during that stay, but still

be considered 'illegally or unlawfully in the United States'" for purposes of the ban on

firearms provided in 18 U.S.C. § 922(g)(5)(A).[16]  <u>Flores</u>, 404 F.3d at 327; <u>see also</u>

<u>Bokhari</u>, 622 F.3d at 360-61.  The court is not persuaded that this holding has any

bearing on the question of whether an alien whose employer has filed a timely

application for a work-based visa, and who by operation of 8 C.F.R. § 274a.12(b)(20)

receives authorization to continue his employment in this country subject to the same

conditions, is nonetheless subject to arrest and deportation at the discretion of ICE's

officers.  Neither <u>Flores</u>, nor <u>Bokhari</u> persuades the court that the government's

proposed reading here can or should be sustained.

### 4.  Conclusion

The government's proposed interpretation of 8 C.F.R. § 274a.12(b)(20), <u>i.e.</u>, that

it extends authorization to work in the country, but not authorization to be in the country,

---

[16] Section 922(g)(5)(A) of the criminal code makes it a crime for an alien who is "illegally or unlawfully in the United States" to transport, possess or receive a firearm.  Because the very next subsection of the statute extends the same firearms prohibition to aliens who have been "admitted to the United States under a non-immigrant visa," 18 U.S.C. § 922(g)(5)(B), the <u>Flores</u> court would have reached an odd result if it had found that aliens who have merely been granted a stay of removal were not subject to subsection (A).  So holding would have meant that both illegal aliens and aliens with nonimmigrant visas could not possess firearms, but aliens who had been granted a temporary stay of removal could.

cannot be squared with the text or purpose of that provision and is not entitled to deference.  Instead, by authorizing aliens with work-related visas to "continue employment with the same employer" as of the date their visa expires and subject to the conditions and limitations of their prior authorization, that regulation is properly interpreted to authorize them to remain in the country while their application is pending.

There is no genuine dispute of material fact regarding El Badrawi's claim for false arrest.  It is undisputed that El Badrawi's arrest was based solely on the charge that he had "remained in the United States beyond May 1, 2004, without authorization from the Immigration and Naturalization Service."  USA Ex. 31 (Notice to Appear).  It is also undisputed that the ICE agents who issued the arrest warrant and arrested El Badrawi knew that El Badrawi had a pending extension of stay application that would trigger 8 C.F.R. § 274(a).12(b)(20).  USA Ex. 29 at 2 (Record of investigation prepared by Agent Loser).  It is not contended that the agents were aware of—or that there were—any other facts that might support probable cause to arrest El Badrawi, either on the charge stated in the Notice to Appear or under any other theory.  Therefore, the most that can be said for the agents' decision to arrest El Badrawi is that it rested upon a mistaken theory of the law.  Under Connecticut law, a mistake of law does not support probable clause.  See State v. Cyrus, 297 Conn. 829, 839 n.6 (2010) (holding that a mistake of law does not even support reasonable suspicion for a traffic stop) (citing United States v. McDonald, 453 F.3d 958, 961 (7th Cir. 2006)).  An arrest without a warrant from a neutral magistrate and without probable cause is actionable for false arrest under Connecticut law.  Beinhorn v. Saraceno, 23 Conn. App. 487, 491 (1990), cert. denied,

217 Conn. 809 (1991).[17]   Therefore, with respect to this claim, the United States' Motion

for Summary Judgment is denied, and El Badrawi's Motion of Summary Judgment is

granted.

### B.   Abuse of Process

In El Badrawi I, the court held that El Badrawi's abuse of process claim against

the United States survived "insofar as it was based on post-voluntary-departure

detention . . . because El Badrawi alleges that, once the government had agreed to

allow him to voluntary depart, the government nonetheless detained him without any

legitimate immigration purpose."   El Badrawi I, 579 F. Supp. 2d at 278.   Abuse of

process creates liability for an individual who uses legal process against another

individual "primarily to accomplish a purpose for which it is not designed."   Mozzochi v.

