UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RASHAD AHMAD REFAAT EL BADRAWI, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 07-cv-1074 (JCH) |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| ET AL., | : | MAY 16, 2011 |
| Defendants. | : | |

**RULING ON STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DOC. NO. 352)**

I.    **INTRODUCTION**

On October 29, 2004, plaintiff Rashad Ahmad Refaat El Badrawi was arrested by federal agents on charges of violating immigration law.  At the behest of federal immigration authorities, El Badrawi was held without bail at the Hartford Correctional Center (HCC), a state prison facility, for nearly two months, until he was escorted out of the country on December 22, 2004.  El Badrawi claims that, while he was at HCC, he was not permitted to join the "Ramadan list" and therefore was not able to observe the Muslim Holy Month of Ramadan by fasting during daylight hours.  El Badrawi also claims that prison staff refused to provide medication in order to treat the painful symptoms of Crohn's Disease.

El Badrawi brought this action against various departments and officials of the federal and state governments, challenging the legality of his arrest, his detention, and his treatment while detained.  In a prior decision, El Badrawi v. Dep't of Homeland Security ("El Badrawi I"), 579 F. Supp. 2d 249 (D. Conn. 2008), the court held that El Badrawi could proceed on certain claims against the United States and on two claims, brought pursuant to 42 U.S.C. section 1983, against HCC's Warden, Charles Lee, for

1

violations of his right to exercise his religion and his right to medical care while in government custody.  The court dismissed a claim, brought pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., against Warden Lee in his official capacity.  El Badrawi I, 579 F. Supp. 2d at 262, 281. However, the court granted permission to amend the Complaint in order to plead an individual capacity RLUIPA claim.  Id.  El Badrawi amended to assert individual capacity RLUIPA claims against Warden Lee; Reverend James Pitts, Director of Religious Services at HCC; and Thomas McGrail, HCC's Director of Food Services.

The court has issued a Ruling (Doc. No. 431) addressing summary judgment motions on the claims against the United States.  This instant Ruling addresses a separate Motion for Summary Judgment (Doc. No. 352) filed on behalf of the "state defendants," i.e., Warden Lee, Reverend Pitts, and Thomas McGrail.  For the following reasons, the state defendants' Motion is granted with respect to the RLUIPA claim against Thomas McGrail and the section 1983 medical care claim against Warden Lee. The Motion is denied with respect to the section 1983 free exercise claim against Warden Lee and the RLUIPA claims against Warden Lee and Reverend Pitts.

## II.   BACKGROUND

The circumstances of El Badrawi's arrest by federal agents and the facts regarding the decision to keep him detained are set forth in the court's Ruling on the claims against the United States.  See Ruling (Doc. No. 431) at 3-8.  The parties do not contend that the state defendants had anything to do with these decisions.  Instead, the claims against the state defendants relate solely to the conditions of El Badrawi's confinement at HCC.

2

El Badrawi was transferred to HCC in the afternoon or evening of October 29, 2004. This was approximately midway through the Muslim Holy Month of Ramadan, which extended from October 14, 2004, to November 13, 2004. El Badrawi is a practicing Sunni Muslim. He observes Islamic dietary restrictions, he prays five times per day, and he routinely attends prayer services. During Ramadan, Muslims are required to fast during daylight hours and abstain from material pleasures. El Badrawi has fasted during Ramadan since he was 10 years old.

In 2004, inmates at HCC could receive meals at times that would permit them to observe Ramadan only if they were placed on a "Ramadan list." A 2004 Connecticut Department of Corrections ("DOC") memorandum (the "2004 Ramadan Memo") indicates that, in order to be place on the Ramadan list, an inmate must sign a form in the presence of a prison chaplain. Def. Ex. 15. It is undisputed that El Badrawi was never added to the Ramadan list and was not provided with meals at times that would have permitted him to fast for Ramadan. Whether El Badrawi could have joined  the Ramadan list midway through the month is a matter of dispute.

The 2004 Ramadan Memo does not indicate whether there is a deadline for signing up or whether new inmates can be added to the list after any such cutoff date has passed. HCC records regarding the number of inmates participating in the Ramadan fast in 2004 do not indicate that any new inmates were added to the list after Ramadan began. Def. Ex. 17; Pl. Ex. 20. Notations on a DOC copy of the 2004 Ramadan Memo indicate that someone at DOC recognized that the Memo should be revised in future years to include an express cutoff date for signing up and an express exception for new inmates. Def. Ex. 16. In 2005 and 2006, DOC policy expressly

3

provided both a cutoff date and an exception for inmates who arrived after that date. Def. Ex. 19; Pl. Exs. 18, 19.

Although there is no explicit deadline date in the 2004 Ramadan Memo, Reverend Pitts testified that HCC had an "implicit deadline" for signing up in 2004. Pl. Ex. 5 (Pitts Depo. Tr.) at 110-13. As the Director of Religious Services at HCC, Reverend Pitts, together with Warden Lee, was responsible for implementing DOC's policies on religion at HCC. Id. at 18-21. Although Reverend Pitts' testimony is unclear at important points, it appears to indicate that the implicit deadline was not intended to be enforced against new inmates who arrived after the deadline. See id. at 110-13 However, his testimony does not indicate whether this understanding of the implicit deadline was communicated to HCC staff who might encounter requests to be added to the Ramadan list. See id. Nor is there any indication in the record that either Reverend Pitts or Warden Lee took measures to train HCC staff regarding the application of the 2004 Ramadan Memo, or any implicit deadline, to new inmates arriving at HCC after Ramadan had begun.

El Badrawi claims that within two days of his arrival at HCC he asked an HCC prison official for a meal accommodation, but the official informed El Badrawi that he could not be added to the Ramadan list midway through Ramadan. Pl. Ex. 1 (El Badrawi Decl.) ¶ 11. El Badrawi claims that he made at least three requests to HCC staff members in total, including two corrections officers and one prison counselor, but his requests were consistently denied for the same reason. Id. ¶¶ 12, 14. El Badrawi also contends that, after learning of the Muslim chaplain, he requested a meeting, but that he was unable to get a meeting until after Ramadan had ended. Id. ¶ 13. At that

meeting, El Badrawi contends, the Muslim chaplain, Imam Havci, confirmed that El Badrawi would not have been permitted to join the Ramadan list midway through Ramadan.  Id.

The defendants claim that El Badrawi could have been added to the Ramadan list if he had made a proper request to HCC's Muslim chaplain or to another member of HCC's Religious Services staff.  They contend that he should have known to do this because an HCC chaplain would have given a presentation about religious services and about the Ramadan list at the new inmate orientation that El Badrawi attended, which orientation should have occurred shortly after his arrival.  Reverend Pitts testified that he trained chaplains to discuss religious services and to address the Ramadan list at new inmate orientations during the months or weeks leading up to Ramadan.  Pl. Ex. 5 (Pitts Depo.) at 65-68.  However, El Badrawi does not recall that any presentation regarding Ramadan or religious services at his orientation session, which occurred in the middle of Ramadan.  Pl. Ex. 1 ¶ 19.  In addition, El Badrawi also contends that he only learned that HCC had a Muslim chaplain sometime later, through a fellow inmate. Id. ¶ 21.  El Badrawi contends that no one at HCC informed him that he should make a request to the Religious Services staff or that he should request and fill out a Ramadan sign-up form.  See Pl. Ex. 1 ¶¶ 16, 17.

El Badrawi has been diagnosed with Crohn's disease, a condition that can cause painful inflammation of the gastrointestinal tract and internal bleeding.  El Badrawi's condition was first diagnosed in 1996 by a physician in Boston.  To treat his condition and suppress the episodic flare-ups, El Badrawi's doctor prescribed daily use of the medication Asacol.  Because El Badrawi took Asacol on a daily basis from 1996 through

2004, his Crohn's disease remained stable, and he experienced only occasional episodes of minor pain.  Pl. Ex. 1 (El Badrawi Decl.) ¶¶ 30, 31.

Shortly after arriving at HCC, El Badrawi underwent a medical intake process, including a mental and physical health screening and evaluation.  During this screening, El Badrawi informed the medical nurse that he suffered from Crohn's disease and that he had been prescribed Asacol to treat it.  The nurse wrote in El Badrawi's medical record that El Badrawi had last taken his Asacol on October 2, 2004.  However, El Badrawi claims that he did not say that to the intake nurse and that he had taken his Asacol regularly up to the day preceding his arrest.  See Pl. Ex. 2 (El Badrawi Depo. Tr.) at 126.