Beck, 204 Conn. 490, 494 (1987) (quoting Restatement (Second) of Torts § 682)

(internal quotation marks omitted).   Accordingly, El Badrawi's claim for abuse of process

depends what could count as a "legitimate immigration purpose" for detention after

voluntary departure is granted.   The parties' cross-motions reflect a substantial

disagreement on that question.   The court must resolve this legal issue first and then

apply the resulting standard to determine whether there are any genuine issues of

material fact.

### 1.   Voluntary Departure and Legitimate Purposes for Detention

The government contends that this court should view an order granting voluntary

departure as no different than an order of removal, and that its authority and discretion

---

[17] In El Badrawi I, the court ruled that the arrest warrant issued by Agent Manack could not
protect the United States from liability because that warrant was not issued by a neutral magistrate.  579
F. Supp. 2d at 275-76.  The government has not argued otherwise at this stage of the proceedings.

to detain aliens is the same in either case.  The statutory scheme does not bear this out.

Section 1229c of title 8 of the United States Code, entitled "Voluntary departure,"

addresses the procedures for voluntary departure and expressly authorizes the use of a

bond to ensure departure, but does not mention the possibility of detention.  8 U.S.C.

§ 1229c(b)(3).  By contrast, section 1231 is entitled "Detention and removal of aliens

ordered removed."  That section provides that, "During the removal period, the Attorney

General <u>shall</u> detain the alien."  8 U.S.C. § 1231(a)(2) (emphasis added).

　　　In a recent opinion, the Supreme Court emphasized the substantial differences

between removal and voluntary departure, including the fact that an alien departing

voluntarily "avoids extended detention:"

> Voluntary departure, under the current structure, allows the
> Government and the alien to agree upon a <u>quid pro quo</u>.
> From the Government's standpoint, the alien's agreement to
> leave expedites the departure process and avoids the
> expense of deportation—including procuring necessary
> documents and detaining the alien pending deportation.  The
> Government also eliminates some of the costs and burdens
> associated with litigation over departure. . . .
>
> Benefits to the alien from voluntary departure are evident as
> well.  He or she avoids extended detention pending
> completion of travel arrangements; is allowed to choose
> when to depart (subject to certain constraints); and can
> select the country of destination.  And, of great importance,
> by departing voluntarily the alien facilitates the possibility of
> readmission.

<u>Dada v. Mukasey</u>, 554 U.S. 1, 11 (2008); <u>see also</u> <u>id.</u> at 23 (Scalia, J., dissenting)

("[voluntary departure] enables the alien to avoid detention pending involuntary

deportation, to select his own country of destination, to leave according to his schedule

(within the prescribed time), and to avoid restrictions upon readmission that attend

involuntary departure").

It would be going too far to say that these authorities expressly foreclose the possibility of a legitimate detention following a grant of voluntary departure. Section 1229c does not expressly prohibit the use of detention in cases of voluntary departure, and, although the Supreme Court in Dada indicated that avoiding detention is among the benefits of agreeing to voluntary departure, it did not hold that the parties could not agree to voluntary departure under different terms. Instead, what these authorities show is that the procedures and rules that apply in a case of voluntary departure should not be conflated with those that apply following an order of removal. The mandate to use detention in cases of removal, 8 U.S.C. § 1231(a)(2), clearly does not apply in cases of voluntary departure, and therefore, it does not explain the authority for detention in this case.[18]

The government has cited no statutory or regulatory authority supporting the use of detention following a grant of voluntary departure. The court is aware of none except 8 C.F.R. § 240.25(b), which provides that "[t]he Service may attach to the granting of voluntary departure any conditions it deems necessary to ensure the alien's timely departure, including the posting of a bond, continued detention pending departure, and removal under safeguards," (emphasis added), and 8 C.F.R. § 1240.26(b)(3)(i), which