Later in the evening of October 29, 2004, after being brought to his housing unit, El Badrawi told another inmate that he was in pain, and the inmate alerted a correctional officer.  The officer brought El Badrawi to the HCC medical facility.    At the medical facility, El Badrawi informed a nurse that he was in serious pain and that he believed his medication had been transferred to HCC.  It is not clear what became of El Badrawi's medication in the process of his transfer to HCC.  El Badrawi testified that the arresting officers had taken custody of his medication and that he had asked them for his medication when he learned that he would be held at HCC.  Pl. Ex. 2 (El Badrawi Depo. Tr.) at 106.  El Badrawi also claims that HCC did not accept his medication from the federal agents.  Pl. Ex. 1 (El Badrawi Decl.) ¶ 35.  Whatever became of his medication, the nurse informed El Badrawi that she had not received anything indicating that El Badrawi should be taking medication.  El Badrawi was told that he would need to see a doctor and was returned to his cell without medication.

On or about November 1, 2004, El Badrawi filled out an inmate request form for Asacol.  Approximately one week after arriving at HCC, perhaps as early as November 3, 2004—the date is contested—El Badrawi received a supply of Asacol.  See Pl. Ex. 2 (El Badrawi Depo. Tr.) at 180-81.  El Badrawi was also eventually seen during his incarceration by Dr. James McKenna of the University of Connecticut Correctional Managed Health Care ("CMHC") staff.  Id.

## III.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to determine whether there are issues of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury.  Sologub v. City of New

7

York, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.   DISCUSSION

### A.   Section 1983 Free Exercise Claim Against Warden Lee

#### 1.   Legal Standard

State defendants have moved for summary judgment on El Badrawi's section 1983 free exercise claim against Warden Lee.  Prison officials run afoul of the First Amendment's Free Exercise Clause when they impose substantial burdens on a plaintiff's sincerely-held religious beliefs for reasons not reasonably related to legitimate penological interests.  El Badrawi I, 579 F. Supp. 2d at 256 (citing Ford v. McGinnis, 352 F.3d 582, 588-95 (2d Cir. 2003)).  The Second Circuit has held that failure to accommodate a prisoner's religious dietary restrictions will constitute a free exercise violation.  Ford, 352 F.3d at 597 ("We have . . . clearly established that a prisoner has a right to a diet consistent with his or her religious scruples").

A supervisor, such as Warden Lee, may not be held vicariously liable in a Section 1983 action.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) ("Respondeat superior or vicarious liability will not attach under § 1983.").  Instead, the Second Circuit has held that a defendant supervisor may be found to be liable under section 1983, if he violated the plaintiff's rights in one of the following manners:

> (1) the defendant participated directly in the alleged
> constitutional violation; (2) the defendant, after being
> informed of the violation through a report or appeal, failed to
> remedy the wrong; (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom; (4) the
> defendant was grossly negligent in managing subordinates
> who committed the wrongful acts; or (5) the defendant
> exhibited deliberate indifference to the rights of inmates by
> failing to act on information indicating that unconstitutional

8

acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); accord El Badrawi I, 579 F. Supp.

2d at 256-57.[1]  The parties' arguments focus on whether or not Warden Lee could be

found liable under either the third or fourth of these categories.

To the extent that plaintiff's claim is based on a failure to manage or train,

defendants have argued, see Def. Mem. at 38, and plaintiff conceded at oral argument,

that the standard for failure to train claims against municipalities provides appropriate

guidance.  The Supreme Court has held that a municipality may be held liable for a

failure to train employees where it is shown that the municipal policy makers were

deliberately indifferent to the constitutional rights at stake.  See City of Canton, 489 U.S.

at 390.  A pattern of similar, prior violations is "ordinarily necessary to demonstrate

deliberate indifference for purposes of failure to train."  Connick v. Thompson, 131 S. Ct.

1350, 1360 (2011) (quotation omitted).  However, the Supreme Court has consistently

recognized that, in some circumstances, "the unconstitutional consequences of failing to

---

[1] State defendants argued in their Memoranda that the availability of supervisor liability on these grounds has been called into question by Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948-49 (2009). However, the Iqbal Court held only that, where a constitutional violation requires discriminatory purpose, this requirement also applies when pursuing a claim on a supervisor liability theory.  See id.  ("The factors necessary to establish a Bivens violation will vary with the constitutional provision at issue.  Where the claim is invidious discrimination in contravention of the First and Fifth Amendment, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose").  At oral argument, state defendants conceded that Iqbal does not establish a heightened intent requirement for supervisor liability with respect to all constitutional violations.  Moreover, the district courts in this Circuit that have addressed this issue most recently have held that, where a violation of a particular constitutional right does not require a heightened form of intent, such as purpose, Iqbal does not affect the application of Colon.  See, e.g., Qasem v. Toro, 737 F. Supp. 2d 147, 152 (S.D.N.Y. 2010); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010); Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009).

Proving a violation of the First Amendment's Free Exercise clause does not require proving discriminatory purpose or any other heightened form of intent; it requires only that the defendant imposed a substantial burden on a plaintiff's sincerely-held religious belief and that this burden cannot be justified by any legitimate penological interest.  See Salahuddin v. Goord, 467 F.3d 263, 274-75 (2d Cir. 2006).  Therefore, with respect to El Badrawi's free exercise claim, Iqbal does not limit application of Colon.

train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." Id. at 1361; accord Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 409 (1997); City of Canton, 489 U.S. at 390 & n.10 ("it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need").

The Second Circuit has imposed four requirements in a claim for failure to train against a municipality:

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation.  [Second], the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation.  [Third], the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.  [Fourth], at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.

Green v. City of New York, 465 F.3d 65, 80-81 (2d Cir. 2006) (quotations and citations omitted).  The Supreme Court's recent decision in Connick does not alter this standard. See Connick, 131 S. Ct. at 1365.  However, the Connick Court does emphasize that a plaintiff must show that constitutional violations were "so predictable that failing to train . . . amounted to conscious disregard" for the rights at issue.  Id.

Based on El Badrawi's concession at oral argument, and finding no support for a

significantly different standard, the court evaluates El Badrawi's claim that Warden Lee may be held liable for failing to supervise and failing to train HCC employees regarding Ramadan policies under this municipal liability standard.  See Shirback v. Lantz, 06-cv-995 (JCH), 2008 WL 878939, *4 n.5 (D. Conn., March 28, 2008) ("It appears to the court that the standard for 'deliberate indifference' as an element of a claim for municipal liability is the same as the standard for 'deliberate indifference or gross negligence' as an element of a claim for personal liability").[2]

## 2.    Application: Imposition of a Substantial Burden

Turning to the record, the court finds that there is a genuine issue of material fact as to whether El Badrawi's right to exercise his religion was substantially burdened.[3]  El Badrawi came to the state correctional facility on October 29, 2004.  In 2004, the Muslim Holy Month of Ramadan extended from October 14 to November 13.  Def. Local R. 56 Statement ¶ 28.  During Ramadan, Muslims are required to fast during daylight

---

[2]  The court notes that a Second Circuit decision cited in Shirback provides some indication that gross negligence, the standard under Colon, may present a slightly lower burden, from the plaintiff's perspective, than deliberate indifference, the standard under Connick and City of Canton.  See Poe v. Leonard, 282 F.3d 123, 140 n.14 (2d Cir. 2002) ("Although 'gross negligence' and 'deliberate indifference' at times are used interchangeably, they represent different degrees of intentional conduct on a continuum").  The Second Circuit cited Doe v. Taylor Independent School Dist., 15 F.3d 443, 453 n. 7 (5th Cir. 1994), for the proposition that these two standards "involve different degrees of certainty, on the part of an actor, that negative consequences will result from his act or omission" and that  gross negligence "is a 'heightened degree of negligence,'" while deliberate indifference is a "lesser form of intent."  Poe, 282 F.3d at 140 n.14; see also City of Canton, 489 U.S. at 388 n.7 (noting, but declining to follow, cases applying a gross negligence standard in claims against municipalities).  However, it is not clear why a different standard should apply to claims of supervisor liability.  See Doe, 15 F.3d at 453 ("The legal elements of an individual's supervisory liability and a political subdivision's liability are similar enough that the same standards of fault and causation should apply").  Nor is it even clear how the court should draw this fine distinction between a heightened form of negligence and a lesser form of intent.  For present purposes, the court applies the deliberate indifference standard, noting that the application of a slightly less stringent standard of fault would not alter the court's disposition of the present Motion.