_____

[18] The government suggests that there is some relevance to the fact that the order in this case contains an alternate order of removal. By its own terms, that alternate order becomes effective only "if respondent fails to depart as required." USA Ex. 42. Moreover, the IJ specifically explained to El Badrawi that the voluntary departure order "is not a deportation order." USA Ex. 41 at 2. It cannot credibly be disputed that El Badrawi was granted voluntary departure and not ordered removed. Thapa v. Gonzales, 460 F.3d 323 (2d Cir. 2006), is not to the contrary. There, the Second Circuit held that orders of voluntary departure, including those with alternate orders of removal, "are final orders of removal for the purposes of judicial review" (i.e., for purposes of triggering a right to judicial review under 8 U.S.C. § 1252). Thapa, 460 F.3d at 334. The Second Circuit did not consider and did not suggest that a grant of voluntary departure is equivalent to an order of removal for purposes of post-order detention. To the contrary, the Second Circuit emphasized certain differences between voluntary departure and removal, noting that voluntary departure allows aliens "to put their affairs in order without fear of being taken into custody at any time." Id. at 328 (quotation omitted).

provides that, upon granting voluntary departure, an immigration judge "may impose

such conditions as he or she deems <u>necessary to ensure the alien's timely departure</u>

from the United States . . . " (emphasis added).  These provisions authorize continued

detention, but only for the same specifically limited purpose.  In the absence of any

other authority for detention following a grant of voluntarily departure, the court holds

that the only intended and legitimate purpose of such detention is "to ensure the alien's

timely departure."

The record of the removal proceedings confirms that this could be the only

legitimate purpose for detention in this case.  At that proceeding, the government's

attorney expressed the parties' agreement to voluntary departure in the following terms,

"Voluntary departure under safe[guards], Your Honor, <u>as soon as possible</u>."  USA Ex.

41, at 1 (emphasis added).[19]  "Voluntary departure under safeguards" appears to refer

generally to a procedure involving detention until departure.  <u>See</u> <u>In re M.A.S.</u>, 24 I. & N.

Dec. 762, 766 (B.I.A. 2009) ("the term 'voluntary departure with safeguards' is

commonly used to characterize the requirement that an alien remain in custody until he

or she departs from the United States").[20]  Because voluntary departure reflects a "<u>quid</u>

<u>pro quo</u>" between the government and the alien, <u>Dada</u>, 554 U.S. at 11, this recorded

---

[19] The IJ accepted that agreement and asked whether 30 days would provide enough time.  USA Ex. 41, at 1.  The government indicated that it would.  <u>Id.</u>  In his written Order, the IJ imposed the 30-day time limit but provided the government with discretion to extend that period.  USA Ex. 42.

[20] El Badrawi contends that he did not understand safeguards to mean detention.  As it appears that "safeguards" does generally refer to detention in this context, a misunderstanding on El Badrawi's part might indicate a lapse by El Badrawi's counsel in the immigration proceedings or by the IJ in failing to explain this to El Badrawi.  It is not clear, however, how this should bear on the claim before the court.  An abuse of process claim tests the defendant's use of the process once it is issued, not the manner by which it obtained the process.  <u>See</u>  <u>Lewis Truck & Trailer, Inc. v. Jandreau</u>, 11 Conn. App. 168, 526 A.2d 532, 534 (1987) ("The purpose for which the process is used, once it is issued, is the only thing of importance").

expression of the parties' intent is significant.[21]  Having obtained El Badrawi's

agreement to "voluntary departure under safeguards," and the IJ's Order to that effect,

under the understanding that the departure would be effected "as soon as possible," it

would be an abuse of process for the government to then prolong El Badrawi's

detention in order to accomplish purposes that did not facilitate his prompt departure.