[3]  There is no dispute that El Badrawi's Islamic faith is sincerely held.  State defendants admit that he practices the Muslim faith, prays five times a day, observes Muslim dietary restrictions, and regularly attends prayer services.  Def. Rule 56 Statement ¶¶ 21-23.  The state defendants also admit that El Badrawi has observed the Muslim Holy Month of Ramadan since the age of 10.  Id. ¶ 25.

hours.  Id. ¶ 26.  El Badrawi was not added to the prison's Ramadan list and, therefore, was not provided with meals at times that would have permitted him to observe the Islamic fasting requirements during Ramadan.  See id. ¶ 190.  El Badrawi claims that he requested to be added to the Ramadan list three times and that he was told by three different correctional facility staff members—a prison counselor and two corrections officers—that he could not be added to the list because he had not signed up prior to the start of Ramadan.  Pl. Ex. 1 (El Badrawi Decl.) ¶¶ 11-12.  El Badrawi also states in his Declaration that, after Ramadan, when he first met Imam Avci, a Muslim chaplain at HCC, Imam Avci confirmed that he could not have been added to the Ramadan list because HCC policy did not permit it.  Id. ¶ 13.  Based on the foregoing, a jury could reasonably find that El Badrawi's right to practice his religion was substantially burdened.

State defendants' argument that El Badrawi should have been more proactive in seeking to be added to the Ramadan list do not alter this conclusion.  Whether or not El Badrawi would have been added to the list if he had taken additional steps is a disputed issue of fact.  Defendants assert that there was no formal policy against adding inmates to the list during Ramadan, citing the Declaration of Reverend Anthony Bruno.  Def. Rule 56 Statement ¶ 133; Bruno Decl. (Def. Ex. 32) ¶¶ 26, 30, 32.  However, there is substantial uncertainty as to whether or not prison policy or custom did, in fact, permit additions to the Ramadan list.

The 2004 Ramadan Memo, issued by Rev. Bruno, does not state whether an inmate could be added to the list after Ramadan began.  Def. Ex. 15.  Reverend Pitts, the facilitator of religious programs at HCC, testified that there was an unwritten

deadline for signing up for the Ramadan list in 2004 and that there may have been some confusion about the policy.  See Pl. Ex. 5 (Pitts Depo. Tr.) at 112 ("I think [the deadline] was there, but I don't think it was written and I don't think it was in the guidelines, and thereby maybe confusing about whether or not we could do that"); id. at 113 ("The deadline, the implicit deadline was always there").  Reverend Pitts testified that the implicit deadline would typically be "about a week" or "several days before Ramadan."  Id. at 112.

The court acknowledges that there are passages in Reverend Pitts' testimony that, to the extent they can be understood, seem to suggest that the deadline was not enforced.  However, these passages are confusing and do not permit the court to rule that, as a matter of law, there is not an issue of fact whether HCC policy permitted new inmates to be added to the Ramadan list after the deadline passed.  The following passages are representative.

> Q:    But is it correct to say that there was no deadline of
>       any sort in 2004 for inmates to sign up for Ramadan?
>
> A:    According to the 2004 guideline that I read, no.
>
> Q:    Was that the 2004 practice?
>
> A.    2004 guidelines said that no deadline was stated, but
>       it was not explicitly implied, but we knew for ourselves
>       that it was implied, that those who came after
>       Ramadan started, they could sign up if they qualified,
>       but that was going on with the guidelines, because
>       anybody could sign up.
>
> Q.    So, in practice, there was no deadline for anyone to
>       sign up at Hartford, is that true?
>
> A.    More than likely.

Id. at 110.

> Q:    So in time before the 2005 policy was issued, during
>        Ramadan 2004, was there a deadline put in place at
>        HCC?
>
> A:    At HCC?
>
> Q:    Yes.
>
> A:    The deadline was, the implicit deadline was always
>        there, and if it came to bear that this deadline came
>        up, then it wasn't written. So anybody could sign up,
>        so I guess that's raised the question.
>
>        The whole thing in DOC is it hasn't been written, it
>        hadn't been done; so it wasn't written, so it wasn't that
>        effective. So I'm saying nobody violated even the
>        deadline if it would have been in place at HCC.

Id. at 112-13. This testimony is confusing, at best. It alternatively suggests that, in

practice, there was a deadline and that, in practice, there was no deadline. On

defendants' summary judgment motion, the court cannot simply credit those portions

that appear to support defendants' position. Viewing Reverend Pitts' testimony in the

light most favorable to El Badrawi, a jury could conclude that HCC had an "implicit

deadline" and that this unstated policy either prohibited new inmates from being added

or left it unclear whether late additions were permitted.[4]

As further evidence that El Badrawi could have been added to the list,

defendants note that Imam Avci testified that he would have solved El Badrawi's

problems, if El Badrawi had come to him before the end of Ramadan. See Avci Depo.

Tr. (Def. Ex. 31) at 72  ("If he came to me, I solve the problem").  Of course, El Badrawi

---

[4] Warden Lee's testimony regarding to the possibility of adding new inmates in 2004 must
similarly be evaluated by a jury.  Warden Lee testified that he did not recall whether inmates were allowed
to sign up after Ramadan had begun in 2004; whether there was any deadline in place; or whether there
was a "specific policy as to . . . new inmates."  Pl. Ex. 3 at 64-65.  He also testified that he did not know
what rule was in place in the absence of a written deadline in the policy. Id. at 65.  Yet, immediately
afterwards, Warden Lee asserted that new inmates could be added to the list in 2004 and that he was
"basing [this answer] off [his] memory."  Id. at 65.

claims that he requested a meeting with the Imam as soon as he learned of his existence, but that request was not granted until after Ramadan was over.  Pl. Ex. 1 ¶ 13.  Even if the court could disregard this fact, the jury would not necessarily find that Imam Avci is correct in his belief that he could have helped El Badrawi.  There is evidence that Imam Avci could not persuade prison staff to follow even the explicit provisions of the 2004 Ramadan Memo.  Although the 2004 Ramadan Memo expressly provided that inmates who had been removed from the Ramadan list for breaking the fast could be reinstated to the list based on a review by a chaplain, see Def. Ex. 15 ¶ 13, Imam Avci testified that in 2004 he was unable to persuade the kitchen staff at HCC to follow this policy and reinstate 2 inmates.  See Pl. Ex. 7 (Avci Depo. Tr.) at 54-55 ("I asked him to remove guys temporary, he didn't remove temporary.  He said I remove permanently . . . I don't know what the reason.  Also, I complained to the warden . . . ." ). Although Imam Avci's testimony is difficult to follow at this point, it appears to indicate that he "gave permission" to two Muslim inmates to break the fast, and that they should have been permitted to rejoin the list "because they have reason" to temporarily break the fast.  See id.; see also Def. Ex. 17 (HCC Ramadan Statistics 2004 stating "kitchen supervisor didn't allow inmates to remove temporarily").  Viewing this evidence in the light most favorable to El Badrawi, a jury could discredit Imam Avci's testimony that he could have had El Badrawi added to the Ramadan list.  Moreover, the jury could conclude that HCC staff did not always follow applicable Ramadan policy.

Defendants' argument also fails because, even assuming that El Badrawi could have been added to the Ramadan list if he had taken additional measures, whether El Badrawi should have known about those measures also depends upon disputed issues

of fact.  Defendants admit that El Badrawi was shocked, intimidated, and overwhelmed
by being arrested and detained at HCC, Def. Rule 56 Statement ¶ 51, and they assert
that El Badrawi "had difficulty understanding prison protocol and procedure," id. ¶ 127.
Nonetheless, defendants accuse El Badrawi of "willful blindness" to the resources and
remedies at his disposal.  Def. Mem. at 41; id. at 42 (accusing El Badrawi of "apathy,
neglect and disregard for obvious and easy access to religious programs").

    First, citing the 2004 Ramadan Memo, Def. Ex. 15, ¶15, defendants claim that El
Badrawi needed only to fill out a form in the presence of a chaplain in order to be added
to the list.  However, that policy memo clearly states that it was intended solely as "Staff
Guidelines—Not for General Posting,"  id. at 2, and Reverend Pitts testified that this
policy memo would not have been provided to inmates.  Pl. Ex. 5 (Pitts Depo.) at 88-89
("the policy would not be posted where inmates would see them"); id. at 71 ("The policy
is not given to inmates, the written is not given to inmates").