The question on El Badrawi's abuse of process claim is whether the government

used the order granting voluntary departure under safeguards in order to ensure El

Badrawi's timely departure or whether they used it to keep him detained primarily for

some other extraneous purpose.  See Larobina v. McDonald, 274 Conn. 394, 403

(2005) ("the gravamen of the action for abuse of process is the use of a legal process

. . . against another primarily to accomplish a purpose for which it is not designed")

(quotation omitted; emphasis in original).  It is important to be clear that the issue is not

whether or not the IJ was correct in entering such an order in the first place.  An abuse

of process claim is not an opportunity to challenge or relitigate the steps that led up to

the issuance of process, because "abuse of process occurs 'not in the issue of process,

but in its abuse.'"  Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 114 (2d Cir. 1996)

(quoting Shaeffer v. O.K. Tool Co., 110 Conn. 528, 148 A. 330, 332 (1930)); see also

Lewis Truck & Trailer, Inc. v. Jandreau, 11 Conn. App. 168, 526 A.2d 532, 534 (1987)

("The purpose for which the process is used, once it is issued, is the only thing of

importance").  The question is whether, having obtained such an order, the government

misused the power the order gave to it.  If El Badrawi was detained in order to effect his

---

[21] Unlike El Badrawi's purported concession of removability, which the government raised in
connection with the false arrest claim, the government's agreement to voluntary departure "as soon as
possible" is supported by the record of the immigration proceedings.  See USA Ex. 41.

timely departure, then there could be no abuse of process.  If the government kept him detained while departure was possible, in order principally to accomplish purposes unnecessary and unrelated to effecting his departure, this would constitute an abuse of process.

Neither Zadvydas v. Davis, 533 U.S. 678 (2001), nor Turkmen v. Ashcroft, 589 F.3d 542 (2d Cir. 2009), supports application of a standard that would be more favorable to the government.  In Zadvydas, the Supreme Court was faced with the interpretation of 8 U.S.C. § 1231(a)(6), a special statutory provision applicable to certain classes of aliens who have been ordered removed.  By its terms, the statute appears to authorize indefinite detention.  Sensitive to the constitutional problems this could present, the Supreme Court read an implicit limitation into the statute, requiring that detention extend no longer than the "period reasonably necessary to bring about the alien's removal." Zadvydas, 533 U.S. at 689.  However, seeking to limit the possibility of intrusive habeas review, the Court held that, for detention under section 1231(a)(6), a six month period of detention is presumptively reasonable.  Id. at 700-01.  Nothing in the Zadvydas decision suggests that this six-month period should apply in cases of voluntary departure or in cases that do not involve 8 U.S.C. § 1231(a)(6).  Moreover, the presumption in Zadvydas applies in the context of constitutional challenges to the length of detention.  El Badrawi, however, proceeds not simply on the theory that his detention was unreasonably long, but on a tort theory that requires him to show that the government affirmatively misused a detention order for a purpose that was not intended.

Another case relied on by the government, Turkmen v. Ashcroft, 589 F.3d 542 (2d Cir. 2009), is distinguishable for similar reasons.  Although two of the plaintiffs in

Turkmen were detained following a grant of voluntary departure, the court considered

the propriety of their detention to be controlled by 8 U.S.C. § 1231(a)(6).  The court did

so because plaintiffs failed to raise any distinction between the voluntary departure

procedures and the removal procedures before the district court and failed to plead the

relevant details; because one of the plaintiffs had been found by the IJ to be a

disappearance risk; and because the other had failed to request bond.  Id. at 549, n.6.

Measuring their detentions against the authority provided by section 1231(a)(6), the

Second Circuit held that the plaintiffs had not pled facts supporting a plausible claim

under the standard articulated in Zadvydas.  Turkmen, 589 F.3d at 549-50.  The court

did not decide whether a plaintiff could state a claim for unconstitutional detention

without satisfying Zadvydas because, "[t]o the extent plaintiffs' claims are not based on

Zadvydas, the moving defendants are entitled to qualified immunity."  Turkmen, 589