    Second, defendants point out that Reverend Pitts testified that he trained
chaplains to address signing up for Ramadan at new inmate orientation.  Id. at 65-67.
However, Reverend Pitts' testimony leaves some doubt about whether or not signing up
for Ramadan would have been addressed after the sign-up deadline had passed.  See
id. at 65-66 ("If the time for the special services were fast approaching, then we would
mention it at orientation."); id. at 67-68 ("[Chaplains conducting orientations] were
trained to say Ramadan is upon us, it's coming . . . Ramadan is going to start")
(emphasis added); id. at 73 (failing to answer a direct question about the content of
orientation after Ramadan had begun); see also id. at 92 (acknowledging that some
chaplains "may not remember to take a [Ramadan sign-up] form" to orientation); id. at

151-52 (acknowledging that "[s]ometimes the [HCC] counselors would inform me that something was missed" by a chaplain at orientation).   In any case, El Badrawi testified that he did not recall that there was any presentation from religious staff at his orientation, Pl. Ex. 2 at 143, and that he was never told that there was a Ramadan sign up form, id. at 167.   The court may not resolve this issue by selectively crediting the defendant's witness and inferring that the sign up procedure was probably explained at El Badrawi's orientation.   A jury could credit El Badrawi and reasonably conclude that the issue was not addressed in El Badrawi's orientation.

State defendants also argue that El Badrawi should have filed an inmate request form.   They claim that El Badrawi should have known to do this based on a DOC inmate handbook.   See Def. Ex. 11 (2003 DOC Handbook).   However, El Badrawi testified that he never received a handbook, Pl. Ex. 2 at 144, and that he signed a form saying that he had received a handbook only because he was told to do so, id. ("This was presented to us as this is like something routine, 'You guys will sign,' and everyone signed and I signed"); see also Def. Ex. 8 (signed acknowledgment form).   It is not inherently implausible that a new inmate in a prison facility would follow orders to sign a simple acknowledgement form rather than object that he had not received the handbook.   A reasonable jury could credit that testimony and conclude that El Badrawi did not receive a handbook.[5]

_____

[5] Moreover, even if El Badrawi received a handbook, it is not clear that a jury would conclude that the handbook put El Badrawi on notice that there were any additional measures worth taking.   The handbook does not address the issue of Ramadan meal accommodations.   The handbook does indicate that there is a religious services staff, Def. Ex. 11 at 10, and that an inmate may file an inmate request form for additional information or an inmate grievance to address problems generally, id. at 9.   However, the handbook could be taken to suggest that DOC would see little need to make religious meal accommodations.   See id. at 12 ("You should be aware that the Master Menu provided by DOC meets all religious dietary restrictions").   It could also be taken to indicate that, by addressing his questions about

State defendants also claim that El Badrawi should have known to speak to the Imam based on the Imam's occasional tours of the facility.  However, Imam Avci testified that his tours were often very brief, Pl. Ex. 7 (Avci Depo.) at 73-74, and sometimes unannounced due to anti-Muslim bias among the staff, id. at 75-76 ("Q:  You said some [DOC] officers don't want to announce [you]; why not?  A:  Because they don't like Islam, they don't like Imam").  In any case, El Badrawi claims that he did not learn that there was an Imam at HCC until a fellow inmate told him, Pl. Ex. 1 at ¶ 13, and that, although he immediately requested a meeting at that point, he was not able to obtain a meeting until after Ramadan ended, id.; Pl. Ex. 2 at 164.  A jury could credit El Badrawi's testimony in this regard.

In short, state defendants' argument that El Badrawi failed to take available measures to remedy his own situation presents a series of disputed issues of fact.  It is not for the court to determine on summary judgment whether to credit El Badrawi's testimony regarding the measures he did take or regarding the reasons why he did not take other additional measures.  Given El Badrawi's testimony that he repeatedly tried to be added to the list without success, and that he was not aware of any other method of fixing this problem, defendants' claim that El Badrawi was "willfully blind" to measures that would have remedied his situation presents an issue of fact to be resolved by the jury.

---

Ramadan meals to multiple staff members, El Badrawi had already taken the appropriate measures to address his problem.  See id. at 9 ("B.  Problem Solving.  Most problems can be solved through verbal contact with the staff member in charge, the Housing Unit Officer, your counselor, or shift supervisor.  Explain the problem and follow the advice or instruction").  Thus, the handbook could be read to support El Badrawi's conclusion that any further request would have been futile.  Pl. Ex. 1 ¶ 16 ("None of the COs ever told me that I should file a written request, and it seemed, based on their comments, that no request would be successful").  What inferences should be drawn from the text of the handbook is an issue to be decided by a jury.

### 3.      Liability of Warden Lee

There are genuine issues of material fact as to whether or not Warden Lee is liable for the alleged burden on El Badrawi's right.  First, a jury could conclude that there was a significant and obvious likelihood that, during Ramadan, HCC staff would encounter new inmates with a right to be added to the Ramadan list.  As noted above, HCC had significant turnover, meaning that numerous new inmates arrive in a given month,  see Def. Ex. 33 (Lee Decl.) ¶ 9, and DOC generally had a significant Muslim population, see Pl. Ex. 26. A jury could reasonably infer that Warden Lee ought to have known that it was highly likely that new Muslim inmates would arrive and would need to be added to the list.

A jury could also reasonably conclude that Warden Lee knew, or should have known, that some measures were needed in order to ensure that such requests would be handled appropriately.  The 2004 Ramadan Policy Memo contained no guidance on whether new inmates could be added or on how to address requests from new inmates.  See Def. Ex. 15.  Focusing on the written policy alone, it could be found that there was a very obvious risk that, without clarification and training about the policy, new inmates would not be permitted to join the Ramadan list.

In addition, as discussed above, Reverend Pitts testified that, in 2004, HCC had an implicit, unwritten deadline for signing up.  Pl. Ex. 5 at 110-13.  Even if the court were to interpret Reverend Pitts' testimony as indicating that this unwritten deadline was not strictly enforced, a jury could quite reasonably find that any such unwritten policy posed an obvious risk of misapplication by some staff members.  Based on Reverend Pitts' testimony, it is unclear to this court whether and against whom the unwritten deadline

was supposed to be enforced.  A jury could certainly find that it would have been unclear to HCC staff as well.  Thus, a jury could reasonably conclude that there was a very obvious need for training and clarification regarding the application of the 2004 Ramadan policy to new inmates who entered HCC after Ramadan commenced.

There are presumably a range of different measures that could have been taken to help ensure that the written Ramadan policy or the unwritten deadline were not applied in such a way as to prevent new inmates from being added to the Ramadan list.  One such measure—clarifying the written policy—was taken in 2005.  Alternatively, HCC might have taken measures to ensure that a Ramadan list sign-up was conducted at every new inmate orientation throughout Ramadan.  This might have substantially decreased the risk that other HCC staff would be confronted with requests to be added to the Ramadan list.  Warden Lee did not claim that he took any such measure.  He testified that inmates would not sign up for the Ramadan list at orientation.  Pl. Ex. 3 at 71 (A.  "They have to sign up if they want to participate [in Ramadan]." . . . Q.  "And at what point would they sign up?  Is this during the orientation or some other time?"  A. "Some other time." . . . Q. "In 2004, when would the inmate be able to sign up if they arrived during Ramadan?"  A. "In 2004 they didn't have to sign up when they came in.").

Instead, Warden Lee's testimony indicates that he permitted and relied upon HCC Corrections Officers ("COs") to address questions about Ramadan policy.  See id. at 143 (A. "The COs can answer any questions they have knowledge of."  Q.  "And could a CO tell an inmate what the policy is regarding Ramadan?"  A. "Yes"); id. at 145-46 ("It's their responsibility to communicate to inmates and answer all the above questions they can regarding any given subject matter that they are able to answer.").

20

There is evidence from which a jury could conclude that relying on COs to address inmate questions about the Ramadan policy was a particularly risky approach. Reverend Bruno testified that, due to the risk of misinformation, he insisted that only chaplains should be permitted to answer inmates' questions about religious issues.  See Pl. Ex. 4 (Bruno Depo.) at 30-31 ("I do an orientation for all new cadets, new employees.  And one of the primary things that I jump up and down with during my presentation, which is if there are any religious questions they have, you refer them to the chaplain. . . . Not only do I encourage it, I insist on it.  Don't do chaplains' business.").  Although that testimony leaves some confusion about what Reverend Bruno meant by a "religious question," Reverend Bruno's subsequent testimony suggests that his answer included questions about DOC religious policy.  Id. at 34 ("The staff persons should be referring all religious issues and matters to chaplains").  Reverend Bruno illustrated the problem with a specific instance in which he had to contact an inmate to correct misinformation provided by prison staff regarding DOC policy.  Id. at 35-36.  Moreover, two Imams who served at HCC, Imam Avci and Imam Hashim, both testified that HCC correctional officers and staff had exhibited bias against Muslim inmates.  See, e.g., Pl. Ex. 7 (Avci Depo.) at 111 ("officers are not educated . . . so they assume all Muslims [are] bad . . . ."); Pl. Ex. 8 (Hashim Depo.) at 53-56 (describing "overall disrespect for Muslims" among the staff and recounting particular instances thereof).  Such evidence could support a jury in concluding that a policy of entrusting COs to address the issues in the 2004 Ramadan policy presented a clear risk that new inmates would be denied access to the Ramadan list and that a Warden entrusting COs to implement the unclear 2004 policy should have known that training

21

was needed.