F.3d at 550.  None of the Second Circuit's reasons for applying section 1231(a)(6) are

applicable here.  El Badrawi has not waived his claim that the voluntary departure

procedures differ from the removal procedures; the record does not indicate that El

Badrawi was found to be a disappearance risk, see USA Exs. 33 (Notice of Custody

Determination by Agent Manack), USA Exs. 40-42 (transcript of immigration

proceedings and IJ's Order); and El Badrawi did request bond, USA Ex. 39 (Bond

Hearing Worksheet).  Therefore, Turkmen does not support the application of

section 1231(a)(6) to El Badrawi's case.  Moreover, the United States is not entitled to

qualified immunity because El Badrawi's claim for abuse of process is a tort law claim

under the FTCA.

 Although the government acknowledges that Zadvydas and Turkmen are

distinguishable, the government nonetheless argues that these cases are instructive to the extent that they suggest that the courts should be wary of permitting claims that intrude upon the executive branch's authority to carry out immigration and national security policy.  The court is sensitive to this concern.  However, while the government requires broad discretion to carry out its immigration, foreign policy and national security functions, the government chose not to invoke the procedures that permit such discretion in this case.  The removal statute, 8 U.S.C. § 1231, provides expansive discretion to detain an alien pending removal.  If the government sought that discretion here, it needed only to put its theory that El Badrawi was removable to the test.  Given that the government agreed to voluntary departure "as soon as possible," it cannot reasonably complain when its subsequent actions are measured according to the laws and regulations applicable to voluntary departure.  Permitting El Badrawi's claim to proceed under the standard articulated here does nothing to limit or intrude upon the executive's discretion in dealing with aliens who are actually ordered removed.  Instead, doing so properly reflects the fact that the government's decision to agree to voluntary departure has consequences.

## 2.    Application to the Record

Applying the standard above, the court finds that there are genuine issues of material fact requiring a trial.  Neither party has produced an uncontested record of what occurred during the 42-day period that El Badrawi was detained following the grant of voluntary departure.  El Badrawi argues that he is entitled to summary judgment because there is evidence that the government investigated him during his detention and because, he believes, there is no other explanation for the delay in his departure.

The government argues that it is entitled to summary judgment because there is no direct evidence that the government delayed El Badrawi's departure for an improper purpose.  Given the absence of evidence indicating what did happen and why, accepting either argument would require the court to draw inferences in favor of the party seeking summary judgment.  El Badrawi has not shown that his departure could have occurred any earlier than it did or that any delay was necessarily attributable to the government's pursuit of an improper purpose.  A finder of fact need not infer that the government delayed El Badrawi's departure in order to accomplish an improper purpose, and the court is not permitted to do so on El Badrawi's summary judgment motion.  The government has not provided evidence indicating why it took 42 days to accomplish El Badrawi's departure.  A finder of fact need not infer that there is a legitimate explanation for this delay, and the court is not permitted to do so on the government's summary judgment motion.  Accordingly, neither party is entitled to summary judgment.

On El Badrawi's Motion for Summary Judgment, the court must view the evidence in the light most favorable to the government and draw inferences in its favor. Doing so, the court concludes that a finder of fact could conclude that El Badrawi's departure date was determined by factors that do not show an abuse of process on the government's part.  First, the court notes that some portion of the delay could be found to be attribute to holidays and routine administrative delays.  El Badrawi was ordered removed on November 10, 2004.  Veterans Day was the following day, and Thanksgiving also occurred during the period between the IJ's Order and El Badrawi's departure.  The ICE official responsible for arranging El Badrawi's departure testified

that it usually took between a few days and a week for a file to be delivered from the immigration court to her office.  USA Ex. 11 at 49.  Crediting this testimony, drawing inferences in the government's favor, and accounting for the Veterans Day holiday, a finder of fact could conclude that it may have been as late as November 18 before anyone at ICE would have had an opportunity to begin arranging El Badrawi's departure.