This evidence also undermines state defendants' reliance on the Supreme Court's recent decision in <u>Connick</u>.  The Court in <u>Connick</u> held that, in the absence of a pattern of similar, prior violations, there was not an obvious risk that the prosecutors on the defendant's attorney staff might fail to disclose exculpatory information as required under <u>Brady</u>.  The Court held that there could be no liability without prior notice because "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles."  <u>Connick</u>, 131 S. Ct. at 1364.  Correctional officers are much more comparable to police officers than lawyers.  There is no indication that they are "equipped with the tools to find, interpret, and apply" the legal principles establishing an inmate's right to practice his religion, with the tools to apply an unwritten, unclear policy in light of those principles, or with accurate knowledge about religious practices.

The record does not indicate that Warden Lee or anyone else at HCC took any measures to ensure that COs would be adequately trained to address questions about the 2004 Ramadan policy.  When asked what would happen if correctional officers provided incorrect information about religious policies at HCC, Warden Lee answered: "If a correctional officer is giving wrong information, then that sometime or another, I'm hoping that information would be corrected because the inmate would not be able to do what he requested based on the information that the officer gave him."  Pl. Ex. 3 at 143-44.  The jury could rely on this testimony to find both that Warden Lee appreciated the risk and that he relied solely on "hope" to address it.

When asked how COs were trained with respect to religious policy, Warden Lee testified only vaguely:  "Through roll call, through in-house training, through training at

the academy." Pl. Ex. 3 at 144.  Subsequently, he added "on the job training" to this list.
Id. at 146.  There is no indication in the record that any such training addressed the
issues with the 2004 Ramadan policy.  With respect to Roll Call, there is no evidence
that, in 2004, COs received any training that would clarify the issues left open by the
written policy or address the application of any implicit, unwritten deadline.  In his
Declaration, Warden Lee asserts that he played no role in developing the Roll Call
training regarding Ramadan, and that such training consists of the "Roll Call Officer
read[ing] verbatim a memorandum prepared by the Director of Religious Services."  Def.
Ex. 33 at ¶ 34; see also Pl. Ex. 3 at 57-58 (deposition testimony to the same effect).  It
is unclear, but the record suggests that this memorandum may have been the
problematic 2004 Ramadan policy memo prepared by the Director of Religious
Services.

There is no explanation of what Warden Lee meant by "in-house training."  Nor is
there any indication in the record that any such training was conducted with respect to
the 2004 Ramadan policy.  Similarly, there is no explanation of what "on the job training"
consists of.  Based on the record before the court, it is possible that "on the job training"
at HCC consists entirely of after-the-fact corrections where CO errors happen to be
detected by a supervisor.  There is also no evidence in the record indicating what sort of
religious policy training that COs receive at the training academy.  There is no basis to
infer that any such training would have addressed the particular details of DOC's 2004
Ramadan policy or of any unwritten deadline imposed at HCC.  See Pl. Ex. 5 (Pitts
Depo.) at 28-29 (Q.  "[At the academy,] do they go into detail about what religious
policies are?"  A.  "I guess.  I don't know.").

23

It should also be noted that Warden Lee claimed that he was not responsible for Roll Call training regarding Ramadan, and that this claim is contradicted both by Reverend Pitts and by the documentary record.  See Def. Ex. 5 (Pitts Depo.) at 33 (Q. "When would religion training happen at rollcall?"  A. "I don't know.  That's determined by the warden . . ."); id. at 76-77 ("The Rollcall [regarding Ramadan policies] is coming from the warden."); Def. Ex. 23 (Roll Call Notice regarding Ramadan 2005 issued by Warden Lee).  This is not the only instance in which Warden Lee's self-serving statements are contradicted by the record.  For example, in both his testimony and in his Declaration, Warden Lee asserts that HCC's Ramadan policy would have been posted where El Badrawi would have seen it.  Pl. Ex. 3 at 60 ("Usually this policy is placed in the inmates posting board in each housing unit."); Def. Ex. 33 ¶ 49 ("New inmates also learn about religious programs available at HCC because those programs and the schedule for programs were posted on a bulletin board in each housing unit. New inmates learn about Ramadan in particular because information about Ramadan was posted in the housing units."); id. ¶ 53 ("[El Badrawi] likely should have known about it before then because information regarding religious programs, including Ramadan, would have been posted in his housing unit.").  However, as noted above, the Ramadan policy memorandum states that it was intended solely as "Staff Guidelines—Not for General Posting,"  Def. Ex. 15 at 2, and Reverend Pitts testified that the policy would not have been available to inmates.  Pl. Ex. 5 (Pitts Depo.) at 88-89 ("the policy would not be posted where inmates would see them"); id. at 71 ("The policy is not given to inmates, the written is not given to inmates").  In addition, the policy memorandum does not address the issue of whether an inmate can sign up midway

through Ramadan.  See Def. Ex. 12.  In light of these discrepancies, the court cannot take the self-serving claims in Warden Lee's Declaration as sufficient to establish, as a matter of law, that he took adequate care to ensure that the Ramadan policy was appropriately implemented or that a policy for mid-Ramadan admittees even existed. Such discrepancies could support a jury in reaching the opposite conclusion.

Thus, viewing the evidence in the light most favorable to El Badrawi, and drawing inferences in his favor, the court concludes that there are genuine issues of fact regarding Warden Lee's personal liability.  There is evidence from which a reasonable jury could conclude that Warden Lee knew that there was a high likelihood that HCC staff would encounter requests from new inmates seeking to be added to the Ramadan list.  Warden Lee also knew that the failure to address such requests properly would mean that the "inmate would not be able to do what he requested," Pl. Ex. 3 at 143-44, that is, receive a meal consistent with his religious scruples.  The record could also support a jury in concluding that, rather than ensuring the policy was clarified or implemented by religious services, Warden Lee entrusted COs to address such requests without providing any policy guidance and without any training that explained how such requests should be addressed.  Given the record before the court, the court finds that a jury could conclude that Warden Lee was deliberately indifferent or grossly negligent with respect to the implementation of the 2004 Ramadan policy.

Finally, based on the foregoing evidence, the court also finds that Warden Lee is not entitled to summary judgment on the basis of qualified immunity.  Before 2004, it was "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." Ford, 352 F.3d at 597.  In this case, whether or not Warden Lee

violated this right depends on whether he took reasonable measures to address risks created by unclear statements of Ramadan policy and inadequately trained staff. Because this issue of reasonableness depends on the disputed facts in this case, the factual issues "must be resolved by the factfinder before qualified immunity can be granted."  Maye v. Vargas, 638 F. Supp. 2d 256, 262 (D. Conn. 2009); see also Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007) ("if there is [a factual] dispute [as to reasonableness], however, the factual questions must be resolved by the factfinder" before qualified immunity can be granted) (quotation omitted).  Therefore, the Motion for Summary Judgment is denied with respect to the section 1983 free exercise claim against Warden Lee.

**B.      RLUIPA Claims Against Each Defendant**

**1.      Legal Standard for RLUIPA Claims**

State defendants also seek summary judgment on El Badrawi's RLUIPA claims against Warden Lee, Reverend Pitts, and Kitchen Supervisor McGrail, in their individual capacities.  The RLUIPA claims are also based on El Badrawi's allegation that he was not added to the Ramadan list.  Section 3 of RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA provides a right of action authorizing private parties to assert "a claim . . . in a judicial proceeding and obtain appropriate relief against a government."  Id. § 2000cc-2(a).  "Government" is defined to include "any . . . official of

26

[a State]" and "any other person acting under color of State law."  42 U.S.C. § 2000cc-5(4)(A).