Some of the delay could also be found to be attributable to foreign countries or airlines.  It is uncontested that Lebanon and any other stop-over country en route—in this case, Italy—had a sovereign right to deny or delay admission to El Badrawi.  See Landon v. Pascencia, 459 U.S. 21, 32 (1982) ("the power to admit or exclude aliens is a sovereign prerogative").  Delay to obtain the permission of such countries therefore would not constitute an abuse of process.  The government argues, and El Badrawi does not dispute, that, in cases of voluntary departure under safeguards to Lebanon, the government's standard procedure included providing advanced notification to and obtaining approval from Lebanon and any countries the alien would pass through en route to Lebanon.  Pl. Local R. 56(a)(2) Statement ¶ 62.  The IJ's Order contemplated the fact that the government would provide notice to Lebanon and that Lebanon would have an opportunity to refuse to accept El Badrawi.  USA Ex. 42.  The government also cites evidence indicating that advanced notice of 10 business days was required for removals into Lebanon.  See November 2004 Removal Guidelines (USA Ex. 49) at 7 (noting that, for removals to Lebanon, ten business days' notification is required and that "[c]ountry clearance must be requested from the embassy"); Mersereau Depo. (USA Ex. 11) at 24-25 (testifying that the Removal Guidelines accurately represented

the process in 2004 and that "ten business days was . . . the basic number that most

countries required").  The documentary evidence does not make clear whether or not

Lebanon imposed the same advanced notice periods for aliens who had been ordered

to depart under safeguards, but the ICE official who oversaw El Badrawi's departure

testified that, generally, 10-days notice would have been required.[22]  See Mersereau

Depo. (USA Ex. 11) at 21, 24-25.  For purposes of El Badrawi's summary judgment

---

[22]  The government also submits the declaration of Lisa Hoechst, a Supervisory Detention and Deportation Officer for ICE, who claims that, based on her experience with deportation generally, "[f]oreign governments and commercial airlines do not differentiate between a final order of removal and an order granting voluntary departure under safeguards . . . ."  Gov. Exh. 5, ¶¶ 4, 8.  According to Hoechst, Lebanon, any other countries through which El Badrawi would have traveled en route to Lebanon, and commercial airlines all would have required advance notice from ICE.  Id. ¶¶ 5-9.  Hoechst claims that, in late 2004, Lebanon routinely required 30 days' notice before accepting an alien in ICE custody, including aliens who presented apparently valid Lebanese passports.  Id. ¶¶ 11-12.  This claim is potentially supported by, and may help to explain, a May 20, 2005 USCIS Memorandum, stating that the Government of Lebanon had begun requiring 30 days' advance notice "on all deportees, regardless of nationality."  USA Ex. 50.  This memorandum does not make clear when this longer requirement went into effect or why, but it is possible that the time period was increased to 30 days because that better reflected practice in the end of 2004 and beginning of 2005.  Additionally, Hoecsht states that processing by ICE was affected by limited staffing resources and that, in 2004, ICE processed 202,842 removals, 2,364 of which originated from the Boston field office, which encompasses the Hartford sub-office which handled El Badrawi's departure.  Id. ¶ 13.

El Badrawi has moved to strike the Hoechst Declaration on the ground that it violates a stipulation between the parties.  On November 19, 2009, the parties stipulated that El Badrawi would withdraw his notice of deposition of a Rule 30(b)(6) witness regarding El Badrawi's detention, and that (i) "all knowledge of the United States regarding Plaintiff's 42-day detention has been previously identified, produced, set forth, and/or testified to in this litigation" and that (ii) "the United States will not offer evidence from any other person . . . who later recalls having any personal involvement with Plaintiff's 42-day detention."  Pl. Ex. 20.  El Badrawi requests that, in the alternative to striking the Hoechst Declaration, discovery be reopened so that he may have the opportunity to depose Hoechst.