The parties agree that RLUIPA's "substantial burden" standard is at least as stringent as the "substantial burden" standard imposed for Free Exercise clause claims brought under section 1983.  Def. Memo. at 47; Pl. Opp. at 41; see also Westchester Day School v. Village of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007) (holding that, by using the term "substantial burden" in RLUIPA, Congress intended to refer to and incorporate Free Exercise jurisprudence).  In fact, the RLUIPA standard appears to be more stringent.  See 42 U.S.C. § 2000cc-1(a) (requiring the government to show not only that the substantial burden is in furtherance of a compelling governmental interest, but also that it is the "least restrictive means" of doing so).  Nonetheless, for purposes of the present Motion, the parties agree that there is no relevant difference between the RLUIPA standard and the section 1983 Free Exercise Clause standard.

### 2.    The Availability of Individual Capacity Claims Under RLUIPA

State defendants argue that RLUIPA does not permit a claim against a state official for monetary damages.[6]  In El Badrawi I, this court held that by authorizing

---

[6] State defendants cite a section of the U.S. Code in which "government" is defined to include only various divisions and officials of the federal government, see 42 U.S.C. § 2000bb-2, but that section is not applicable here, see 42 U.S.C. § 2000cc-5(4).

State defendants also argue that El Badrawi may not bring an action under RLUIPA because he is no longer "a person residing in or confined to an institution," see 42 U.S.C. § 2000cc-1(a).  They offer no support for this reading of the statute except their own view of wise policy and an analogy to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e.  The PLRA's requirement that a "prisoner confined in any jail" may not bring an action without exhausting remedies has been read to apply only to persons who are confined at the time the action is filed.  See Grieg v. Goord, 169 F.3d 165, 167 (2d Cir. 1999).  However, there is an obvious difference between the PLRA and RLUIPA.  In the PLRA, the phrase "confined" is used to express a limitation on actions:  "No action shall be brought . . . by a prisoner confined in any jail . . . ."  42 U.S.C. § 1997e(a).  In RLUIPA, the similar phrase is used to identify the scope of the government's duty:  "No government shall impose a substantial burden . . . on  . . . a person residing in or confined to an institution . . . ."  42 U.S.C. § 2000cc-1(a).  There is no indication in RLUIPA that this language is intended to have any bearing on when a person may bring an action to remedy a

claims for "appropriate relief," RLUIPA does not authorize claims for money damages against a state or a state official, sued in his official capacity.  579 F. Supp. 2d at 261-62.  The court held that the phrase "appropriate relief" was not sufficiently clear to support a waiver of sovereign immunity in suits for monetary damages against a state or against a state official sued in his official capacity.  Id.  The court permitted El Badrawi to replead his RLUIPA claim as an "individual capacity" claim.  Id. at 262.  However, at the time, the court did not specifically rule that RLUIPA would permit such individual capacity claims.[7]  See id.

It is apparent from the text of RLUIPA that Congress intended to authorize suits against state officials in their individual capacity.  RLUIPA authorizes suits against "government," but it defines "government" to include "any other person acting under color of State law."  42 U.S.C. § 2000cc-5(4)(a).  RLUIPA "appears to authorize suit against [a state official] in his individual capacity because the third prong [of the definition of 'government'] allows for suits against 'person[s] acting under color of State law' even apart from those persons as 'official[s]' as described in the second prong."  Nelson v. Miller, 570 F.3d 868, 886 (7th Cir. 2009) (quoting 42 U.S.C. § 2000cc-5(4)(a)).

---

violation of this duty.  Defendants' reading would create a hidden statute of limitations, cutting off the right to the relief Congress sought to provide by enacting RLUIPA.  Twisting the language of the statute to reach this result would be unjust and contrary to the intent of Congress.  See 42 U.S.C. § 2000cc-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution").

[7] The Supreme Court has now issued a decision confirming this result.  See Sossoman v. Texas, 131 S. Ct. 1651, 1658-59 (2011) (holding that RLUIPA does not establish a waiver of sovereign immunity for claims for monetary damages against state officials sued in their official capacity).  The Supreme Court's decision did not address whether RLUIPA authorizes claims for monetary damages where officials are sued in their individual capacity. See id. at 1656; see also Sossoman v. Texas, 130 S. Ct. 3319 (2010) (granting certiorari "limited to the following question: 'Whether an individual may sue a State or state official in his official capacity for damages for violations of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq.'").

The use of the phrase, "any other person acting under color of State law," 42 U.S.C. § 2000cc-5(4)(a), is reminiscent of section 1983, which authorizes individual capacity by permitting suit against "[e]very person [acting] under color of any statute, ordinance, regulation, custom, or usage, of any State," 42 U.S.C. § 1983.

State defendants question whether Congress acted within the scope of its authority in permitting such suits.  In enacting RLUIPA, Congress "invok[ed] federal authority under the Spending and Commerce Clauses." Cutter v. Wilkinson, 544 U.S. 709, 715 (2005) ("Section 3 [of RLUIPA] applies when . . . 'the substantial burden [on religious exercise] affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several states, or with Indian tribes.'" (quoting 42 U.S.C. § 2000cc-1(b)(2))); see also Westchester Day School, 504 F.3d at 353 ("Congress alternatively grounded RLUIPA, depending on the facts of a particular case, in the Spending Clause, the Commerce Clause, and § 5 of the Fourteenth Amendment").

A number of circuit courts have held that, to the extent RLUIPA is grounded in Congress's Spending Clause power, RLUIPA cannot authorize individual capacity suits. See, e.g., Nelson, 570 F.3d at 889; Sossomon v. Lone Star State of Texas, 560 F.3d 316, 329 (5th Cir. 2009); Smith v. Allen, 502 F.3d 1255,1275 (11th Cir. 2007).  These courts have drawn an analogy between Spending Clause power and the terms of a contract, and reasoned that the Spending Clause does not empower Congress to impose liability on people who are not the recipients of federal funds.  See Nelson, 570 F.3d at 888; Sossomon, 560 F.3d at 329 ("Congressional enactments pursuant to the Spending Clause do not themselves impose direct liability on a non-party to the contract between the state and the federal government"); Smith, 502 F.3d at 1275 ("[prison]

29

institutions are the 'grant recipients' that are amendable to suit as a condition to receiving funds—but their individual employees are not 'recipients' of federal funding").

These courts have not considered whether Congress properly authorized individual capacity suits by invoking the Commerce Clause, because they have found that there is no basis for Commerce Clause jurisdiction in the particular case before them.  See Nelson, 570 F.3d at 886 (limiting its analysis to the Spending Clause power, because "there is no evidence in this case that Miller's denial of a religious diet affected commerce" (quotations and alterations omitted)); Sossomon, 560 F.3d at 328 n.34 (holding that RLUIPA should be evaluated under the Spending Clause "when there is no evidence concerning the effect of the substantial burden on commerce" (quotation omitted))[8]; Smith, 502 F.3d at 1274 n.9 ("there is no evidence that a state prison's denial of a individual prisoner's request for a religious item would 'affect[]' interstate commerce"); see also Rendleman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) ("the independent commerce clause basis for RLUIPA is not properly before the court on this appeal, and we need not resolve whether the statute, analyzed under the commerce

---

[8]  The Supreme Court chose not to review the Fifth Circuit's decision that the Spending Clause does not support individual capacity RLUIPA suits.  See Sossoman v. Texas, 130 S. Ct. 3319 (2010) (narrowing the issues raised in the Petition for Certiorari). Because the Fifth Circuit's decision addressed only the Spending Clause authority for such suits, not the Commerce Clause authority, Sossamon, 560 F.3d at 328 n.24, the Supreme Court's decision to limit its review cannot be construed as an endorsement of the view that Congress did not authorize individual capacity suits in cases invoking the Commerce Clause.  Moreover, the Supreme Court's decision not to consider individual capacity suits may have reflected a judgment that the authority for individual capacity suits was not ripe for review.  See  Brief for the United States as Amicus Curiae, Sossoman v. Texas, 2010 WL 990561,*7-8 (arguing that the Fifth Circuit's "conclusion that RLUIPA does not authorize damages suits against state officials in their individual capacities is incorrect," but that review was not warranted on this issue because there was not yet a split of circuit authority on the issue); see also Sossoman, 131 S. Ct. at 1657 ("We granted certiorari to resolve a division of authority among the courts of appeal . . ."). This court makes no assumption about why the Supreme Court chose not to address the availability of individual capacity RLUIPA suits.

clause, would authorize individual capacity damages actions").[9]