The Hoechst Declaration does not violate the second of these terms in the parties' Stipulation.  Hoechst's Declaration disclaims any recollection of personal involvement in El Badrawi's case, Gov. Ex. 5, ¶ 14, and is based instead on Hoechst's personal knowledge of ICE removal and detention procedures generally, id. ¶ 2.  The government's position that the Hoescht Declaration also does not violate the first of the above quoted terms depends on a very strict reading of the Stipulation.  Although Hoechst's Declaration does not set forth knowledge directly about El Badrawi's detention per se, it does set forth knowledge about detentions generally and it is being offered to prove facts about El Badrawi's detention.  It is questionable whether this is consistent with the intent of the parties as expressed in the Stipulation.

Nonetheless, El Badrawi's Motion to Strike is denied.  Under the circumstances, the ends of justice are better served by permitting, rather than excluding, relevant evidence.  The Hoescht Declaration contains evidence that may be relevant at trial, but consideration of that Declaration would not change the court's Ruling on the pending Motions.  Therefore, neither party has been prejudiced at this stage.  In order to prevent prejudice at trial, the court allows El Badrawi leave to take Hoechst's deposition before trial.

motion, the court must credit this testimony.  Therefore, a finder of fact could reasonably conclude that some of the delay in El Badrawi's departure was due to the necessary process of obtaining foreign government approval.

The record does not establish when the government first sought approval from Lebanon, Italy, or the airline that carried El Badrawi.  The earliest documented international communication, a cable to United States diplomatic offices in Lebanon and Italy, was issued on December 6, 2004, nearly a month after El Badrawi was granted voluntary departure.  USA Ex. 46.  However, drawing inferences in favor of the government, a finder of fact could find that there would have been earlier communications.  The December 6, 2004 cable indicates that El Badrawi was initially scheduled to depart on December 13, 2004.  Id.  Thus, even if immediately passed on from the U.S. embassies to the foreign governments, the December 6 cable would not have satisfied the minimum 10-day advanced notice requirement discussed above.  To conclude that the government delayed until December 6 to seek approval from foreign governments would require an inference in El Badrawi's favor.  No such inference is permissible on El Badrawi's Motion for Summary Judgment.

Granting reasonable inferences in favor of the government, the finder of fact could also find that the notification and approval process would have caused a significant portion of the delay in El Badrawi's departure.  Such a conclusion would find some support in the evidence that the government believed El Badrawi posed a potential threat to national security.  USA Ex. 3 at 203, 208-09, 242; USA Ex. 8 at 169-70; USA Ex. 28.  Whether or not that belief was correct or justified at the time, a finder of fact could reasonably believe that the government would have been obliged to

provide some indication of its concerns about El Badrawi to the countries and airlines with whom it needed to arrange El Badrawi's departure.  It would also be reasonable to suppose that sharing such information would prompt demands for further investigation and delays in providing approval from those countries and airlines.  Thus, a finder of fact could find that investigation of El Badrawi by the government was either required by a foreign country or airline or done during a period of delay attributable to a foreign country.  Such investigation would have either facilitated El Badrawi's departure or, at least, not delayed it.  In either case, it would not constitute abuse of process.

Finally, the initial itinerary, showing a travel date of December 13, was cancelled, and another itinerary was issued for December 22, 2004.  USA Ex. 45.  Government witnesses testified that this was not unusual, and that rescheduling might be required because, inter alia, officers were unavailable to escort the alien to the airport or because the foreign government refused to accept the alien on that date.  USA Ex. 11 at 28. Thus, granting inferences in favor of the government, the final period of delay between December 6 and December 22, 2004, could be found to be attributed to routine personnel issues or to the demands of a foreign sovereign.