The Second Circuit also has not specifically decided whether RLUIPA permits individual capacity suits.  See Hall v. Ekpe, 09-4492-pr, 2010 WL 3996211, *3 (2d. Cir. Oct. 13, 2010) (reserving decision on that question pending a decision in Sossomon);[10] see also Redd v. Wright, 597 F.3d 532, 536-38 (2d Cir. 2010) (affirming a grant of qualified immunity on an individual capacity RLUIPA suit).  However, in reviewing a district court's grant of injunctive relief against a village board, the Second Circuit has held that, where an interstate commerce nexus is demonstrated in a particular case, "RLUIPA constitutes a valid exercise of congressional power under the Commerce Clause."  Westchester Day, 504 F.3d at 354.  The circuit court held that, where a plaintiff can show that the conduct at issue affects interstate commerce, the plaintiff may

_____

[9] District court decisions in this circuit have also reached the conclusion that RLUIPA does not authorize individual capacity suits, but they have also focused solely on Spending Clause principles and have not addressed Congress' invocation of Commerce Clause power.  See, e.g., Prescott v. Annetts, 09-cv-4435, 2010 WL 3020023, *7 (S.D.N.Y. July 22, 2010) (rejecting individual capacity claim without discussing the Commerce Clause); Sweeper v. Taylor, 06-cv-379, 2009 WL 815911, *9 (N.D.N.Y. March 27, 2009) (same); Pugh v. Goord, 571 F. Supp. 2d 477, 506-07 (S.D.N.Y. 2008) (following Smith v. Allen, without discussing the Commerce Clause).  Some such decisions have cited El Badrawi I for the proposition that individual capacity RLUIPA suits are not permitted.  See Johnson v. Delaunay, 09-cv-2462, 2010 WL 2541358, *2 (S.D.N.Y. June 18, 2010) (relying on prior case law and plaintiff's waiver, without discussing the Commerce Clause); Singh v. Goord, 05-cv-9680, 2010 WL 1875653, *6 (S.D.N.Y. March 9, 2010) (Magistrate's Recommendation citing El Badrawi I and not discussing the Commerce Clause), adopted by 2010 WL 1903997, *3 (S.D.N.Y. May 10, 2010) (no discussion of Commerce Clause); Vega v. Lantz, 04-cv-1215, 2009 WL 3157586, *4 (D. Conn. Sept. 25, 2009) (Magistrate's Ruling citing El Badrawi I and not discussing the Commerce Clause).  It is not necessarily surprising that these courts have not had occasion to consider whether individual capacity RLUIPA suits may be grounded on the Commerce Clause.  Very often, accommodation of religious faith will not require a prison to purchase goods or to pay for additional employee time.  Even where it does, a plaintiff might not take adequate steps to make a record of that connection.  Where, as here, the plaintiff has invoked the Commerce Clause and submitted a record to support it, the court cannot simply follow cases that have not addressed this issue.

[10] The Second Circuit reserved decision in order to await the Supreme Court's in Sossomon v. Texas, "because resolution of [the question of whether RLUIPA permits claims against officials in their official capacity] may also shed light on Hall's ability to sue defendants in their individual capacities for money damages under RLUIPA."  Hall, 2010 WL 3996211, *3.  The Supreme Court has issued its decision in Sossomon, and it does not appear to this court to shed light on the availability of individual capacity suits.  The Second Circuit has not yet decided the question reserved in Hall.  The court will consider appropriate motions if and when the Second Circuit does address the issue.

assert a claim under RLUIPA.  Id.

The court sees no basis for holding that the Westchester Day decision is not controlling in the current context.[11]  The Second Circuit explained that, "the satisfaction of [a Commerce Clause] jurisdictional element—common in both civil and criminal cases—is sufficient to validate the exercise of congressional power because an interstate commerce nexus must be demonstrated in each case for the statute in question to operate. . . . [T]his Court has consistently upheld statutes under the Commerce Clause on the basis of jurisdictional elements."  Id. (citing United States v. Griffith, 284 F.3d 338, 346-48 (2d Cir. 2002) (upholding application of a federal criminal statute where an interstate commerce nexus is established), and United States v. Santiago, 238 F.3d 213, 216 (2d Cir. 2001) (same)).  If Congress may authorize the imposition of criminal sanctions where the conduct at issue is shown to affect interstate commerce, it is not apparent why Congress may not also authorize suits for damages in such situations.  See Atkins v. Christiansen, 08-cv-972, 2009 WL 4042756, *6 (W.D. Mich. Nov. 20, 2009) (relying on Westchester Day in holding that an individual capacity RLUIPA claim could proceed if plaintiff could demonstrate an impact on interstate commerce).  By requiring that an adequate impact on commerce be established, Congress ensures that section 3 of RLUIPA regulates the conduct of prison officials only where they are engaged in conduct affecting commerce.  Therefore, the court holds that RLUIPA authorizes suits for damages against officers in their individual capacities where an adequate interstate commerce nexus is established.

---

[11] Defendants have not argued that Westcheter Day is inapplicable or that individual capacity RLUIPA claims are not permitted where an impact on interstate commerce can be established.  Instead, they have argued only that "there is no evidence here of an effect on interstate or international commerce to indicate that RLUIPA should be interpreted under the Commerce Clause."  Def. Mem. at 45 n.2.

The Second Circuit has held that "the evidence need only demonstrate a minimal effect on commerce to satisfy the jurisdictional element." Westchester Day, 504 F.3d at 354 (citing Griffith, 284 F.3d at 347).  The record in the present case establishes an adequate interstate commerce nexus under this standard.  According to an email from Reverend Bruno, "Ramadan results in significant additional costs to the DOC, not fewer costs."  Pl. Ex. 24.  In that same email, Reverend Bruno indicated that the state would pay roughly $7,000 in order to provide an additional orange or apple in each Ramadan breakfast bag, as well as over $85,000 in overtime costs to staff.  Id.  DOC's estimated costs of providing Ramadan meals in 2006 included $7379.70 for "added breakfast items (Peanut butter, 2 slices of wheat bread);" $13,023 for the "added dinner item (Fish);" and $130,402.70 for staff overtime.  Pl. Ex. 25.  These additional costs establish an interstate commerce nexus because food ingredients—including, most obviously, oranges and peanuts—are shipped in interstate commerce before reaching Connecticut.  See Katzenbach v. McClung, 379 U.S. 294, 304 (1964) (Civil Rights Act of 1964 could be applied to restaurant that "serves food, a substantial portion of which has moved in interstate commerce").  The need to employ prison staff for additional hours also affects the demand for labor and, in aggregate, impacts interstate labor markets.  See Adams v. Suozzi, 433 F.3d 220, 225-26 (2d Cir. 2005) (holding that the Commerce Clause permits regulation of both private and public employment, including "ostensibly intrastate activity that has a cumulative substantial effect on interstate commerce").  This evidence indicates that, in the aggregate, religious meal accommodations have a sufficient impact on interstate commerce.  Therefore, there is an adequate jurisdictional basis to proceed with a RLUIPA claim against the state defendants in their individual

capacities in this case.

### 3.    Application:  RLUIPA Claim Against Warden Lee

The parties agree that RLUIPA imposes a duty on Warden Lee that is at least as stringent as the free exercise clause.  Defendants' Motion for Summary Judgment with respect to the RLUIPA claim against Warden Lee is therefore denied for the reasons stated above with respect to the section 1983 free exercise claim against Warden Lee. See supra at 11-26.

### 4.    Application:  RLUIPA Claim Against Reverend Pitts

With respect to the RLUIPA claim against Reverend Pitts, state defendants offer no specific argument that Reverend Pitts is entitled to summary judgment.  Apart from the general legal arguments discussed above and apart from their arguments that El Badrawi did not suffer a substantial burden of his religious rights, state defendants do not argue that the individual liability of Reverend Pitts can be resolved as a matter of law.  See Def. Mem. at 48 (arguing only that the record does not support a claim against defendant McGrail); State Def. Reply at 12-14 (arguing only that there is an absence of evidence showing that defendants Lee or McGrail are individually liable).  State defendants do assert that Pitts is entitled to qualified immunity, but they support that claim only by cross-referencing their now unsuccessful argument that Warden Lee is entitled to qualified immunity on the religious liberty claims and without any analysis of any particular facts bearing on the claim against defendant Pitts.  See State Def. Mem. at 48.  Therefore, having addressed these general arguments above, see supra at 11-18, 25-33, the court finds that defendants have not carried their burden of showing that Reverend Pitts is entitled to summary judgment on the record in this case.  See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").

Furthermore, on its own review of the record, the court finds that there is sufficient evidence to create a material issue of fact regarding the liability of Reverend Pitts.  Reverend Pitts, as the facilitator of religious programs at HCC, was responsible for the implementation of DOC religious policies at HCC, including the 2004 Ramadan policy.  See Pl. Ex. 5 (Pitts Depo.) at 18-21, 23-24, 89.  Reverend Pitts testified that he was responsible for training and monitoring the chaplains at HCC to ensure that they provided adequate information about religious services during new inmate orientations, including information about signing up for the Ramadan list.  Id. at 62-67. Reverand Pitts testified that he supervised chaplains during their first time conducting an orientation session, id. at 67, but after that there was no formal mechanism to ensure that they addressed all important issues regarding religious policy, id. at 151-52.  He testified that occasionally counselors at the orientations would sometimes inform him that chaplains forgot to cover certain information, id. at 152, and he admitted that some chaplains might not remember to bring the Ramadan sign up forms to orientation, id. at 92.  Reverend Pitts' testimony also indicates that he did not discourage COs from answering inmates' religious policy questions, id. at 39, and that his approach to training COs to answer such questions was primarily reactive, that is, dependent upon officers coming to him to ask for clarification, see id. at 45-49.  Finally, as discussed above,

35

Reverend Pitts testified that, at HCC, there was an implicit deadline for signing up for Ramadan in 2004.  Id. at 112-13.

Viewing this testimony in El Badrawi's favor, a jury could reasonably conclude that Reverend Pitts had a duty to see that the 2004 Ramadan policy was properly implemented; that he was or should have been aware that Ramadan policy in 2004 was significantly unclear; that he entrusted COs to address issues arising under this policy despite a substantial risk that they would either deny or fail to refer new inmate requests to be added to the Ramadan list; and that Reverend Pitts failed to provide clarification and training needed to address this risk.  Therefore, the state defendants are not entitled to summary judgment with respect to the RLUIPA claim against Reverend Pitts.

### 7.    Liability of Kitchen Supervisor McGrail

McGrail, HCC's kitchen supervisor, claims that he was not aware of El Badrawi at HCC, that he played no role in determining whether El Badrawi could be added to the Ramadan list, and that he did not supervise any of the staff who allegedly informed El Badrawi that he could not be added.  Def. Ex. 35 (McGrail Decl.) ¶¶ 6, 10.  El Badrawi relies on evidence indicating that McGrail did at one point refuse to reinstate inmates to the Ramadan list after they had been removed for breaking the fast, see Pl. Ex. 7 (Avci Depo.) at 108-09; Def. Ex. 17 (2004 Ramadan Statistics), and that kitchen staff generally did not like to add new inmates to the list because it made their job more difficult, see Pl. Ex. 4 (Bruno Depo.) at 95-96; Pl. Ex. 5 (Pitts Depo.) at 113-14.  There is, however, no evidence showing that McGrail or anyone on his staff refused any request that El Badrawi be added to the list.  There is also no evidence that McGrail or anyone on his staff had any responsibility for training or directing COs or any other non-

kitchen staff who might have told El Badrawi that he could not be added to the list.

Therefore, in order to find McGrail liable, a jury would have to infer that the kitchen

staff's general opposition to new additions somehow gave rise to a custom or policy that

led the non-kitchen staff who addressed El Badrawi's inquiries to inform El Badrawi that

he could not be added to the list.  Even viewing the evidence in the light most favorable

to El Badrawi, the court concludes that there is no basis in the record for such an

inference.  Therefore, state defendants are entitled to summary judgment on the

RLUIPA claim against defendant McGrail.

### C.    Section 1983 Medical Care Claim

State defendants have moved for summary judgment on El Badrawi's section

1983 Eighth Amendment claim against Warden Lee.  El Badrawi claims that his Eighth

Amendment rights were violated because he was not immediately provided medicine to

address a painful flare-up of Crohn's Disease.[12]  El Badrawi suffers from Crohn's

Disease, a serious medical condition that can cause inflammation of the gastro-

intestinal tract, internal bleeding, and severe pain.  On the first night of his detention, El

Badrawi visited the HCC medical center, where he explained that he was suffering from

a painful flare-up of his Crohn's Disease and requested Asacol, a drug he had been

prescribed to alleviate these symptoms.  The nurse did not dispense Asacol to El

---

[12] State defendants argue that, because El Badrawi was not a convicted prisoner subject to criminal punishment, his right to medical treatment arises under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment.  See Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) ("a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the . . . Due Process Clause of the Fourteenth Amendment if held in state custody").  However, neither party contends that there is any difference between the Due Process and Eighth Amendment standards for medical care for a person in government custody.  See id. at 72 (holding that such claims "should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment"); see also Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244-45 (1983) (holding that a person in police custody has a due process right to medical care at least as great as the equivalent Eighth Amendment right of a convicted prisoner).

Badrawi, informing him that she could not determine whether he needed it and that he would need to see a doctor.  El Badrawi was returned to his room without seeing a doctor.  Although El Badrawi made further requests for medication and treatment, El Badrawi did not receive Asacol until almost a week later.  On this record, there is an issue of fact as to whether El Badrawi received inadequate medical care.

However, in order to reach a jury on this claim against Warden Lee, El Badrawi must provide a basis for a jury to find that Warden Lee was personally responsible in one of the ways identified in Colon, 58 F.3d at 873.  See supra at 8-11.  According to Warden Lee's declaration, medical services at HCC were provided by University of Connecticut Correctional Managed Healthcare ("CMHC"), that CMHC staff were supervised by their Director of Medical Services, and that they did not report directly to him.  Def. Ex. 33 ¶¶ 5, 14.  When Warden Lee would receive notice of a medical issue at HCC, he would refer those issues to a Health Services Administrator who served as a liaison between the warden and CMHC staff.  Def. Ex. 33 ¶¶ 6, 15.  While Warden Lee was ultimately responsible for the safety of inmates, Warden Lee did not directly manage medical care provided by CMHC.  See Def. Ex. 33 ¶ 14; see also Def. Ex. 14 (Memorandum of Agreement between DOC and CMHC).  Warden Lee declared that he had no notice of El Badrawi's condition or any delay in his medical care until this suit was filed, Def. Ex. 33 ¶ 15, and that he had no notice of a general concern regarding delays in obtaining prescriptions for other inmates at HCC, id. ¶ 28.  While a jury would not be required to credit these statements by Warden Lee, they are sufficient to shift the burden of production to El Badrawi with respect to Warden Lee's personal involvement.  See Salahuddin v. Goord, 467 F.3d 263, 272-73, 281-82 (2d Cir. 2006) (holding that,

38

where defendant provided evidence that he was not aware of an imminent need for medical treatment, the plaintiff "must actually point to record evidence creating a genuine dispute as to those specific facts" to support an Eighth Amendment medical care claim).

El Badrawi argues that a jury could reasonably find that Warden Lee either created a custom allowing the medical staff's failure to provide medical care or was grossly negligent in supervising the medical staff.  However, the only evidence El Badrawi offers for this claim is an isolated snippet of deposition testimony.  Testifying in 2009, Warden Lee explained that he was sure that, in his years as warden, he had heard some complaints about medical care at HCC because "[i]n talking to 500, 600, a thousand inmates per day in one form or another . . . I've heard it all."  Pl. Ex. 3 at 107. El Badrawi cites no evidence that Warden Lee received any warranted complaints about delays in medical care, nor any evidence that Warden Lee failed to respond to such complaints, whether they were warranted or not.  Most significantly, there is no evidence that Warden Lee received any complaints or any other indication of inadequacies in the provision of medical care prior to El Badrawi's case.  Thus, even if Warden Lee's testimony is taken to indicate that he was, at some point, on notice of a problem with the medical services, a jury would have no basis from which to infer that Warden Lee was on notice at the time El Badrawi arrived at HCC.  Finally, El Badrawi also provides no evidence that Warden Lee had any knowledge of or involvement in the specific delay in the provision of El Badrawi's medical care.

In short, there is no basis from which a jury could conclude that Warden Lee had actual or constructive knowledge either of El Badrawi's medical treatment or of any

significant, general problem in the provision of medical care at HCC during the relevant

time period.  Although El Badrawi appears to have a legitimate complaint that he

received inadequate care from CMHC, the record would not support a jury in finding that

Warden Lee was personally liable for that lapse in care.  Therefore, state defendants'

Motion for Summary Judgment is granted with respect to El Badrawi's section 1983

claim for inadequate medical care against Warden Lee.

## V.    CONCLUSION

For the foregoing reasons, state defendants' Motion for Summary Judgment is

**GRANTED IN PART** and **DENIED IN PART**.  It is granted with respect to the RLUIPA

claim against defendant McGrail and the section 1983 medical care claim against

defendant Lee.  It is denied in all other respects.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 16th day of May 2011.


 /s/ Janet C. Hall_____
Janet C. Hall
United States District Judge