El Badrawi has not countered with evidence that would require a finder of fact to conclude that Lebanon, Italy and the airlines had approved his travel for an earlier date, or that ICE delayed in initiating the process of obtaining their approval until after ICE had accomplished some other improper purpose.  El Badrawi has presented evidence that ICE's Cyber Crimes division was investigating El Badrawi through December 3, 2004, the last weekday before itineraries for El Badrawi's departure were generated. However, the government witnesses involved in this investigation and in arranging El

53

Badrawi's departure both testified that the investigation had no impact on his departure date.  USA Ex. at 86-88; USA Ex. 11 at 29, 49-50.  El Badrawi also argues that delay may have been attributable to an investigative check referred to as a Third Agency Check or "TAC."  However, it is unclear whether a TAC was done in El Badrawi's case, or whether it actually delayed his departure.  Pl. Ex. 8 (Rollins Depo.) at 96-97, 101 (testifying that the government searched for but could not find any record that a TAC had been done in El Badrawi's case).  On El Badrawi's Motion for Summary Judgment, the court cannot infer that the government delayed El Badrawi's departure in order to complete these investigations.  As a result, a finder of fact drawing reasonable inferences from the record before the court could conclude that El Badrawi's departure was delayed primarily due to some combination of routine administrative delays and scheduling issues, holidays, and the demands of foreign governments and airlines, whose approval was needed to accomplish departure.  If a finder of fact reached that conclusion, it could not find that the government abused the voluntary departure process primarily to accomplish an improper purpose.  Therefore, El Badrawi's Motion for Summary Judgment on the abuse of process claim is denied.

Turning to the United States' Motion for Summary Judgment, the court views the evidence and draws inferences in favor of El Badrawi.  Doing so, the court cannot find that the government is entitled to summary judgment.  First, on the government's Motion, the court may not infer that the government made any effort to secure foreign government approval prior to December 6, 2004.  Therefore, the court may not rely on the possibility that foreign governments caused the delay in order to find in the government's favor.  Indeed, viewing the evidence in El Badrawi's favor, the absence of

any cable prior to December 6, 2004, as well as the uncontroverted evidence that the government was investigating El Badrawi up until December 3, 2004, would support a finder of fact in inferring that the government delayed in seeking to make the necessary arrangements for El Badrawi's departure in order to investigate El Badrawi.

The government argues that a typical removal to Lebanon could take as long as El Badrawi's departure took, and that the standard removal procedures, if followed in El Badrawi's case, would explain the full period of El Badrawi's departure.  The government fails to establish, however, that these standard removal procedures were actually followed in this case.  Indeed, it concedes that it cannot establish this.  The court cannot draw an inference, as the government requests, that the standard removal process was followed.  Even if the court could draw this inference, the government has not established that these standard removal procedures were a necessary or appropriate part of effecting El Badrawi's departure.  The government's own witness testified that its normal procedure for an alien being removed to Lebanon would have included a TAC, and that this process could substantially delay the alien's departure. See, e.g., USA Ex. 11 at 21-23, 28; see also USA Local R. 56(a)(1) Statement ¶¶ 57-59.  The government also admits that one of the purposes of a TAC is not to effect timely departure, but to prevent the removal of an alien who may be a national security risk to the United States.  USA Local R. 56(a)(1) Statement ¶ 56.  This purpose is inconsistent with the purpose of detention pending voluntary departure and with the specific purpose agreed to by the government.  Although identifying and preventing the release of national security threats is a goal of paramount importance, it is a goal that should inform the decision to agree to voluntary departure in the first place.  The

government may not agree to allow the alien to voluntarily depart, and then keep the alien incarcerated for the purpose of deciding whether that agreement was a mistake. Thus, if an investigation was conducted, and if that investigation delayed El Badrawi's departure, this could constitute an abuse of the voluntary departure process.  Viewing the evidence in the light most favorable to El Badrawi, a finder of fact could conclude that this is what happened.  Therefore, the United States' Motion for Summary Judgment on the abuse of process claim is also denied.

**V.      CONCLUSION**

For the foregoing reasons, the United States' Motion for Summary Judgment is **DENIED**.  El Badrawi's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  It is granted with respect to his claim for false arrest and denied with respect to his claim for abuse of process.  El Badrawi's Motion to Strike is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 11th day of April 2011.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge